**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAJOR LEAGUE BASEBALL PROPERTIES, INC.,

               PLAINTIFF,

     -against-

THE UPPER DECK COMPANY, LLC,

               DEFENDANT.

Case No.

ECF Case

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED DISCOVERY

Brendan J. O'Rourke (BO-2351)
Adam D. Siegartel (AS-6947)
Alexander Kaplan (AK-4207)
Patrick J. Dempsey (PD-8372)
Of Counsel

February 1, 2010

PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
(212) 969-3000
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

                                                                    **Page(s)**

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ...................................................................................3

    MLBP, The MLB Marks, And MLBP's Extensive Licensing Program ...........................3

    The Baseball Trading Card Market ..........................................................................4

    Upper Deck And Its Contractual Relationship With MLBP ......................................5

    MLBP's Quality Control Rights Under The Upper Deck License ..............................8

    Upper Deck's New And Unlicensed Trading Card Sets Feature MLB
        Marks ......................................................................................................8

    Upper Deck's Licensed And Unlicensed Trading Cards Look The Same ..................10

    MLBP/Upper Deck Correspondence Regarding Upper Deck's
        Unauthorized Cards .................................................................................13

ARGUMENT ....................................................................................................13

I.   MLBP IS ENTITLED TO A TEMPORARY RESTRAINING ORDER ....................13

    A.   The Standard For A Temporary Restraining Order ...........................................13

    B.   MLBP Is Likely To Succeed On The Merits .................................................. 14

        1.   Upper Deck Has Breached Its Surviving Obligations Under
            The Upper Deck License .................................................................14

        2.   Upper Deck Infringes The MLB Marks And MLB Uniform
            Trade Dress .................................................................................20

            a.   The MLB Marks And MLB Uniform Trade Dress Are
                Valid And Distinctive .........................................................20

            b.   There Is A Likelihood Of Confusion ...........................................21

                i.     Strength Of The Mark ......................................... 21

                ii.    Similarity Of The Marks ....................................... 22

                iii.   Proximity Of The Goods ....................................... 23

                iv.   Bridging The Gap .............................................. 23

                v.     Actual Confusion .............................................. 23

                vi.   Defendant's Intent ............................................ 24

                vii.   Quality Of Defendant's Product ............................ 25

                viii.  Sophistication Of The Consumers .......................... 26

                ix.   Balance Of All Factors ........................................ 26

            c.   Upper Deck's Disclaimer Does Not Alleviate the
                Likelihood Of Confusion ......................................27

             d.   The Nominative Use Defense Does Not Apply ..................................28

        3.   Upper Deck Has Diluted The MLB Marks .........................................30

    C.   MLBP Is Likely To Suffer Irreparable Harm ................................................ 31

    D.   MLBP Also Satisfies The Alternate Standard For A TRO ...............................34

II.  MLBP IS ENTITLED TO EXPEDITED DISCOVERY .........................................34

CONCLUSION ................................................................................................35

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Ambrit, Inc. v. Kraft Inc.*,
    812 F.2d 1531 (11th Cir. 1986) .................................................................................24

*Audi AG v. Shokan Coachworks, Inc.*,
    2008 U.S. Dist. LEXIS 92021 (N.D.N.Y. Nov. 13, 2008) .............................28, 30

*Ayyash v. Bank Al-Madina*,
    233 F.R.D. 325 (S.D.N.Y. 2005) ..........................................................................35

*Beer Nuts, Inc. v. King Nut Co.*,
    477 F.2d 326 (6th Cir. 1973) .................................................................................16

*Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg. Inc.*,
    510 F.2d 1004 (5th Cir. 1975) ...............................................................................27

*CAE, Inc. v. Clean Air Eng'g, Inc.*,
    267 F.3d 660 (7th Cir. 2001) .................................................................................26

*Centaur Commc'n, Ltd. v. A/S/M Commc'n, Inc.*,
    830 F.2d 1217 (2d Cir. 1987)..........................................................................23, 26

*Chrysler Corp. v. Newfield Publ'ns, Inc.*,
    880 F. Supp. 504 (E.D. Mich. 1995)..........................................................21, 22, 27

*Clorox Co. v. Sterling Winthrop, Inc.*,
    117 F.3d 50 (2d Cir. 1997).....................................................................................16

*Credit Counseling Ctrs. of Am., Inc. v. Budget & Credit Counseling Servs., Inc.*,
    1997 WL 115645 (S.D.N.Y. Mar. 13, 1997) .........................................................21

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979).................................................................................20

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    1989 U.S. Dist. LEXIS 7950 (E.D. Cal. June 19, 1989), *aff'd as modified*, 955 F.2d
    1327 (9th Cir. 1992), *amended*, 967 F. 2d 1280 (9th Cir. 1992) ...........................27

*E. Gluck Corp. v. Rothenhaus*,
    585 F. Supp. 2d 505 (S.D.N.Y. 2008).....................................................................31

*Educ. Testing Serv. v. Touchstone Applied Sci. Assoc.*,
    739 F. Supp. 847 (S.D.N.Y. 1990) .........................................................................31

*Eli Lilly & Co. v. Natural Answers, Inc.*,
    233 F.3d 456 (7th Cir. 2000) ...................................................................................15

*Feathercombs, Inc. v. Solo Products Corp.*,
    306 F.2d 251 (2d Cir. 1962)....................................................................................24

*Global Telesystems, Inc. v. KPNQwest, N.V.*,
    151 F. Supp. 2d 478 (S.D.N.Y. 2001)......................................................................14

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    2006 U.S. Dist. LEXIS 44792 (S.D.N.Y. June 29, 2006)..........................................19

*Gund, Inc. v. SKM Enters.*,
    No. 01 Civ. 0882 (CSH), 2001 U.S. Dist. LEXIS 1324 (S.D.N.Y. Feb. 14, 2001)................14

*Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*,
    281 F.2d 755 (2d Cir. 1960).....................................................................................24

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
    858 F.2d 70 (2d Cir. 1988).......................................................................................23

*Hillerich & Bradsby Co. v. Christian Bros., Inc.*,
    943 F. Supp. 1136 (D. Minn. 1996).........................................................................29

*Home Box Office, Inc. v. Showtime/The Movie Channel*,
    832 F.2d 1311 (2d Cir. 1987)...................................................................................28

*Horphag Research Ltd. v. Pellegrini*,
    337 F.3d 1036 (9th Cir. 2003) .................................................................................28

*Int'l Kennel Club v. Might Star, Inc.*,
    846 F.2d 1079 (7th Cir. 1988) .................................................................................28

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
    387 F.3d 163 (2d Cir. 2004).....................................................................................15

*Jordache Enter., Inc. v. Levi Strauss & Co.*,
    841 F. Supp. 506 (S.D.N.Y. 1993) ..........................................................................24

*Klos v. Polskie Linie Lotnicze*,
    133 F.3d 164 (2d Cir. 1997).................................................................................15, 16

*Lakedreams v. Taylor*,
    932 F.2d 1103 (5th Cir. 1991) .................................................................................15

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
    799 F.2d 867 (2d Cir. 1986).....................................................................................26

*Major League Baseball Prop., Inc. v. Pac. Trading Cards, Inc.,*
150 F.3d 149 (2d Cir. 1998).............................................................................18, 19

*Major League Baseball Prop., Inc. v. Pac. Trading Cards, Inc.,*
1998 WL 241904 (S.D.N.Y. May 14, 1998) ...........................................................18

*Major League Baseball Prop., Inc. v. Salvino, Inc.,*
420 F. Supp. 2d 212 (S.D.N.Y. 2005) *aff'd*, 542 F.3d 290 (2d Cir. 2008) .............22

*Marquis Who's Who, Inc. v. North American Advertising Associates Inc.,*
426 F. Supp. 139 (D.D.C. 1976), *aff'd without op.*, 574 F.2d 637 (D.C. Cir. 1978)..............27

*Marshak v. Thomas,*
1998 WL 476192 (E.D.N.Y. June 11, 1998) ...........................................................34

*McGraw-Hill Cos. v. Ingenium Techs. Corp.,*
364 F. Supp. 2d 352 (S.D.N.Y. 2005)....................................................................13

*Medinol Ltd. v. Boston Scientific Corp.,*
346 F. Supp. 2d 575 (S.D.N.Y. 2004)....................................................................15

*Merck & Co. v. Mediplan Health Consulting,*
425 F. Supp. 2d 402 (S.D.N.Y. 2006)....................................................................27

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
818 F.2d 254 (2d Cir. 1987)...................................................................................25

*MWS Wire Indus., Inc. v. Cal. Fine Wire Co., Inc.,*
797 F.2d 799 (9th Cir. 1986) .................................................................................16

*My-T Fine Corp. v. Samuels,*
69 F.2d 76 (2d Cir. 1934).......................................................................................24

*Nat'l Football League Prop. v. Playoff Corp.,*
808 F. Supp. 1288 (N.D. Tex. 1992) ......................................................................22

*NBA Prop., Inc. v. Dahlonega Mint Inc.,*
No. 4:97-CV-0208-HLM .........................................................................................22

*Paddington Corp. v. Attiki Importers & Distrib. Inc.,*
996 F.2d 577 (2d Cir. 1993)........................................................................20, 21, 24

*Patsy's Italian Rest., Inc. v. Banas,*
575 F. Supp. 2d 427 (E.D.N.Y. 2008) ....................................................................15

*Perfect Fit Indus., Inc. v. Acme Quilting Co.,*
618 F.2d 950 (2d Cir. 1980)...................................................................................24

*Polaroid Corp. v. Polarad Electronics Corp.*,
    287 F.2d 492 (2d Cir. 1961)...................................................................................21

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*,
    314 F.3d 62 (2d Cir. 2002)....................................................................................27

*RJR Foods, Inc. v. White Rock Corp.*,
    603 F.2d 1058 (2d Cir. 1979)................................................................................26

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
    970 F. Supp. 279 (S.D.N.Y. 1997) .......................................................................27

*Standard Inv. Chartered, Inc. v. NASD, Inc.*,
    2007 U.S. Dist. LEXIS 27342 (S.D.N.Y. Apr. 11, 2007).....................................34

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004)..............................................................................13, 25

*T&T Mfg. Co. v. A. T. Cross Co.*,
    587 F.2d 533 (1st Cir. 1978).................................................................................17

*The New Kids on the Block v. News Am. Publ'g, Inc.*,
    971 F.2d 302 (9th Cir. 1992).................................................................................29

*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*,
    294 F.3d 383 (2d Cir. 2002)............................................................................16, 17

*Union Carbide Corp. v. Ever-Ready Inc.*,
    531 F.2d 366 (7th Cir. 1976) ................................................................................23

*United States Jaycees v. Philadelphia Jaycees*,
    639 F.2d 134 (3d Cir. 1981)..................................................................................27

*Virgin Enter. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003)..................................................................................20

*Volkswagenwerk Aktiengesellschaft v. Church*,
    411 F.2d 350 (9th Cir. 1969).................................................................................29

*W. E. Bassett Co. v. Revlon, Inc.*,
    435 F.2d 656 (2d Cir. 1970)..................................................................................23

*Warner-Lambert Co. v. Northside Dev. Corp.*,
    86 F.3d 3 (2d Cir. 1996)..................................................................................13, 34

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
    744 F. Supp. 1259 (S.D.N.Y. 1990).....................................................................28

*Weight Watchers Intern., Inc. v. Luigino's, Inc.,*
    423 F.3d 137 (2d Cir. 2005)................................................................28

*Yurman Studio, Inc. v. Castanada,*
    2008 U.S. Dist. LEXIS 63158 (S.D.N.Y. Aug. 19, 2008)........................30

*Zino Davidoff SA v. CVS Corp.,*
    571 F.3d 238 (2d Cir. 2009)................................................................31

**FEDERAL STATUTES**

15 U.S.C. § 1125(c)(1)....................................................................30

15 U.S.C. § 1125(c)(2)(B) ...............................................................30

15 U.S.C. § 1125(c)(2)(C) ...............................................................30

**STATE STATUTES**

§ 349 of N.Y. General Business Law ..................................................27

**RULES**

Fed. R. Civ. P. 65(a)(2)............................................................... passim

**OTHER AUTHORITIES**

J.T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:51, at
    23-161 (4th Ed. 1996)..................................................................27

Plaintiff Major League Baseball Properties, Inc. ("MLBP") respectfully submits this memorandum of law in support of its application for a temporary restraining order ("TRO") to prevent the irreparable and imminent harm that is being caused to MLBP by defendant The Upper Deck Company, LLC ("Upper Deck") by its marketing and selling at least three different unauthorized and infringing series of baseball trading cards, and any other similar trading card series Upper Deck may decide to distribute, bearing the famous and distinctive marks and trade dress of MLBP and the Major League Baseball clubs. In the past several days, two of these series of trading cards have just started to infiltrate the market by being delivered from distributors to retail accounts. Imminently, a third series is expected to be shipped from Upper Deck's distributors to retail accounts. MLBP seeks this TRO pending a preliminary injunction hearing or a combined preliminary injunction hearing and trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2).

## PRELIMINARY STATEMENT

For the past twenty years Upper Deck has enjoyed the benefits of being an MLBP-licensed baseball trading card company. During that entire time, Upper Deck had the contractual right to use the trademarks, trade dress, and logos associated with Major League Baseball and the individual Major League Baseball Clubs in connection with the sale of baseball trading cards, subject to MLBP's prior approval for quality control. Upper Deck benefited from and exploited those rights, which were exercised vigorously against any unlicensed third-parties. As part of the business relationship between MLBP and Upper Deck, MLBP always maintained the right and ability to carefully control the quality of Upper Deck's licensed trading cards. Indeed, U.S. trademark law obligated MLBP to do so. As part of their bargain, Upper Deck acknowledged the validity and great value of the rights that MLBP was licensing (in addition to the validity of the licensing agreement itself), and promised not to use any of the licensed intellectual property without MLBP's explicit written consent during the term of such license and thereafter.

The relationship between Upper Deck and MLBP has recently soured. Among other things, Upper Deck defaulted under its domestic trading card license agreement with MLBP and owes MLBP and other Major League Baseball entities millions of dollars. Upper Deck's rights under the domestic MLBP/Upper Deck trading card license expired on December 31, 2009, and Upper Deck is no longer licensed by MLBP to use the valuable intellectual property rights associated with Major League Baseball. For legitimate and lawful business reasons, MLBP has determined that the trading card business has been diluted with too many producers of MLBP-authorized trading cards and has agreed to grant The Topps Company, Inc. the exclusive rights to produce baseball trading cards making use of the trademarks, trade dress, and logos associated with Major League Baseball and the individual Major League Baseball Clubs.

Notwithstanding Upper Deck's lack of a current license from MLBP, and its explicit ongoing contractual obligations not to use the valuable intellectual property rights associated with Major League Baseball post-term, Upper Deck has undertaken to cheat MLBP and confuse, mislead, and defraud the public by creating sets of baseball trading cards that unlawfully use the famous and distinctive trademarks, trade dress, and logos long used and owned by, and widely associated with, MLBP and the Major League Baseball clubs. In fact, Upper Deck has just introduced three series of baseball trading cards in which every single player shown is wearing his authentic Major League Baseball club game uniform, which in most cases bear Major League Baseball logos prominently on their caps and/or helmets. This creates the overwhelming perception and, even more important, is likely to confuse consumers into believing, that Upper Deck is still an authentic manufacturer and seller licensed by MLBP, or that in some way Upper Deck's cards are affiliated with or endorsed by MLBP or the Major League Baseball clubs. This is in clear violation of established trademark and unfair competition law and in

blatant breach of the surviving terms of the MLBP/Upper Deck license agreement. A temporary restraining order is necessary to preserve the status quo; otherwise, MLBP is without a remedy for the irreparable harm it is suffering.

## STATEMENT OF FACTS

### MLBP, The MLB Marks, And MLBP's Extensive Licensing Program

MLBP is indirectly owned by the 30 Major League Baseball clubs (the "MLB Clubs") and is a licensee of and acts as licensing agent for each of the MLB Clubs, the Office of the Commissioner of Baseball, and their respective affiliated entities (collectively, the "MLB Entities"). *See* Declaration of Howard Smith (the "Smith Declaration"), ¶ 3. MLBP is responsible for, among other things, licensing the manufacture, production, distribution, offering for sale, sale, and promotion of goods and services bearing the intellectual property of the MLB Entities and for the protection of and enforcement of rights in such intellectual property. *Id.*

Each of the MLB Clubs owns and uses its MLB Marks, including without limitation, the trademark names under which it competes, along with a variety of other names, trademarks, service marks, logos, and designs, as well as its distinctive trade dress, including, without limitation, the unique and inherently distinctive color combinations, striping, and/or positioning of the Club names, logos and other elements (such as geographic designations) used on the MLB Clubs' uniforms (sometimes referred to herein separately as the "MLB Uniform Trade Dress"). *Id.*, ¶ 4. In the case of trading cards, these uniforms are depicted during a wide variety of settings, including during games, during practices, and in Spring Training. *Id.* All of the various names, trademarks, service marks, logos, designs and trade dress elements used by the MLB Clubs, including without limitation the MLB Uniform Trade Dress and individual MLB Club logos used among other things on baseball caps and helmets ("MLB Cap and Helmet Logos"), are referred to collectively herein as the "MLB Marks."

MLBP has licensed hundreds of entities the right to use the MLB Marks on or in connection with a wide variety of authorized goods and services. *Id.*, ¶ 5. As a result of MLBP's licensing efforts, the combined domestic wholesale sales of Major League Baseball merchandise bearing the MLB Marks over just the past ten years alone have exceeded $10 billion dollars. *Id.*

The MLB Marks have also been marketed and promoted extensively for many years on television, in major magazines and newspapers, on radio, and via the Internet, and have been the subject of extensive unsolicited media coverage across the United States and internationally. *Id.*, ¶ 6. In addition, the MLB Entities and MLBP spend millions of dollars annually in advertising and promoting goods and services identified by the MLB Marks, including the Major League Baseball games attended by millions of fans annually at ballparks throughout North America and enjoyed by millions more fans as a result of radio and television broadcasts, as well as transmissions of these games via the Internet or other interactive media. *Id.* As a result of the substantial use and promotion of the MLB Marks for many years in connection with baseball-related goods and services and as part of an extensive licensing program on a wide variety of goods and services relating to and promoting the MLB Clubs, the MLB Marks, including without limitation the MLB Uniform Trade Dress and MLB Cap and Helmet Logos, have become famous among the relevant consuming public and possess significant goodwill of great value to the MLB Entities. *Id.*, ¶ 7.

## The Baseball Trading Card Market

The trading card business is a highly visible one for MLBP and has been for decades. *Id.*, ¶ 8. Over the past decade, MLBP's revenues from baseball card licensing is well over $75 million. *Id.*

Notwithstanding the importance of the trading card market, the overall trading card business for the four major sports (baseball, football, basketball, and hockey) has been steadily declining for many years, falling from approximately $1 billion at its height to approximately $200 million at present. *Id.*, ¶ 9. In addition, the share within the trading card sector for Major League Baseball licensed cards has decreased over the years from approximately 75%-80% in the mid-1980's to roughly 15-20% of the total business (including non-sports trading cards) as of today. *Id.* As a result, in MLBP's reasoned judgment, having an excessive number of trading card licensees diminishes and dilutes the value of the trading card business for MLBP. MLBP has therefore made the strategic business decision to reduce the number of companies that are authorized and licensed to manufacture and sell complete sets of official MLBP trading cards. *Id.* Specifically, MLBP has decided that it is currently most beneficial to enter into an exclusive multi-year licensing deal with just one trading card manufacturer and distributor, namely, The Topps Company, Inc. ("Topps"). *Id.*, ¶ 11. Topps has become the "Official Baseball Card of Major League Baseball," and under this exclusive arrangement, Topps has the exclusive right to use the MLB Marks on trading cards for sale at retail as of January 1, 2010. *Id.*

**Upper Deck And Its Contractual Relationship With MLBP**

Upper Deck manufactures and distributes, among other things, sports trading cards throughout the United States. *Id.*, ¶ 12. Upper Deck began producing Major League Baseball trading cards approximately twenty years ago. *Id.* Upon information and belief, through the end of 2009, Upper Deck had never previously attempted to produce baseball trading cards without a license from MLBP, and such licenses always included, among other provisions, a specific surviving acknowledgment from Upper Deck regarding the proprietary nature of MLB Marks and an agreement not to use such MLB Marks without MLBP's consent. *Id.* Not only were such

provisions always included in the Upper Deck licenses, but upon information and belief Upper Deck never negotiated changes to these provisions, despite Upper Deck negotiating at least six or seven trading card licenses with MLBP during this approximate 20-year period. *Id.*

The most recent license agreement between MLBP and Upper Deck granting the right to produce and distribute trading cards in the United States became effective in 2006 and expired on October 31, 2009 (the "Upper Deck License" or "License"). *Id.*, ¶ 13; Ex. 1, ¶ 3 & Schedule G. The License had a two month sell-off period that concluded on December 31, 2009. *Id.*, ¶ 13; Ex. 1, ¶ 17 & Schedule H. In the License, MLBP granted Upper Deck the right to produce trading card sets bearing the MLB Marks on a free-standing basis, and as part of the MLB Uniform Trade Dress worn by Major League Baseball players in the images depicted therein (such players being featured under license from the Major League Baseball Players Association [the "Players Association"]). *Id.*, ¶ 13; Ex. 1, ¶ 1 & Schedule D.

In the Upper Deck License, Upper Deck expressly agreed that it would make no use of the MLB Marks (including, without limitation, the MLB Uniform Trade Dress) upon the expiration of the agreements without the prior written consent of MLBP. *Id.*, ¶ 14; Ex. 1, ¶ 15.A. Paragraph 15.A of the License provides as follows:

> Licensee represents that it has not made any unauthorized use of MLB Marks,[1] including, without limitation, those contained in Licensor's Official Style Guide, and acknowledges that a license from the MLB Entities and/or Licensor is required in order to use such MLB Marks or create derivatives thereof, and agrees that it will during or after the License Period make no use of any such MLB Marks, other than as

---

[1] The "MLB Marks" are defined under the Upper Deck License as encompassing a list of specifically defined "Licensed Properties" as well as "any other names, trademarks, service marks, trade dress and copyrights, including word marks, logos, uniform designs, mascots, images, colors and color combinations, characters, symbols, designs, likenesses and visual representations owned, controlled or cleared for use by or on behalf of and/or applied for in or registered with the U.S. Patent and Trademark Office . . . or any combination or derivative of same, by Licensor or any of the MLB Entities." Smith Decl., Ex. 1, ¶ 7.C.i.c.

> provided in this Agreement, without the prior written consent of
> Licensor or the appropriate individual MLB Entity. ... Licensee further
> acknowledges that for purposes of this Paragraph 15, "use" includes, but
> is not limited to, trademark, fair, incidental, descriptive or functional
> uses.

Smith Decl., Ex. 1, ¶ 15.A (footnote added). The Upper Deck License also provided in ¶ 15.A

that (a) Upper Deck specifically acknowledges the proprietary nature of the MLBP Marks, (b)

the prohibition on use of the MLB Marks extended to "trademark, fair, incidental, descriptive or

functional uses," and (c) "Derivative Works" created by arranging, modifying, or altering the

MLB Marks are owned by MLBP or its licensors and require a license for their use. *Id.* The

License provided in § 15.B that Upper Deck will not use the primary colors of the MLB Clubs in

combination with baseball indicia or the MLB Clubs' geographic designation. *Id.*, ¶ 15.B.

In Paragraph 12 of the License, Upper Deck explicitly represented that it "recognizes the

great value of the publicity and goodwill associated with the MLB Marks and, in such

connection, acknowledges that such goodwill belongs exclusively to Licensor . . . and that the

MLB Marks have acquired a secondary meaning in the minds of the purchasing public." *Id.*, ¶

12. Upper Deck also specifically agreed that "[i]t will not acquire any rights in the Licensed

Properties as a result of its use" under the license, and that "all uses of the Licensed Properties or

MLB Marks shall inure to Licensor's benefit." *Id.*, ¶ 13.A.

Under the License, Upper Deck also agreed that a breach of any of these provisions (or

any other provision in the License), "or its failure upon the expiration or termination of this

Agreement to cease the manufacture of the Licensed Products and limit their distribution and

sale" would result in "immediate and irreparable damage" to MLBP, entitling MLBP to

injunctive relief in the event that there is no adequate remedy at law. *Id.*, ¶ 18. Further, the

Upper Deck License expressly instructs that each of these provisions survive expiration of the

License. *Id.*, ¶ 31 ("Paragraphs . . . 12, 13(A), . . . 15, . . . 18 . . . shall survive any termination or

expiration of this Agreement."); *see also* ¶ 13.A ("During the License Period, each additional License Period, if any, and thereafter in perpetuity . . . .").

## MLBP's Quality Control Rights Under The Upper Deck License

The Upper Deck License explicitly provides that MLBP has "absolute approval . . . of the Licensed Products and all packaging at all stages of the development thereof." Smith Decl., Ex. 1, ¶ 10.A. Under the License, Upper Deck was obligated to furnish to MLBP for written approval "designs of each Licensed Product and samples of each Licensed Product before its manufacture, sale, promotion, advertisement, or distribution, whichever first occurs . . . ." *Id.* This is a critically important right and one that MLBP has rigorously exercised during the term of the Upper Deck License. Smith Decl., ¶ 19. Indeed, before merchandise licensed under the Upper Deck License has been released to the marketplace, MLBP has carefully reviewed that merchandise in order to ensure that Upper Deck's trading cards and use of the MLB Marks, including the MLB Uniform Trade Dress and MLB Cap and Helmet Logos, were in compliance with the terms of the Upper Deck License and MLBP's branding guidelines. *Id.*

## Upper Deck's New And Unlicensed Trading Card Sets Feature MLB Marks

Although the Upper Deck License has expired, and despite the unequivocal License provisions just discussed, Upper Deck is prominently using without MLBP's authorization the MLB Marks, including without limitation the MLB Uniform Trade Dress and MLB Cap and Helmet Logos, in connection with at least three different brand-new trading card sets of which MLBP is currently aware. *Id.*, ¶ 20. Upper Deck's unauthorized trading cards are distributed by the same distributors as MLBP's licensed trading cards, and sold and marketed in the same retail and trade channels to the same consumers. *Id.*, ¶ 36.

MLBP has reason to believe that the first two sets, Signature Stars 2009 (the "2009 Signature Stars Series") and Ultimate Collection 2009 (the "2009 Ultimate Collection Series") were shipped to Upper Deck's distributors during this past week of January 25, 2010. *Id.*, ¶ 20. Further, these distributors have in the past couple of days started delivering the sets to their retail store accounts. *Id.* MLBP also has reason to believe that the third unauthorized Upper Deck set, Series 1 2010 (the "2010 Unauthorized Series 1"), is now in the possession of Upper Deck's distributors, and may be shipped imminently to retail store accounts. *Id.*

MLBP just saw these unauthorized products for the first time, and even as of the present time, MLBP has only seen small amounts of each of the three sets. *Id.*, ¶ 21. On January 27 MLBP first saw the 2009 Signature Stars Series and 2009 Ultimate Collection Series, and on January 29 MLBP first saw the 2010 Unauthorized Series 1 cards. *Id.* Unfortunately, in the case of the 2009 Signature Stars Series and 2009 Ultimate Collection Series cards, MLBP had no opportunity to review what these cards would look like before their distribution to distributors and retail store accounts because Upper Deck is no longer a licensee of MLBP and MLBP did not have the benefit of exercising quality control over Upper Decks products. *Id.* For the same reason, MLBP had no opportunity to review the 2010 Unauthorized Series 1 cards before distribution to distributors. *Id.*

Although MLBP knew that Upper Deck had a license from the Players Association to use the Major League Baseball players' images, MLBP did not know until Upper Deck released the 2009 Unauthorized Series and 2010 Unauthorized Series 1 cards for distribution that Upper Deck would depict the players with the use of the MLB Marks and thus blatantly infringe the intellectual property rights of MLBP and the MLB Clubs. Nor did MLBP know that Upper Deck would violate its surviving obligations under its prior License Agreements by displaying the

MLB Marks , including the MLB Uniform Trade Dress and MLB Cap and Helmet Logos, without MLBP's express consent. *Id.* at ¶ 22. When Upper Deck was an MLBP licensee, the license from the Players Association to Upper Deck did not authorize Upper Deck to display any of the MLB Marks, and the current Players Association license to Upper Deck would also not so authorize such use of the MLB Marks. *Id.* Nor could it, as the MLB Marks, including the MLB Uniform Trade Dress and MLB Cap and Helmet Logos, are owned by and exclusively proprietary to the respective MLB Entities. *Id.*

## Upper Deck's Licensed And Unlicensed Trading Cards Look The Same

Last year, when it was licensed by MLBP, Upper Deck released a set of genuine and authorized trading cards also called Series 1 (the "2009 Authorized Series 1"). A side-by-side comparison of Upper Deck's final set of licensed 2009 Authorized Series 1 trading cards and Upper Deck's new 2010 Unauthorized Series 1 trading cards reveals no sufficiently meaningful changes that would lead a consumer to realize that Upper Deck's new trading cards are no longer licensed by MLBP. Smith Decl., ¶ 23 & Ex. 2.

For example, the 2009 Authorized Series 1 trading cards in Exhibit 3 all feature Major League Baseball players in their respective Club uniforms bearing the distinctive MLB Uniform Trade Dress. The same holds true for Upper Deck's new 2010 Unauthorized Series 1 trading cards. Smith Decl., ¶ 24 & Ex. 2. Moreover, both the licensed 2009 Authorized Series 1 and unlicensed 2010 Unauthorized Series 1 sets of Upper Deck cards prominently display MLB Cap and Helmet Logos fully visible on the players' headwear, other MLB Marks on the jersey fronts and backs and sleeves, as well as the MLB Uniform Trade Dress as a whole. *Id.*, ¶ 25.

Although Upper Deck may have attempted to minimally obscure the MLB Marks on certain of its unauthorized cards through its selection of particular types of action photos, the

MLB Marks are still clearly visible and readily identifiable, including the MLB Uniform Trade Dress, in these cards (as well as on the boxes for the sets and the wrappers for the card packs). *See id.*, ¶ 26. Moreover, to the extent that trademarks are obscured, that does not in any way serve to distinguish the licensed and unlicensed cards, because Upper Deck's previously-licensed cards included obscured trademarks in the exact same way, namely, through the use of action shots that partially obscure the MLB Marks featured on the players' uniforms (*e.g.*, swinging a bat; pitching a baseball; etc.). *Id.*

Furthermore, the wrappers for the individual card packs and the cover for the trading card box for the 2010 Unauthorized Series 1 cards bear a striking resemblance to, and in some respects are virtually identical to, the overall commercial impression of the previously licensed 2009 Authorized Series 1 cards, in that they feature the same player in the same Major League Baseball uniform – namely Derek Jeter in the iconic New York Yankees home pinstripe uniform – against a virtually similar radiating design. *Id.*, ¶ 27 & Ex. 2.

For all of these and other reasons, the overall impression of the 2010 Unauthorized Series 1 cards is virtually indistinguishable from the previously-licensed 2009 Authorized Series 1 cards, and the changes between Upper Deck's licensed and unlicensed trading cards are not sufficiently meaningful to allow a consumer to discern that Upper Deck's trading cards are no longer authorized by MLBP. *Id.*, ¶¶ 28-29. As such, consumers who purchase and collect baseball cards are likely to mistakenly believe that the unlicensed 2010 Unauthorized Series 1 set is a continuation of the previously-licensed 2009 Authorized Series 1 set. *Id.*

This is not changed by Upper Deck's new disclaimer ("NOT authorized by Major League Baseball or its Member Teams"). Smith Decl., ¶ 30. These disclaimers on the boxes that display the individual card packs and on the card packs themselves are too small to meaningfully affect

consumer perception – they will most likely be ignored completely due to their small size, and to

the extent they are even noticed, will quite possibly be misunderstood by bringing attention to

the authorization by Major League Baseball and its Member Teams. *Id.* The likelihood of the

disclaimers being ignored is also increased by the fact that because the unauthorized Upper Deck

trading card boxes and packs prominently display what the consumer truly values, namely, the

MLB Marks – a fact that will be apparent when the consumer is still at least several feet away

from the boxes and packages – a consumer is much less likely to be "on the lookout" for, and

much more likely to ignore, a disclaimer by the time they are within arms-length of the boxes

and packaging. *Id.* As for the even smaller disclaimers that are included on the backs of the

cards themselves, it is again unreasonable to believe that such a disclaimer will be noticed or

properly appreciated by trading card purchasers. *Id.* In any event, consumers will not even have

the opportunity to see the tiny disclaimers on the cards themselves until after the cards are

purchased. *Id.*

The bottom line is that for 20 years until December 31 2009, Upper Deck enjoyed the

right under license from MLBP to sell baseball trading cards that prominently used and displayed

the MLB Marks. *Id.*, ¶ 31. During that time, as a direct result of its business relationship with

MLBP, Upper Deck benefited from MLBP's enforcement of its rights such that only licensed

companies enjoyed the right to use the MLB Marks in connection with baseball trading cards

with quality controlled by MLBP. *Id.* For legitimate business reasons, MLBP decided not to

grant a new license to Upper Deck. *Id.* Notwithstanding, and in clear violation of its ongoing

obligations under the License not to use MLB Marks, Upper Deck has introduced new lines of

baseball trading cards that plainly and prominently display the MLB Marks in a way that will

lead consumers to believe Upper Deck remains an authorized licensee when it is not. *Id.*

**<u>MLBP/Upper Deck Correspondence Regarding Upper Deck's Unauthorized Cards</u>**

On January 28, 2010, the day after first seeing the Signature Series and Ultimate Collection

cards, MLBP sent a cease-and-desist letter to Upper Deck. *Id.*, ¶ 32 and Ex. 3. In this letter,

MLBP explained that these unauthorized trading card sets featuring and prominently incorporating

the MLB Marks breach the Upper Deck License and constitute trademark infringement and other

violations in contravention of federal, state, and other laws. *Id.*. The letter further demanded that

Upper Deck cease and desist from exploitation of the unauthorized trading cards and any further

use of the MLB Marks. *Id.* Upper Deck responded to this January 28 letter on January 29. Smith

Decl., ¶ 33. In its letter, Upper Deck denied MLBP's allegations and refused to cease selling its

unauthorized trading card sets. *Id.* Indeed, there may be additional unauthorized Upper Deck

trading card sets that are already released or about to be released, and that would be at least as

objectionable as the three sets of which MLBP is already aware.

**ARGUMENT**

**I.      <u>MLBP IS ENTITLED TO A TEMPORARY RESTRAINING ORDER</u>**

     **A.      <u>The Standard For A Temporary Restraining Order</u>**

Injunctive relief barring Upper Deck from marketing and selling its unauthorized trading

cards is necessary and appropriate to protect MLBP from irreparable harm. In the Second

Circuit, a plaintiff is entitled to a TRO upon a showing of: (1) irreparable harm, and (2) <u>either</u> (a)

a likelihood of success on the merits, <u>or</u> (b) the existence of serious questions going to the merits

of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly

in the plaintiff's favor. *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004);

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996); *McGraw-Hill Cos. v.*

*Ingenium Techs. Corp.*, 364 F. Supp. 2d 352, 355 (S.D.N.Y. 2005) (applying preliminary

injunction standard in granting temporary restraining order). When this test is satisfied, courts

13

will not hesitate to grant TROs that enforce contractual rights and award specific performance. *See, e.g., Global Telesystems, Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d 478, 481 (S.D.N.Y. 2001); *Gund, Inc. v. SKM Enters.*, No. 01 Civ. 0882 (CSH), 2001 U.S. Dist. LEXIS 1324, at *3, 16 (S.D.N.Y. Feb. 14, 2001).

## B.  <u>MLBP Is Likely To Succeed On The Merits</u>

### 1. **Upper Deck Has Breached Its Surviving Obligations Under The Upper Deck License**

Upper Deck explicitly agreed in the Upper Deck License that it will not use the MLB Marks (or any derivations thereof) in any capacity without the prior written consent of MLBP, and that "it will during or after the License Period make no use of any such MLB Marks, other than as provided in this Agreement, without the prior written consent of Licensor or the appropriate individual MLB Entity." *See* Smith Decl., Ex. 1, ¶ 15.A. Upper Deck further agreed that "for purposes of this Paragraph 15, 'use' includes, but is not limited to, trademark, fair, incidental, descriptive or functional uses." There is no question that these provisions, which explicitly survive expiration (*id.*, ¶31), are squarely violated by Upper Deck's prominent use of the MLB Marks on or in connection with its unlicensed 2009 Unauthorized Series and 2010 Unauthorized Series 1 cards and any other similar unauthorized goods bearing the MLB Marks.

The Upper Deck License also provided that "Derivative Works" created by arranging, modifying or altering the MLB Marks are owned by MLBP and require a license for their use. *See id.*, ¶ 15.A. Accordingly, the fact that Upper Deck has used slightly revised or obscured versions of some of the MLB Marks (which nevertheless remain visible and recognizable) does not change the contractual requirement to obtain MLBP's permission for their use.

Upper Deck has no justification for willfully violating these surviving provisions of the Upper Deck License. Indeed, Upper Deck specifically agreed that it would not attack the

validity of the License. *See id.*, ¶¶13.B, 13.Y. Furthermore these provisions that Upper Deck voluntarily agreed to are plainly enforceable as a matter of established contract law. The law makes clear that negotiated commercial arrangements between sophisticated business entities may not be callously cast aside once one of the parties simply no longer wishes to comply. As a "large and sophisticated commercial enterprise that was familiar with and well understood" the terms of the Upper Deck License, Upper Deck is not in a position to avoid the clear legal effect of the contracts it knowingly made. *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004).[2]

Furthermore, the Upper Deck License should be enforced as a matter of public policy, to eliminate the likelihood of confusion that will be created by Upper Deck's infringing trading cards. *See, e.g., Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) (public interest is served by enforcement of trademark laws to prevent consumer confusion); *Lakedreams v. Taylor*, 932 F.2d 1103, 1110 (5th Cir. 1991) (the public has an interest in preventing confusion about the products it buys); *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 460 (E.D.N.Y. 2008) (public interest dictates that Court enter injunctive relief to prevent consumer confusion).

---

[2] Were Upper Deck to argue that the Upper Deck License is not enforceable as an "adhesion contract," this argument would be insupportable in light of the fact that the Upper Deck License was heavily negotiated by two sophisticated entities before it was executed. It is a black letter principle that courts will not find such heavily-negotiated instruments to be adhesion contracts. *See Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) ("[t]ypical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms"). Further, the concept of a contract of adhesion "may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability." *Id.* at 169; *see also Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 623 (S.D.N.Y. 2004) (rejecting contract of adhesion defense where none of the "telltale elements" were present, such as use of fraud or deception, absence of notice of the relevant provision or gross inequality of bargaining power).

Even putting the likelihood of consumer confusion to the side, public policy still supports holding Upper Deck to their word as expressed in the Upper Deck License and enforcing agreements restricting trademark use. Absent significant threat to the public, the courts are inclined to enforce licensing agreements which derive from the arms-length negotiation of experienced, sophisticated parties. *See, e.g., Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 60 (2d Cir. 1997) ("As we stated previously, trademark agreements are favored in the law as a means by which parties agree to market products in a way that reduces the likelihood of consumer confusion and avoids time-consuming litigation. Parties such as [the litigants] are in a position to structure such agreements in the way that the parties believe best accommodates their interests in light of trademark law"); *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 396 (2d Cir. 2002) (observing the "greater deference" afforded negotiated agreements concerning trademark usage, and explaining that "[s]imple fairness requires holding a party to its contract unless adhering to the contract will damage the public and not just a contracting party"); *see also MWS Wire Indus., Inc. v. Cal. Fine Wire Co., Inc.*, 797 F.2d 799, 803 (9th Cir. 1986) (enforcing contractual promise not to use plaintiff's trademark; "the public interest in guarding against the depletion of the general vocabulary available for the description of articles in commerce is not so great that it should take precedence over the rule of the law of contracts that a person should be held to his undertakings"); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328 (6th Cir. 1973) (upholding contractual provision barring use of mark that had arguably become descriptive and thus unprotectible by time of litigation; "[g]enerally, courts uphold the contract principle that a contracting party may not repudiate his promises solely because he later becomes dissatisfied with his bargain").

Ultimately, agreements regulating the use of trademarks will not be invalidated on public policy grounds absent some significant threat of harm to the public health, safety or welfare. Plainly, no such threat would be imposed here by requiring Upper Deck to live up to the terms of its contract with MLBP. *See, e.g.*, *Times Mirror Magazines, Inc.*, 294 F.3d at 396 (court "declined to don the mantle of public interest to save plaintiff from a harm that is permitted by the contract"); *T&T Mfg. Co. v. A. T. Cross Co.*, 587 F.2d 533, 538 (1st Cir. 1978) (enforcing agreement on use of trademarks where no showing of "significant harm to the public" resulting from such agreement).

### MLBP's 2009 Litigation Against Donruss Is Instructive

To the extent MLBP's prior trading card litigations are relevant, MLBP's 2009 litigation against Donruss Playoff, L.P. and its general partner Donruss LLC (collectively, "Donruss") merits attention. Donruss was a former MLBP trading card licensee that, just like Upper Deck, produced and distributed unauthorized trading card sets containing images of Major League Baseball players in Major League Baseball uniforms bearing MLB Marks in similar action poses, *after* the expiration of its license. *See* Declaration of Brendan J. O'Rourke (the "O'Rourke Declaration"), Exh. C, at 3. In provisions that survived expiration of Donruss' license, Donruss acknowledged the proprietary nature of the MLB Marks and agreed not to make any use of the MLB Marks or derivatives thereof without the prior written consent of MLBP. After Donruss did so, MLBP sued for breach of contract, trademark infringement, and related violations. The Southern District of New York entered a consent injunction in which Donruss was

> permanently enjoined from manufacturing, selling, distributing, advertising or promoting any items depicting Major League Baseball players . . . in uniform, or with MLB Marks, MLB Uniform Trade Dress . . . or any component of any of them, including, but not limited to, caps, helmets, jerseys, pants, jackets and catchers' equipment. For the avoidance of doubt, the foregoing shall preclude [Donruss] from, among other things, using any images, pictures,

posters, photographs, caricatures, depictions or likenesses that feature a component of a Major League Baseball . . . uniform that is airbrushed, intentionally blocks or covers, or otherwise alters, any of the MLB Marks, MLB Uniform Trade Dress and Minor League Baseball Marks.

*See id.* at 4. The consent injunction also instructed that "[a]ny breach by Donruss of the terms of this Final Judgment on Consent shall be deemed to constitute immediate and irreparable injury to MLBP and the respective MLB Entities . . . ." *See id.* at 5.

The same result is warranted here. If Upper Deck will not agree to an injunction against its unauthorized and infringing use of the MLB marks, this Court should order it enjoined, starting with granting this application for a TRO.

### The Second Circuit's Prior *Pacific Trading Cards* Litigation Is Also Persuasive Here

*Major League Baseball Properties, Inc. v. Pacific Trading Cards. Inc.*, 150 F.3d 149 (2d Cir. 1998), also weighs heavily in MLBP's favor, although Upper Deck may attempt to defend its breach by relying on the vacated district court opinion. There, the district court denied MLBP's motion to preliminarily enjoin defendant's unlicensed baseball cards that depicted players in Major League Baseball uniforms under trademark and breach of contract theories. *See* 1998 WL 241904 (S.D.N.Y. May 14, 1998). Reliance on the district court's vacated opinion would not only be inherently contradictory to principles of vacatur generally (i.e., a judicial declaration that a particular decision is entitled to no weight), but also to the facts of *Pacific* specifically.

In *Pacific*, the parties ultimately settled and the Second Circuit vacated the lower court decision, but only *after* the Second Circuit strongly indicated that it intended to grant MLBP's motion for an injunction pending appeal unless Pacific posted a bond sufficient to secure MLBP's claims. *Major League Baseball Prop., Inc. v. Pac. Trading Cards, Inc.*, 150 F.3d at 150-51. The Second Circuit's determination that it had intended to grant MLBP's motion

18

indicates that the Second Circuit had rejected the district court's reasoning and had concluded

that MLBP had made a strong showing of likely success on the merits in support of its injunction

motion. *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 2006 U.S. Dist. LEXIS 44792, at *4

(S.D.N.Y. June 29, 2006) (court must consider likelihood of success on the merits in deciding

whether to issue an injunction pending appeal) (citing *Mohammed v. Reno*, 309 F.3d 95, 100

(2d Cir. 2002)).

In order to avoid posting a bond, Pacific settled with MLBP on the condition that the

lower court's opinion be vacated, and indeed, the Second Circuit held that Pacific Trading Cards

"wanted a settlement as much as, or more than," MLBP. *See Pacific*, 150 F.3d at 152. The

Second Circuit also held that it granted vacatur not only because "Pacific could not test the

merits of the favorable lower-court opinion without risking the severe financial consequences of

[the Second Circuit's] intended ruling" for an injunction pending appeal, *but also* because MLBP

needed the vacatur in order to avoid "the effect of the district court's decision in future litigation

with alleged infringers." *Id.* Thus, any reliance on the lower court *Pacific* decision would

contradict the Second Circuit's instruction that MLBP not be prejudiced in circumstances just

like these.

The district court's vacated decision is equally inapplicable to MLBP's breach claim

against Upper Deck. The court concluded that there was fair ground for litigation as to whether

language in MLBP's agreement with Pacific restricting use of MLB's logos was meant to

preclude what the district court considered to be "incidental use" of the logos. 1998 WL 241904

at *4. First, respectfully, the district court was mistaken, as MLBP's contractual rights (and

trademark rights as well) warranted granting MLBP's motion. Second, unlike in *Pacific*, the

language in the Upper Deck License explicitly indicates that it applies to all uses, including

so-called "incidental" uses. Smith Decl., Ex. 1, ¶15.A. Accordingly, the express and legally binding language of the Upper Deck License makes plain that such incidental uses are not permitted. Indeed, Upper Deck has made more than "incidental" use here.

> **2.  Upper Deck Infringes The MLB Marks And MLB Uniform Trade Dress**

To succeed on a claim for trademark or trade dress infringement, a plaintiff must demonstrate (i) the existence of a valid mark or distinctive trademark or trade dress (as applicable), and (ii) a likelihood of confusion. *See, e.g., Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Paddington Corp. v. Attiki Importers & Distrib. Inc.*, 996 F.2d 577, 582 (2d Cir. 1993). Here, these elements are clearly met, and Upper Deck has clearly infringed MLB's trademark and trade dress rights in the MLB Marks, including the MLB Uniform Trade Dress.

> **a.  The MLB Marks And MLB Uniform Trade Dress Are Valid And Distinctive**

The MLB Marks are indisputably valid and are covered by a wealth of active federal trademark registrations. *See* Complaint, ¶ 14. Indeed Upper Deck expressly acknowledged the proprietary nature of the MLB Marks and the MLB Entities' ownership of all rights, title and interest to the MLB Marks in the Upper Deck Licenses. *See* License, ¶ 15.A. These marks, including the combination of colors and arbitrary designs comprising the MLB Uniform Trade Dress, and the unique MLB Club logos used on caps and helmets, are inherently distinctive and source identifying. *See, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir. 1979) (holding cheerleader uniforms to be protectable). Moreover, the MLB Clubs have established broad rights in the MLB Marks as a result of the longstanding and widespread use of such marks in connection with a broad range of goods and services. *See* Smith Decl., ¶¶ 3-7. From the sampling of Upper Deck's infringing trading cards that MLBP has been able to review thus far, it appears that a large number of MLB Marks are depicted on

the cards and MLBP, which marks are the subject of federal registrations. *See* Complaint ¶ 14 (listing registration numbers).

### b. There Is A Likelihood Of Confusion

Likelihood of confusion is assessed in this Circuit according to the eight factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), including (i) the strength of plaintiff's mark; (ii) the similarity of plaintiff's and defendant's mark; (iii) the competitive proximity of the products; (iv) the likelihood that plaintiff will "bridge the gap"; (v) any actual confusion; (vi) defendant's good faith; (vii) the quality of defendant's product; and (viii) the sophistication of the buyers. The eight *Polaroid* factors are non-exclusive. *Credit Counseling Ctrs. of Am., Inc. v. Budget & Credit Counseling Servs., Inc.*, 1997 WL 115645, at *4 (S.D.N.Y. Mar. 13, 1997). Application of these factors here leads to the inescapable conclusion that Upper Deck's baseball cards will create a likelihood of confusion. *See, e.g.*, *Chrysler Corp. v. Newfield Publ'ns, Inc.*, 880 F. Supp. 504, 511 (E.D. Mich. 1995) (finding likelihood of confusion, even in absence of evidence of actual confusion, from defendant's unauthorized use of automobile manufacturers' trademarks and trade dress on defendant's collectible cards).

### i. Strength Of The Mark

The strength of a mark or dress depends on its "distinctiveness . . ., or more precisely, its tendency to identify the goods sold . . . as emanating from a particular, although possibly anonymous, source." *Paddington*, 966 F.2d at 585. The marks and trade dress at issue are plainly distinctive and inherently protectable. Moreover, by virtue of the long and extensive advertising, display, and use of the MLB Marks, including without limitation the MLB Uniform Trade Dress and MLB Cap and Helmet Logos, and the wide geographic distribution and substantial sales of authorized goods and services bearing such marks, the MLB Marks have

obtained wide renown and established substantial public recognition among members of the consuming public. *See, e.g., Major League Baseball Prop., Inc. v. Salvino, Inc.*, 420 F. Supp. 2d 212, 223 (S.D.N.Y. 2005) *aff'd*, 542 F.3d 290 (2d Cir. 2008) (specifically noting the long use and extensive promotion of the MLB Clubs' official colors to an accused infringer who intentionally imitated such colors). The MLB Marks are extremely strong and, therefore, this factor weighs heavily in favor of MLBP.

### ii.    Similarity Of The Marks

The degree of similarity factor also strongly favors MLBP because Upper Deck is, in fact, not using "similar" marks, but the *identical* MLB Marks. Upper Deck's cards reproduce the actual uniforms worn by Major League Baseball players bearing the identical MLB Marks including the distinctive MLB Uniform Trade Dress and MLB Cap and Helmet Logos as used on the club uniforms. *See, e.g., Nat'l Football League Prop. v. Playoff Corp.*, 808 F. Supp. 1288, 1292 (N.D. Tex. 1992) ("these are not uniforms similar to those that players wear during actual play; they are the actual uniforms. It must therefore be concluded that there is not merely similarity of design, there is sameness of design"); *Chrysler Corp.*, 880 F. Supp. at 510 (no dispute as to similarity of marks where defendant has used plaintiff's exact marks and display actual photographs of plaintiff's trade dress). Moreover, the efforts to obscure certain of the MLB Marks appearing on the cards or to make minor alterations to such marks are insufficient to avoid confusion because such marks remain clearly visible and readily identifiable to consumers. Indeed, at least one court has found trademark infringement based on the use of NBA and NFL players' uniforms on trading cards even where the logos were removed in their entirety. *See NBA Prop., Inc. v. Dahlonega Mint Inc.*, No. 4:97-CV-0208-HLM, at 84-85, at pp. 74-85 (N.D. Ga. April 2, 1999) (removal of team names, logos, and licensing entity's official licensing

insignia are not significant alterations of team marks encompassing uniforms and team colors) (opinion attached to O'Rourke Declaration, Exhibit A).

### iii. Proximity Of The Goods

The proximity of goods factor "addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988). In the case of closely related goods, less similarity is required to establish likelihood of confusion than with respect to unrelated goods. *See Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 382 (7th Cir. 1976) ("the more closely products are related, the more likely sources may be confused"). Here, Upper Deck's cards will compete directly with, and are identical to, authorized trading cards produced under license from MLBP. Furthermore, MLBP's and Upper Deck's products are distributed by the same distributors as MLBP's licensed trading cards, and sold and marketed in the same retail and trade channels. Accordingly, the proximity of goods factor clearly militates in favor of a likelihood of confusion.

### iv. Bridging The Gap

Because the parties are already in the identical field, there is no gap to be bridged and thus no need to consider the fourth *Polaroid* factor addressing the likelihood that the plaintiff will enter the same field as defendant. Because there is no gap, this factor favors MLBP.

### v. Actual Confusion

Evidence of actual confusion is not a prerequisite for recovery under the Lanham Act. *Centaur Commc'n., Ltd. v. A/S/M Commc'n., Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987) (evidence of actual confusion not required to prove likelihood of confusion); *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970) (same). Because Upper Deck's unauthorized products

have either just been released to retail store accounts or are about to be released, it is too soon to obtain any meaningful assessment of whether there will be actual confusion in the marketplace. Accordingly, this factor does not weaken MLBP's position. *See, e.g., Jordache Enter., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 518-19 (S.D.N.Y. 1993) ("[A]lthough the Court finds no evidence of actual confusion, this factor does not weigh in [alleged infringer's] favor as the [infringing] mark has not significantly infiltrated the marketplace . . . .").

<strong>vi. Defendant's Intent</strong>

The second comer has a duty to so name and dress its product as to avoid all likelihood of confusion with the senior user's product. *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir. 1980); *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 257-58 (2d Cir. 1962); *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960). Moreover, where a defendant intentionally copies a plaintiff's trademark or trade dress, a presumption arises that there will be a likelihood of confusion. *See, e.g., Paddington*, 996 F.2d at 586; *Perfect Fit Indus.*, 618 F.2d at 954; *Harold F. Ritchie*, 281 F.2d at 758-59; *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 77 (2d Cir. 1934).

Upper Deck is undeniably attempting to capitalize on the reputation and goodwill of the MLB Entities by deliberately using the MLB Marks in its products. For twenty years Upper Deck was an official licensee and produced authorized trading cards. Although its license has now expired, Upper Deck has not changed its trading cards in any meaningful way. Indeed, even its minimal effort to obscure or slightly alter the MLB Marks only serves to underscore Upper Deck's intent to benefit from the goodwill of the MLB Entities. *See, e.g., Ambrit, Inc. v. Kraft Inc.*, 812 F.2d 1531, 1543 (11th Cir. 1986) ("even an intent to come as close as the law will allow is an intent to derive benefit from the other party's reputation and is therefore probative on the likelihood of confusion issue").

Moreover, as a former licensee, Upper Deck was obviously aware of the proprietary

nature of the MLB Marks and indeed acknowledged the MLB Entities' rights in such marks in

the Upper Deck License. Upper Deck's efforts to continue exploiting the MLB Marks following

the expiration of its license smacks of bad faith, creates an increased risk of confusion and

weighs strongly in favor of a likelihood of confusion. *See Sunward Elect., Inc. v. McDonald*,

362 F.3d 17, 25 (2d Cir. 2004) ("there is an increased danger that consumers will be confused

and believe that the former licensee is still an authorized representative of the trademark

holder"). Indeed, Upper Deck's willful breach of the license agreement is strong evidence of its

concurrent intent to deceive consumers.

Upper Deck has even gone to great lengths to produce and market packaging for its 2010

Unauthorized Series 1 cards that is virtually indistinguishable from the packaging used for the

2009 Authorized Series 1 cards it put out as a licensee of MLBP. *See* Smith Decl., ¶ 27;

Complaint, ¶ 35. Furthermore, with respect to the trading cards themselves, as discussed at

greater length above, both Upper Deck's previously-licensed and new unlicensed trading cards

feature Major League Baseball players in their respective Club uniforms bearing the distinctive

MLB Uniform Trade Dress, and prominently display MLB Cap and Helmet Logos fully visible

on the players' headwear, as well as other MLB Marks on the jersey fronts, backs, and sleeves.

*See* Smith Decl., ¶¶ 24-27. Such similarities and the fact that the licensed and unlicensed cards

reveal no meaningful differences compel the conclusion that Upper Deck is acting in bad faith

and has willfully attempted to confuse consumers and create deception.

### vii. Quality Of Defendant's Product

Because MLBP cannot control the quality of Upper Deck's product, it is left unable to

safeguard its goodwill and reputation. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818

F.2d 254, 259-60 (2d Cir. 1987) (senior user's right to control its own image permits it to sue to

protect its reputation regardless of actual quality level of junior user's goods). Moreover, even if Upper Deck's products were to be of good quality, that fact actually supports a finding of likelihood of confusion. *See Centaur Commc'ns*, 830 F.2d at 1228 (fact that parties' goods are of corresponding quality "supports the inference that they emanate from the same source"); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986) (holding that good quality of alleged infringer's product actually may increase the likelihood of confusion as to source).

### viii. Sophistication Of The Consumers

The final *Polaroid* factor considers the level of sophistication of an ordinary consumer of the parties' goods. Because baseball trading cards are inexpensive products, consumers are unlikely to exercise a great deal of care in purchasing such items. *See, e.g., CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 683 (7th Cir. 2001) ("The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases"); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (modest cost of product not conducive to careful purchaser selectivity). Therefore, this factor also favors MLBP.

### ix. Balance Of All Factors

In sum, all of the relevant factors here favor a finding that consumers are likely to be confused as to whether MLBP, the Clubs, or the other MLB Entities have sponsored, licensed or otherwise authorized Upper Deck's trading cards. Indeed, not even a single factor favors Defendant. The MLB Marks are strong, and Upper Deck is using essentially identical marks and identical packaging on identical products in order to trade upon the goodwill and reputation of MLBP, the Clubs, and the other MLB Entities. The potential for public confusion is thus

inevitable.[3] *See, e.g.*, *Chrysler Corp.*, 880 F. Supp. at 511 (holding, after an application of the 6th Circuit's similar likelihood of confusion multi-factor test, that these factors "overwhelmingly support a finding of likelihood of confusion" from defendant's unauthorized use of automobile manufacturers' trademarks and trade dress on defendant's collectible cards where "[p]laintiff has amply proven all factors except actual confusion, which is not required").

        **c.**        **Upper Deck's Disclaimer Does Not Alleviate the Likelihood Of Confusion**

Upper Deck's inconspicuous disclaimers will not alleviate the likelihood of confusion. Disclaimers are routinely held to be ineffective in dispelling confusion, especially those disclaimers, like here, "which employ brief negator words such as 'no' or 'not'." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002).[4] Indeed, in some instances, a disclaimer can actually aggravate confusion. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 1989 U.S. Dist. LEXIS 7950 (E.D. Cal. June 19, 1989), *aff'd as modified*, 955 F.2d 1327 (9th Cir. 1992), *amended*, 967 F. 2d 1280 (9th Cir. 1992) (finding customer confusion in some instances slightly higher with a disclaimer than without). Moreover, "use of a relatively inconspicuous disclaimer will not prevent likely confusion." J.T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:51, at 23-161 (4th

---

[3] For the reasons above, MLBP is likely to succeed on its state law claims for unfair competition and deceptive business practices. *See Merck & Co. v. Mediplan Health Consulting*, 425 F. Supp. 2d 402, 410 (S.D.N.Y. 2006) (standard for § 349 of N.Y. General Business Law claim is "substantially the same" as the standard for a claim under the Lanham Act); *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 302 (S.D.N.Y. 1997) (standard for unfair competition based on infringement is substantially similar to those applied under the Lanham Act, except insofar as the state claim may require an additional element of bad faith or intent).

[4] Other Circuits have similarly held that disclaimers are routinely ineffective in dispelling confusion. *See, e.g.*, *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg. Inc.*, 510 F.2d 1004, 1013 (5th Cir. 1975); *Marquis Who's Who, Inc. v. North American Advertising Associates Inc.*, 426 F. Supp. 139, 143 (D.D.C. 1976), *aff'd without op.*, 574 F.2d 637 (D.C. Cir. 1978).

Ed. 1996) (citing cases); *see also Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1276 (S.D.N.Y. 1990) ("[T]his disclaimer appears in minuscule print on the very bottom of the ad. Because of its location and size, the disclaimer does not effectively eliminate the misleading impression conveyed in the ad's large headline.").

Indeed, "[w]here, as here, an infringer attempts to avoid a substantial likelihood of consumer confusion by adding a disclaimer, it must establish the disclaimer's effectiveness." *Weight Watchers Intern., Inc. v. Luigino's, Inc.*, 423 F.3d 137, 143-44 (2d Cir. 2005) (finding an insufficient basis to conclude that the disclaimer solved the problem of consumer confusion). Here, Upper Deck's disclaimer is in barely readable print in inconspicuous locations. Upper Deck has hardly met its "heavy burden . . . to come forward with evidence sufficient to demonstrate . . ." that its disclaimer eliminated confusion. *Home Box Office, Inc. v. Showtime/The Movie Channel*, 832 F.2d 1311, 1316 (2d Cir. 1987). Stated otherwise, the MLB Clubs' "reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers." *See Int'l Kennel Club v. Might Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988).

### d. The Nominative Use Defense Does Not Apply

Any attempt by Upper Deck to defend its infringement using the nominative use defense would be unavailing. In order for the nominative use defense to apply, Upper Deck must show that (1) the MLB Clubs are not readily identifiable without use of the MLB Marks; (2) only so much of the MLB Marks are used as is reasonably necessary to identify the MLB Clubs; and (3) Upper Deck has done nothing that would, in conjunction with the MLB Marks, suggest sponsorship or endorsement by MLBP or the MLB Baseball Clubs. *See, e.g., Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1041 (9th Cir. 2003); *see also Audi AG v. Shokan Coachworks,*

*Inc.*, 2008 U.S. Dist. LEXIS 92021, at *45-46 (N.D.N.Y. Nov. 13, 2008) (citing cases applying Ninth Circuit test).

Upper Deck cannot satisfy any of these elements. Regarding the first element, Upper Deck cannot demonstrate that it must use the MLB Marks to identify the MLB Clubs, because there was no need for the MLB Clubs to be identified on Upper Deck's unauthorized trading cards in the first place. *See Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1140 (D. Minn. 1996) (defendant used "Messier" – a famous hockey player's surname – on unauthorized hockey sticks that were same shape as that used by that hockey player; although no substitute for that hockey player's last name, nominative use defense rejected because it was unnecessary to use the hockey player's name in the first place). Even if it was necessary to identify the MLB Clubs on Upper Deck's cards, players are identifiable with a specific team, and thus it would be sufficient for Upper Deck to display only the players without the MLB Marks.

Similarly, with respect to the second factor, Upper Deck has inherently taken more of the MLB Marks than is reasonably necessary, because there is no need to depict the players in actual game uniforms in order to identify either the player or the respective clubs. *See, e.g., The New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992) (only permitting fair use defense where defendant did not use plaintiff's "distinctive logo or anything else that isn't needed to make the announcements intelligible to readers"); *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969) (use of the mark was allowed, in part, because it did not use the trademark holder's "distinctive lettering style or color scheme").

Finally, regarding the third factor, for all of the reasons discussed above, the prominent use of the MLB Marks, including without limitation the MLB Clubs' logos, the MLB Uniform Trade Dress, and MLB Cap and Helmet Logos, will falsely create a suggestion of sponsorship or

endorsement by MLBP or the MLB Clubs. *See, e.g., Audi AG*, 2008 U.S. Dist. LEXIS, at *48

(uses all implied sponsorship and thus could not be nominative fair use); *Yurman Studio, Inc. v.*

*Castanada*, 2008 U.S. Dist. LEXIS 63158, at *60 (S.D.N.Y. Aug. 19, 2008) (use of plaintiff's

brand names may suggest or imply sponsorship or endorsement, thereby defeating fair use

defense).

### 3. Upper Deck Has Diluted The MLB Marks

The Lanham Act defines "dilution by blurring" as an "association arising from the

similarity between a mark or trade name and a famous mark *that impairs the distinctiveness* of

the famous mark." *See* 15 U.S.C. § 1125(c)(2)(B) (emphasis added). In order for there to be

actionable dilution under § 1125(c), plaintiff need only show a likelihood of dilution, as opposed

to actual dilution. *See* 15 U.S.C. § 1125(c)(1). Here, however, actionable dilution is not only

likely but inevitable. Upper Deck's unauthorized trading cards repeatedly and prominently

employ the MLB Marks, which are exceedingly well-known and famous within the meaning of

§ 1125(c). Further, Upper Deck's unlicensed cards and prominent use of the MLB Marks will

inherently impair the distinctiveness of these marks. Such impairment will be especially

pronounced here, as the Upper Deck unlicensed trading cards are destroying the opportunity for

the MLB Marks to develop the even-greater distinctiveness and caché that is associated with an

exclusively-licensed trademark. In addition to dilution by blurring, Upper Deck's bad faith and

inexcusable contract violations create a reasonable apprehension that not only will the MLB

Marks be blurred, but also tarnished within the meaning of 15 U.S.C. § 1125(c)(2)(C), which

prohibits dilutive uses that "harm[] the reputation of the famous mark."

### C.    MLBP Is Likely To Suffer Irreparable Harm

As a matter of law, a showing of a likelihood of confusion based on the foregoing factors

is itself sufficient to establish irreparable harm. *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238,

246 (2d Cir. 2009) ("[A] plaintiff who establishes that an infringer's use of its trademark creates

a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury.")

(quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005)).

Even without this presumption, however, it is clear that MLBP will suffer irreparable

harm absent an injunction. "Because of the trademark's unique function in representing

intangible assets such as reputation and good will . . . and the consequent difficulties in

measuring its value, irreparable injury will almost always be found when there is a high

probability of confusion." *Educ. Testing Serv. v. Touchstone Applied Sci. Assoc.*, 739 F. Supp.

847, 853 (S.D.N.Y. 1990) (citations omitted); *see also E. Gluck Corp. v. Rothenhaus*, 585 F.

Supp. 2d 505, 519 (S.D.N.Y. 2008) (finding harm from confusion is "real threat" and constitutes

irreparable harm).

Indeed, as discussed *supra*, Upper Deck explicitly conceded in the Upper Deck License

that its breach of the License, and its "failure upon the expiration or termination of [the License]

to cease the manufacture of the Licensed Products and limit their distribution and sale . . ."

would constitute "immediate and irreparable damage" to MLBP. Smith Decl., ¶ 17. Further, this

concession survives the term of the License. *Id.*, ¶ 18 & Ex. 1, ¶ 31. That state of affairs has

now come to pass, and Upper Deck's unauthorized trading cards are greatly harming MLBP, its

entire licensing program, and the MLB Clubs in several different ways.

First, it is fundamentally important that MLBP be able to control the use of its

tremendously valuable MLB Marks, so that MLBP is certain that these properties are not being

distorted or negatively impacted in the public eye. As discussed above, the Upper Deck License

incorporated extensive "quality control" measures that MLBP vigorously exercised during the terms of that License. Smith Decl., ¶ 19 & Ex. 1, ¶ 10.A. Now that the License has expired, MLBP is not being afforded any opportunity to exercise quality control, and the perception of the MLB Marks will suffer as a result of Upper Deck's compromised product. Smith Decl., ¶ 35. Simply put, MLBP's hard-earned reputation and goodwill are being placed in the hands of an unrelated third-party over whom MLBP has no control. *Id.* By its very nature, that injury is irreparable unless immediately enjoined.

Second, MLBP's strategic decision to strengthen demand for its authorized trading cards by eliminating the cluttering effect of multiple licensed trading cards is being undermined by Upper Deck's activities. *Id.*, ¶ 36. MLBP for valid business reasons has determined it is in the best interests of its branded products to have an exclusive retail trading card licensee, namely, Topps. *Id.* By continuing to sell baseball trading cards in a way that creates the overwhelming perception that the Upper Deck cards are officially licensed by MLBP, Upper Deck has damaged the caché of the only validly licensed line of retail MLBP trading cards. *Id.* In addition, Upper Deck is causing a likelihood of consumer confusion by making consumers mistakenly believe that the Upper Deck cards are genuine cards approved by MLBP. *Id.* This consumer confusion is exacerbated by the fact that Upper Deck's unauthorized trading cards are distributed by the same distributors as MLBP's licensed trading cards, and sold and marketed in the same retail and trade channels to the same consumers. *Id.*

Upper Deck's actions unless restrained will also undermine MLBP's long-established licensing programs. MLBP has in good faith negotiated for the benefit of protecting and enhancing its brands and image through a contractual requirement that its licensees will respect MLBP's intellectual property rights by not using them post-expiration without the express

consent of MLBP. *Id.*, ¶ 37. Unless immediately restrained, Upper Deck's deceptive trading cards threaten to severely undermine MLBP's licensing programs. *Id.*

Upper Deck's actions are particularly injurious to MLBP's exclusive license agreement with Topps and MLBP's decision to move to a single licensor with respect to trading cards generally. *Id.*, ¶ 38. MLBP should be able to determine the best way to license its products, and MLBP's decision to license its trading card products on an exclusive basis is a reflection of that choice. *Id.* MLBP should be free from interference by a former licensee using MLB marks without authorization and in violation of MLBP's rights. *Id.*

If MLBP cannot control the use of the MLB Marks on products, its entire licensing program and its ability to decide how best to exploit its most valuable assets are irreparably harmed. *Id*, ¶ 39. If Upper Deck is permitted to market these unauthorized trading cards, the value of an exclusive license for which licensees pay a significant premium to MLBP will be substantially diminished. *Id.* Exclusive licensees are also willing to undertake a larger marketing and promotional commitment in order to grow and develop, in this case, the game of baseball, in order to increase the value and marketability of the licensee's exclusive right. *Id.* If MLBP's other current or potential licensors see that MLBP cannot guarantee them exclusivity where that right has been bargained and paid for, MLBP will suffer greatly in an amount that cannot be quantified. *Id.*

In sum, Upper Deck's prominent use of the MLB Marks, if permitted, will at the very least threaten and quite possibly destroy MLBP's ability meaningfully to license the MLB Marks in connection with trading cards on an exclusive basis, resulting in a severe and irreparable injury to MLBP's licensing efforts. *Id.*, ¶ 40.

### D. MLBP Also Satisfies The Alternate Standard For A TRO

While not necessary given that MLBP has shown that it is likely to succeed on the merits, MLBP can satisfy the alternate test for a TRO because the balance of hardships tips decidedly in favor of MLBP and there are fair grounds for litigation. *See Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996) (plaintiff must show *either* likelihood of success on the merits *or* fair grounds for litigation coupled with the balance of the equities tipping decidedly in plaintiff's favor). As set forth in § I.B, *supra*, at a minimum, there are more than fair grounds for litigation in this case. Also, as set forth in § I.C, *supra*, MLBP will suffer irreparable harm if no injunction is issued. As such, the balance of hardships tilts decidedly in MLBP's favor.

By contrast, the only conceivable harm that Upper Deck could suffer if an injunction were to issue would be lost profits, which cannot tip the balance of hardships in Defendants' favor. *See Warner-Lambert*, 86 F.3d at 8 (finding that only harm to defendant from injunction was lost profits, which are quantifiable); *Marshak v. Thomas*, 1998 WL 476192, at *13 (E.D.N.Y. June 11, 1998) (granting preliminary injunction where "defendant has not shown any hardship that could not be compensated by money damages").

## II. MLBP IS ENTITLED TO EXPEDITED DISCOVERY

MLBP also seeks permission to conduct limited expedited document and deposition discovery from Upper Deck. MLBP has good cause to request this discovery as it goes to the heart of its claims and is necessary to permit MLBP to develop a full and appropriate evidentiary record for timely consideration by this Court of its proposed motion for preliminary injunctive relief. The requests are extremely narrow and do not place any significant burden on Defendants. Thus, MLBP's request should be granted. *See Standard Inv. Chartered, Inc. v. NASD, Inc.*, 2007 U.S. Dist. LEXIS 27342 (S.D.N.Y. Apr. 11, 2007); *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325 (S.D.N.Y. 2005).

## **CONCLUSION**

For all of the foregoing reasons, MLBP respectfully requests that the Court grant its

motion for a temporary restraining order and for expedited discovery.

Dated: New York, New York
      February 1, 2010

PROSKAUER ROSE LLP

By: _____

    Brendan J. O'Rourke (BO-2351)
    Adam D. Siegartel (AS-6947)
    Alexander Kaplan (AK-4207)
    Patrick J. Dempsey (PD-8372)

1585 Broadway
New York, New York 10036
(212) 969-3000

*Attorneys for Plaintiff*
*Major League Baseball Properties, Inc.*