Ex. 24);

(c)  DALLAS COWBOYS (Pls.' Ex. 22);

(d)  Detroit Lions Helmet Design (Pls.' Ex. 23);

(e)  Kansas City Chiefs Helmet Design (Pls.' Ex. 25);

(f)  KANSAS CITY CHIEFS (Pls.' Ex. 26);

(g)  Miami Dolphins Helmet Design (Pls.' Ex. 27);

(h)  MIAMI DOLPHINS (Pls.' Ex. 28);

(i)  New England Patriots Helmet Design (Pls.' Ex. 29);

(j)  San Francisco 49ers Helmet Design (Pls.' Ex. 30);

(k)  St. Louis/Los Angeles Rams Helmet Design (Pls.' Ex. 31); and

(l)  Washington Redskins Helmet Design (Pls.' Ex. 32).

36.  Plaintiff NFL registered team uniform designs without team logos for International Class 41, which does not cover trading cards:

(a)  Buffalo Bills Uniform (white) (Pls.' Ex. 33);

(b)  Buffalo Bills Uniform (blue) (Pls.' Ex. 34);

(c)  Dallas Cowboys Uniform (white) (Pls.' Ex. 35);

(d)  Dallas Cowboys Uniform (blue) (Pls.' Ex. 36);

(e)  Kansas City Chiefs Uniform (Pls.' Ex. 37); and

(f)  San Francisco 49ers Uniform (Pls.' Ex. 38).

Plaintiff NFL registered these trademarks under Section 2(f) of the Lanham Act, which required Plaintiff NFL to demonstrate to the PTO that the trademarks possessed secondary meaning.

AO 72A
(Rev.8/82)

(Tr. at 169-171.)

37. Plaintiff NFL spends between $27 million and $35 million annually to promote Plaintiff NFL's licensed products. (Tr. at 174.)

38. Plaintiff NFL's trademarks receive substantial television exposure. (Tr. at 175-76.) The NFL's Super Bowl championship game is one of the most-watched television sporting events of the year in the United States. (Id.) Over eighteen and one half million people attend NFL football games per year. (Id. at 175.)

39. Plaintiff NFL believes that its trademarks possess enormous value. (Tr. at 174-75.)

40. Plaintiff NFL licenses third parties to reproduce the NFL Trademarks in specific product markets. (Tr. at 172.)

41. Plaintiff NFL licenses the "Club Marks," which are "[t]he names, symbols, designs and colors of the member clubs of the NFL, including, without limitation, the helmet designs, team uniforms, team names, nicknames, identifying slogans, identifying logos, city and regional names . . . and other club indicia adopted by the respective member clubs." (Hagen Dep. at 21; Pls.' Ex. 173G.)

42. The annual domestic wholesale sales of Plaintiff NFL's licensed products have exceeded $1 billion annually since 1993, and recently reached $1.5 billion. (Tr. at 173;

27

Hagen Dep. at 16.)

43. Since 1993, Plaintiff NFL's licensed trading cards have generated yearly revenue of $100 million, peaking at over $180 million in 1996. (Tr. at 173; Hagen Dep. at 17.)

44. Plaintiff NFL does not measure sales of trading cards by team or by player. (Tr. at 178.) The specific teams relevant to this case, however, including the Dallas Cowboys, San Francisco 49ers, and Kansas City Chiefs, sell the most licensed products in other markets. (Id.) Dallas Cowboys merchandise accounts for nearly 25 percent of the overall sales of NFL merchandise since 1993. (Pls.' Ex. 228.) Troy Aikman and Emmitt Smith replica jerseys also account for $9 to $12 million in annual sales since 1995. (Tr. at 178; Pls.' Ex. 228.) Additionally, the San Francisco 49ers and the Kansas City Chiefs have ranked among the top ten NFL teams in merchandise sales for each year since 1993. (Tr. at 178; Pls.' Ex. 228.)

45. Plaintiff NFL advertises its licensed trading cards. (Hagen Dep. at 43-44.)

46. Since 1992, Plaintiff NFL has licensed the following companies to use NFL Trademarks in connection with trading cards:

(a) Fleer Corp.;

(b) Collector's Edge, Inc.;

28

(c)  Leaf, Inc.;

(d)  Pacific Trading Cards, Inc.;

(e)  Pinnacle Brands, Inc.;

(f)  Playoff Corp.;

(g)  Score Board/Classic;

(h)  The Topps Company;

(i)  The Upper Deck Company;

(j)  AAA Wild Card;

(k)  Action Packed;

(l)  AW Sports;

(m)  Pro Set; and

(n)  Ted Williams Card Co.

(Hagen Dep. at 17.)  Plaintiff NFL's licensees pay a lump sum of money when they execute a licensing contract and also pay royalties at the rate of nine percent for the right to reproduce Plaintiff NFL's trademarks on trading cards.  (Hagen Dep. at 20; Pls.' Ex. 173G.)

47.  Plaintiff NFL strictly controls the quality of the trading cards that its licensees produce.  (Hagen Dep. at 21-22.)  Plaintiff NFL requires its licensees to use high quality photographs that are flattering to the athletes and do not embarrass the athletes on its trading cards.  (Id. at 38-39.)

48.  Plaintiff NFL's trading card licensees sell different styles of cards in order to appeal to a wide variety

29

of customers. (Hagen Dep. at 23.) Plaintiff NFL's licensees charge between ninety-nine cents and $7.99 for a pack of trading cards. (*Id.*)

49. Purchasers of Plaintiff NFL licensed trading cards consist of: "casual sports fans," "hard-core collectors," "gate keepers," and "gift giv[ers]." (Hagen Dep. at 24, 27-28.) These purchasers vary widely in knowledge and experience "[f]rom knowing nothing at all to knowing everything there is to know about what is going on." (*Id.* at 28.)

50. Plaintiff NFL markets its teams using team colors. (Hagen Dep. at 57, 118-19; Tr. at 177-78.)

51. Plaintiff NFL uses team colors on "all licensed products," such as pennants, flags, clothing, furnishings, and media guides. (Hagen Dep. at 25-26.) The NFL uses team colors to decorate the team's playing fields and the team's cheerleaders' uniforms. (*Id.*)

52. Plaintiff NFL also hired Payne Stewart, the professional golfer, to wear the "team colors" of the local NFL team when he played in professional golf tournaments. (Hagen Dep. at 50.)

53. Additionally, the media and the public often refer to NFL teams by their colors. (Hagen Dep. at 49-58.) Plaintiff NFL introduced the following articles into evidence at trial:

a. <u>Articles from 1984 through 1996 associating "silver and blue" with the Dallas Cowboys</u>:

"the national pastime of hating the men in silver and blue" (U.P.I., September 5, 1984); a plane "in the team's trademark silver-and-blue and put the Cowboys logo on the tail" (Dallas Business Journal, April 14, 1986); "silver and blue running through his veins" (Gannett New Services, March 1, 1989); "silver-and-blue knickers." (The Associated Press, May 6, 1990, PM cycle); "What's silver and blue and will be yukking it up this weekend? Those Dallas Cowboys" (The Washington Times, April 19, 1991); "the people in blue and silver made more noise than the folks in black and silver" (The Dallas Morning News, October 28, 1992); "Dale Jarrett wore the silver and blue of the Dallas Cowboys yesterday in the TranSouth 500 stock-car race" (The Courier-Journal Louisville, KY, March 30, 1992); "Do you bleed silver and blue?" (The San Francisco Chronicle, October 16, 1994); "Cowboys rate as team we love to hate. Here are 5 reasons to despise silver and blue, in case you need more." (Milwaukee Journal Sentinel, January 12, 1996); "The planning committee for the Dallas Cowboys victory celebration is busily preparing for yet another downtown parade if the boys in silver and blue score a Super Bowl victory" (The Dallas Morning News, January 18, 1996); "The silver and blue. The black and gold. The Pittsburgh Steelers and Dallas Cowboys are ready to go full-tilt for the world championship in Super Bowl XXX" (Chicago Tribune, January 23, 1996); and "silver and blue floats during a Texas-sized salute" (The Des Moines Register, February 8, 1996). (Pls.' Ex. 44.)

b. <u>Articles from 1990 through 1996 associating "red and gold" with the Kansas City Chiefs</u>:

"The fans, many clad in the familiar red and gold Chiefs colors, met the players with confetti, huge and deafening cheers" (The Associated Press, December 30, 1990 AM cycle); "Clad in Kansas City Chiefs red and gold, they hoot, holler, scream" (St. Louis Post-Dispatch, January 3, 1993); "Joe Montana wearing the red and gold of the Kansas City Chiefs?" (The Arizona Republic, February 13, 1993); "But today, for the first time in his career, he

31

will run through the Coliseum tunnel and emerge as a member of the visiting team, wearing the red, gold and white of the Kansas City Chiefs." (Los Angeles Times, November 14, 1993); "Don't touch those holiday lights just yet. And while you're at it, head to the store for some replacement bulbs - in Chiefs red and gold." (The Kansas City Star, January 5, 1996); "the Technicolor red and gold of the Chiefs, Oakland's most hated enemy" (The San Francisco Examiner, December 2, 1995). (Pls.' Ex. 45.)

c.  Articles associating "red and white" with the San Francisco 49ers:

"The suit contended that the Montana shoes were made in red and white, which are the team colors of the 49ers." (Footwear News, September 24, 1984); "the emotional block of dealing with Montana's red-and-white uniforms was too much for Williams to handle." (Rocky Mountain News, January 3, 1994); "They were quiet and resolute as they marched on the field in gleaming gold helmets and fresh red and white jerseys" (The Associated Press, July 20, 1989, AM cycle); "Nobody in the San Francisco 49ers' camp is wearing No. 42 and there's no No. 33 among the red and white jerseys at the practice fields" (The Associated Press, July 23, 1991, AM cycle); "Wearing the red jerseys and white pants will be the San Francisco 49ers" (U.P.I., January 26, 1995); "some restaurants ladling their soup from tables decorated with blue and yellow for the San Diego Chargers and others stationed on the side for the red and white San Francisco '49ers." (The Santa Fe New Mexican, January 29, 1995); "Billy Earnhart, 5 months, was accompanied by his cheerleader, a complete 49ers skirt and red and white pompons" (Sun-Sentinel - Fort Lauderdale, October 29, 1995). (Pls.' Ex. 46.)

d.  Articles associating "red and blue" with the Buffalo Bills:

"An alumnus hung a poster in the front window of the gym reading: . . . 'Go Buffalo Bills,' in the schools' colors of red and black and in the Bills' red and blue." (The Associated Press, January 14,

32

1992); "see office workers dressed in red, white and blue -- Bills colors. Sorry, U.S.A." (The Washington Post, January 21, 1992); "he's created a 'home away from home for Buffalo Bills fans,' according to the large banner in red, white and blue (Bills colors) hanging near the bar." (The Washington Post, January 23, 1992); "Dress codes have been abandoned at businesses as employees come to work wearing the red and blue of the Bills." (The Associated Press, January 23, 1992, PM cycle); "About 10,000 Buffalo Bills fans, many decked out in the team's red, white and blue colors, rallied at City Hall" (U.P.I., January 27, 1992); "the first stamp imprinted the Buffalo Bills' red, white and blue logo of a charging bison." (The Buffalo News, December 11, 1992); "where the colors were all Bills red and bl.e, in anticipation of the team's arrival." (The Buffalo News, January 9, 1993); "Only a small island of Bills' red and blue could be spotted in the stadium's sea of black and gold." (The Buffalo News, January 10, 1993); "Ann Johnston is fond of telling acquaintances that the first professional football uniform her son ever pulled on sported the familiar red, white and blue of the hometown Buffalo Bills." (Gannett News Service, January 20, 1993); "I told our players, 'You know something? You know who's going to be wearing red, white and blue out there on Sunday. The Buffalo Bills. You're America's Team.'" (Sun-Sentinel - Fort Lauderdale, January 26, 1993); "It was the peak of football frenzy and they waded into the red-and-blue sea of fans until they were about to drown." (The Buffalo News, November 28, 1993); "The disruption for us is the men in red, white and blue (the Bills). Those are the guys we have to beat. The weather man is neutral." (Gannett News Service, January 12, 1994); "And men, women and children have spent days dressed in the Bills' red, white and blue, even at work." (U.P.I., January 22, 1994); "'I wanted to be here for the victory celebration,' he said, his face painted in Bills' blue and red. Was it worth it to come all that way for this? 'Oh yes,' he said. 'It's worth it just to wake up tomorrow and have some sympathetic people around.'" (USA Today, January 31, 1994); "Fans who decked their homes in the Buffalo Bills' red, white and blue packed up the decorations as if they were Christmas ornaments being put away for

next year." (The Associated Press, February 1, 1994 PM cycle); "it is impossible to separate Simpson from the current Bills. Besides his glory seasons in Bills red, white and blue, Simpson has maintained close ties to the players and franchise for the past several years" (The Buffalo News, June 24, 1994); "Gone are the red, white and blue of the Buffalo Bills. Gone are the blue, silver and white of the Dallas Cowboys." (The Buffalo News, January 22, 1995); "He'll be wearing the red, white and blue of the Buffalo Bills" (The Herald - Rock Hill, S.C., August 17, 1996): "We always go when the Bills come to Florida, and I am looking forward to being surrounded by red, white and blue instead of teal and orange." (The Buffalo News, September 15, 1996); "He is one of hundreds of Bills fans in the Jacksonville area who have spent years rooting for the red and blue of Buffalo and spent the week coping with the taunts of being a Bills fan in enemy territory." (The Florida Times-Union - Jacksonville, FL, December 28, 1996). (Pls.' Ex. 47.)

54. Plaintiff NFL believes that "the consumer can identify a product as associated with a particular team even if they cannot read the name," based on the team colors. (Hagen Dep. at 26, 58.)

55. Plaintiff NFL believes that consumers associate team colors on trading cards with the corresponding NFL team. (Hagen Dep. at 36-38.)

56. Plaintiff NFL's market research indicates that consumers associate team colors with NFL teams. (Tr. at 176.) In Wichita Falls Sportswear, Plaintiff NFL proffered its 1981 market survey as evidence that Plaintiff NFL's team uniform designs possessed secondary meaning with consumers. 532 F. Supp. at 659. The court relied in part on Plaintiff NFL's

34

market research to conclude that Plaintiff NFL's team uniform designs possess secondary meaning. <u>Wichita Falls Sportswear</u>, 532 F. Supp. at 659.

57. Defendants advertised clothing using Plaintiff NFL's team colors. (Pls.' Ex. 84.) Defendant Dahlonega Mint advertised licensed NFL team sweatshirts with the banner "You'll be sporting team colors." (Pls.' Ex. 84, at 22; Tr. at 656.) Defendants also advertised NFL licensed jerseys with the statement: "The colors match your favorite team's uniforms." (Pls.' Ex. 87, at 15; Tr. at 657-58.)

58. Defendant Revels testified that team colors were a significant selling feature for the NFL clothing. (Tr. at 653-54.) Defendant Revels also testified that consumers associate NFL team color combinations with the specific NFL teams. (<u>Id.</u> at 658 ("Q. And they are those colors because people associate those colors with those teams, don't they? A. They probably do.").)

### C.   Defendants' Conduct

#### 1.   Defendants' Sales Practices

59. From 1993 through 1997, Defendants purchased from manufacturers and then re-sold 120 separate sports trading card designs that Plaintiffs had not licensed. (Defs.' Ex. 235.; Pls.' Ex. 49.)

35

60. The parties agree that sixty-seven of the unlicensed sports card designs depict professional athletes in their team uniforms, complete with the team names and logos ("the uncontested designs"). (Pls.' Ex. 49.)

61. Defendants contest liability with respect to the remaining fifty-three card designs ("the contested designs"). (Defs.' Prop. Findings of Fact and Conclusions of Law at 3.) Most of the contested designs depict professional athletes in their team uniforms, with the team names and logos removed or partially removed. (Defs.' Ex. 235; Pls.' Ex. 49.) These cards are called "airbrushed cards." (Tr. at 277 (referring to "airbrushed cards); Defs.' Ex. 235; Pls.' Ex. 49.) Four of the contested designs depict Plaintiffs' logos or word trademarks in some form or another and thus do not qualify as true "airbrushed" cards. (Pls.' Ex. 49.)

(a) For instance, one contested design depicts Michael Jordan in his Chicago Bulls' uniform, but Plaintiffs' trademark "BULLS" is partially obscured by Michael Jordan's left arm. (Id. (design number 3-A-6).)

(b) Another contested design shows Michael Jordan with his jersey draped over his left shoulder in a manner that obscures Plaintiffs' trademark "BULLS" printed on the front of Mr. Jordan's jersey. (Id. (design number 3-A-8).) The back of the same card portrays Plaintiffs' trademark "Chicago

36

Bulls." (<u>Id.</u> (design number 3-A-8).)

(c) Another contested design depicts Emmitt Smith and Troy Aikman wearing "airbrushed" jerseys and helmets on which Plaintiffs' trademark blue star clearly is visible. (<u>Id.</u> (design number 3-B-13).)

62. Prior to 1993, Defendants sold their trading cards in hobby magazines such as "Sports Collectors Digest, Tuff Stuff Magazine, Baseball Hobby News, and perhaps others." (Tr. at 669; Pls.' Ex. 48 (Answer to Interrog. No. 12).) These magazines advertised numerous products bearing the NBA Team Marks and the NFL Trademarks that Plaintiffs' had licensed. (Hagen Dep. at 44-45.)

63. In 1993, Dahlonega Mint ceased advertising in national hobby publications. (Tr. at 664; Pls.' Ex. 98; Pls.' Ex. 99.) Sports Collectors Digest's publisher prohibited Defendants from advertising in its magazine unless Defendants removed unlicensed trading cards from their advertisements. (Tr. at 670-71.)

64. Since 1993, Defendants have sold cards only through their own magazine called, <u>The Coin & Sportscard Wholesaler</u>. (Tr. at 664; Pls.' Exs. 52-94.)

65. Defendants advertised trading cards that Plaintiffs had licensed next to trading cards that Plaintiffs had not licensed in <u>The Coin & Sportscard Wholesaler</u> without

37

distinguishing between the two types of cards. (Tr. at 665; Pls.' Exs. 52-94.)

66. Defendants sold trading cards in "sets," containing both cards that Plaintiffs had licensed and cards that Plaintiffs had not licensed. (Tr. at 665; Pls.' Ex. 73 at 32; Pls.' Ex. 76 at 23).

67. Defendants advertised that the unlicensed, "air-brushed cards" that Defendants offered for sale in the "sets" pictured players in the players' team uniforms. (Tr. at 666-69; Pls. Ex. 49 at 3-A-20; Pls. Ex. 79; Pls.' Ex. 55 at 12; Pls.' Ex. 123 at 3.)

68. Defendants also sold trading cards through monthly "collector's clubs." (Tr. at 365-66.)

69. Defendants created three "collector's clubs": a $20 per month "collector's club," a $50 per month "collector's club," and a $100 per month "collector's club." (Tr. at 381-91.)

70. Defendants' "collector's clubs" contained about 1000 members. (Tr. at 381.) The $20 per month "collector's club" contained about 800 members. (_Id._) The $50 per month "collector's club" contained about 100 members. (_Id._ at 382.) The $100 per month "collector's club" contained about 100 members. (_Id._)

71. Defendants used the "collector's clubs" to sell

AO 72A
(Rev.8/82)

surplus cards. (Tr. at 379.)

72. Defendants sent forty-one trading cards each month to the $20 "collector's club" members, seventy-four cards each month to the $50 "collector's club" members, and eighty-three cards each month to the $100 "collector's club" members. (Tr. at 391.)

73. Defendants' employee, Opal Hale, prepared the "collector's club" card sets each month under Defendant Revels' supervision. (Tr. at 375-76.) Ms. Hale had no training or qualifications to assess the value of trading cards. (Id. at 373.)

74. Defendant Revels only permitted Ms. Hale to include certain trading cards in the "collector's clubs." (Tr. at 375-76, 393.) Ms. Hale selected the cards to include in each "collector's club" member's monthly set from the cards that Defendant Revels permitted her to use in the "collector's clubs." (Id. at 380-81, 393.) Ms. Hale assigned a "value" to each card -- ranging from fifty cents to five dollars -- based entirely on the card's appearance. (Id. at 378.)

75. Defendants touted the cards in the "collector's clubs" as "the best, the hottest, and the hardest-to-find items," (Pls.' Ex. 55, at 15), and "highly-desirable sports cards that our staff, along with a dealer analysis, shows to be of explosive profit potential." (Tr. at 383; Pls.' Ex. 58,

39

at 39).

76. Defendants placed unlicensed cards in the "collector's club" sets, and used unlicensed cards to induce new members to join the clubs. (Tr. at 385-87.) New members joined Defendants' "collector's clubs" as a result of Defendants' offers of unlicensed trading cards. (Id. at 386.)

77. Defendants occasionally distributed a newsletter entitled Sports Card Forecasting Newsletter to "collector's club" members. (Tr. at 388-89; Pls.' Exs. 123-47.)

78. Defendants also sold surplus cards in its "Monster Box[es]." (Tr. at 544-45.) Defendants did not keep records of which sports trading cards it placed in the "monster boxes." (Id.) Defendants, however, did include football and basketball cards in the "monster boxes." (Id.; Pls.' Ex. 80 at 8.)


2. Defendants' First Encounter With Plaintiff NBA

79. In 1993, Plaintiff NBA learned that Defendants were selling unlicensed Shaquille O'Neal basketball cards in conjunction with a set of licensed basketball cards through the "Sports Collector's Digest." (Pls.' Ex. 101; Tr. at 683.) Defendant Revels testified that, prior to receiving this letter, he knew that Plaintiff NBA's licensed cards possessed a "little symbol on the back, [an] NBA symbol." (Tr. at 678-

40

79; Pls.' Ex. 183 at 95:23-96:5.)

80. Plaintiff NBA informed Defendants that these unlicensed Shaquille O'Neal basketball cards infringed on Plaintiff NBA's trademarks. (Pls.' Ex. 101; Tr. at 683.)

81. Plaintiff NBA demanded that Defendants cease selling the unlicensed Shaquille O'Neal cards and provide the following items to Plaintiff NBA: (1) the name of Defendants' supplier of the unlicensed Shaquille O'Neal cards; (2) the remaining inventory of the unlicensed Shaquille O'Neal cards; and (3) the sales information regarding the unlicensed Shaquille O'Neal cards. (Pls.' Ex. 101.)

82. Defendants failed to comply with Plaintiff NBA's requests. (Tr. at 686.) Specifically, Defendants failed to provide the sales figures that Plaintiffs had requested. (Id.) Evidence at trial also demonstrated that Defendants retained some inventory of the unlicensed Shaquille O'Neal cards. (Pls.' Ex. 61 at 26; Pls.' Exs. 115A-18.)

83. On July 16, 1993, Defendant Revels wrote a letter to Plaintiff NBA. (Pls.' Ex. 102.) In the July 16, 1993, letter, Defendant Revels stated that he sent the "remaining inventory of these Ball Street Cards" to Plaintiff NBA. (Id.)

84. On July 22, 1993, Defendant Revels sent a memorandum to his employees directing them to stop providing the "Shaq Ball Street Cards" to customers. (Pls.' Ex. 105.)

41

85. On July 23, 1993, Defendant Revels wrote another letter to Plaintiff NBA. (Pls.' Ex. 106.) In the July 23, 1993, letter, Defendant Revels stated that Defendants would stop selling the "Shaq Ball Street Cards." (Id.)

86. Defendant Revels testified that he was "pretty scared" by Plaintiff NBA's letter. (Tr. at 619.) Defendant Revels, however, concealed from Plaintiff NBA the fact that Defendants were selling similar unlicensed "Ball Street" cards depicting other NBA players. (Id. at 619, 693-95.) Defendants continued to sell the unlicensed "Ball Street" cards depicting NBA players other than Shaquille O'Neal. (Id. at 694.)

87. On July 23, 1993, Plaintiff NBA faxed a letter to Defendants. (Pls.' Ex. 103.) Plaintiff NBA's July 23, 1993, letter, demanded that Defendants provide Plaintiff NBA with the names of Defendants' sources for the cards depicted in Defendants' May 21, 1993, Sports Collector's Digest advertisement. (Pls.' Ex. 103.) Defendants' May 21, 1993, Sports Collector's Digest advertisement depicts Defendants' "Gold Prism" cards. (Pls.' Ex. 108.)

88. At trial, Defendant Revels denied that he discussed any type of card other than the "Shaq Ball Street" cards with Plaintiff NBA. (Tr. at 621.) When Plaintiff NBA's attorney confronted Defendant Revels with Plaintiff NBA's July 23,

42

1993, letter, however, Defendant Revels conceded that the letter referred to "Gold Prism" cards and did not address only the "Shaq Ball Street Cards." (Id. at 698.)

89. At trial, Defendant Revels testified that Defendants stopped selling "Shaq Ball Street Cards" after July 22, 1993. (Tr. at 617.)

90. Defendants' sales records indicate that Defendants continued to sell the "Shaq Ball Street Cards" even after Defendant Revels had promised Plaintiff NBA that Defendants would cease selling the cards. (Pls.' Exs. 116-17.) Defendants' records indicate that, on July 28, 1993, Defendants sold the "Shaq Ball Street Cards" on Order Number 344987. (Pls.' Ex. 116.) Defendants' records also reveal that, on July 28, 1993, Defendants sold the "Shaq Ball Street Cards" on Order Number 345072. (Pls.' Ex. 117.) Additionally, Defendants' records demonstrate that, on September 21, 1993, Defendants sold the "Shaq Ball Street Cards" on Order Number 351846. (Pls.' Exs. 115A, 118.) Finally, Defendants' records indicate that, on April 19, 1994, Defendants sold the "Shaq Ball Street Cards" on an unnumbered order. (Pls.' Ex. 115A.)

91. Defendants also continued to advertise the "Shaq Ball Street Cards" after Defendant Revels had promised Plaintiff NBA that Defendants would cease selling "Shaq Ball

43

Street Cards." (Tr. at 700; Pls.' Ex. 61 at 26.)

92. On August 9, 1993, Plaintiff NBA wrote another letter to Defendants. (Pls.' Ex. 107.) In the August 9, 1993, letter, Plaintiff NBA offered to "hold [Defendants] harmless for past purchases, sales and promotions of unlicensed NBA trading cards." (Id.) Plaintiff NBA also asked Defendants to reveal Defendants' sources of unlicensed Shaquille O'Neal cards and other unlicensed NBA trading cards. (Id.)

93. Plaintiff NBA received no information from Defendants in response to Plaintiff NBA's August 9, 1993, letter. (Tr. at 316-17, 332; Pls.' Ex. 229.) On direct examination, Defendant Revels testified that, on August 9, 1993, after Defendant Revels received the August 9, 1993, letter by facsimile, he telephoned Plaintiff NBA's attorneys, Eric Weinstein and Jeff Laytin, and provided the requested information, including the names of his sources of the "Shaq Ball Street" cards. (Tr. at 618-23.) On cross examination, Defendant Revels testified that he gave Plaintiff NBA the names of his sources of the "Shaq Ball Street" cards prior to August 9, 1993. (Id. at 692-94.) Neither Mr. Weinstein's nor Mr. Laytin's time records, however, reflect that they talked to Defendant Revels on August 9, 1993, after Mr. Weinstein prepared the August 9, 1993, letter. (Id. at

44

316-17, 332; Pls.' Ex.  229.) Mr. Weinstein's time records indicate that he had a telephone conversation with Defendants prior to preparing the August 9, 1993, letter, but the records do not reflect that Mr. Weinstein spoke with Defendant Revels after preparing the letter.  (Tr. at 316-17, 332; Pls.' Ex. 229.)  Plaintiff NBA's records also indicate that Defendants did not provide the information necessary to obtain a release from Plaintiff NBA.  (Tr. at 316-17, 332, 335.)

### 3.  Defendants' Knowledge of Infringement

94.  On April 22, 1997, Defendant Revels wrote a letter to Rick Welts, who served as Plaintiff NBA's president.  (Tr. at 628; Pls.' Ex. 109.)  In the April 22, 1997, letter, Defendant Revels asked Mr. Welts how to distinguish between cards that are licensed by Plaintiff NBA and cards that are not licensed by Plaintiff NBA.  (Tr. at 628; Pls.' Ex. 109.) At trial, Defendant Revels initially testified on cross-examination that he did not know how to tell the difference between cards that are licensed by Plaintiff NBA and those that are not licensed by Plaintiff NBA.  (Tr. at 679.)  When confronted with his prior deposition testimony to the contrary, however, Defendant Revels admitted that he knew prior to 1993 that cards licensed by Plaintiff NBA "have a little symbol on the back, [an] NBA symbol."  (Id. at 678-79;

45

Pls.' Ex. 183 at 95:23-96:5.)

95. Defendant Revels testified that he had not heard the term "Broder cards" before 1996, when the Rossville police searched Defendants' warehouse and confiscated the unlicensed trading cards that are the subject of this lawsuit. (Tr. at 674-75.) Defendant Revels denied that he saw several articles describing "Broder cards" and the problem of unlicensed trading cards in Sports Collector's Digest. (Id. at 675.)

96. Defendant Revels testified that he read the literature that manufacturers of licensed cards provided to him when he purchased trading cards from the manufacturers. (Id. at 677.) Defendant Revels testified that he ignored the portion of the literature that discussed the fact that the cards were licensed. (Id.) Nevertheless, in 1993, Defendants used the term "Broder cards" in their magazine Coin and Sportscard Wholesaler. (Tr. at 702-03; Pls.' Ex. 62 at 29.)

97. Robert Pressley is an experienced sports card dealer who testified for Plaintiffs. (Tr. at 122.) Mr. Pressley is not affiliated with Plaintiffs. (Id. at 122.) Mr. Pressley has conducted trading card shows since the late 1980s. (Id. at 122-23.) Mr. Pressley testified that during the early 1990s, dealers knew the difference between licensed and unlicensed trading cards. (Id. at 125.) Mr. Pressley testified that some dealers did not care whether cards were

46

licensed or unlicensed, but that enough information existed in the industry at that time to enable dealers to determine the difference. (Id. at 125.)

98. Ken Goldin, another sports trading card dealer, testified by deposition on behalf of Defendants. (Tr. at 565.) Mr. Goldin testified that sports trading card licensing became common in the early 1990s. (Dep. of Ken Goldin at 34.) Mr. Goldin testified that his role as a dealer required him to monitor which trading card manufacturers produced licensed cards. (Id. at 35.) Mr. Goldin testified that he could distinguish between unlicensed and licensed cards in the 1980s before he became a dealer. (Id. at 107.)

99. Industry practice is to consult price guides to determine the value of sports trading cards. (Tr. at 65, 688-89.) Defendant Revels testified that he cannot locate unlicensed trading cards in any price guides. (Id. at 689.)

100. Defendant Revels testified that he read occasionally trading card hobby magazines such as Tuff Stuff and Sports Collectors Digest. (Tr. at 671; Pls.' Ex. 184 at 208:17-209:16.) Since the early 1990s, the hobby magazines regularly have published articles about unlicensed and counterfeit cards. (Tr. at 125; Pls.' Exs. 190-91, 213-215.)

101. In January 1995, Defendants published an article in The Sports Card Forecasting Newsletter that opines that

unlicensed trading cards have investment value. (Pls.' Ex. 147.)

102. Plaintiff NFL published merchandising catalogs, licensee lists, consumer products reference guides, and made press releases to enable sports trading card dealers to identify trading cards licensed by Plaintiff NFL. (Tr. at 197-80; Hagen Dep. at 18; Pls.' Ex. at 230.)

103. Additionally, Plaintiff NBA published consumer products reference guides and licensee lists to enable sports trading card dealers to identify trading cards licensed by Plaintiff NBA. (Tr. at 254, 259-60.)

104. Defendants continued to sell unlicensed trading cards after Defendants' 1993 encounter with Plaintiff NBA. (Tr. at 623, 703.) Defendants continued to sell unlicensed "Ball Street" cards, including Michael Jordan and Magic Johnson cards. (Tr. at 694, 713-14; Pls.' Ex.66 at 33.). Defendants also continued to sell the "Gold Prism" cards that Plaintiff NBA had identified in its July 23, 1993, letter. (Tr. at 699, 700; Pls.' Exs. 89 at 44, 128 at 6, 130 at 5.)

105. In 1993, Defendant Revels informed Plaintiff NBA that Defendant bought many of the unlicensed trading cards from a dealer in Florida known as Kevin Brady, and also known as Dennis Murray (hereinafter "Mr. Murray"). (Pls.' Ex. 183 at 104:22-105:8.) Defendants continued to purchase cards from

48

Mr. Murray. (Tr. at 703-04; Pls.' Exs. 119, 121.)

106. In 1994, Plaintiffs sued Mr. Murray for allegedly counterfeiting Plaintiffs' trademarks on sports trading cards. (Pls.' Ex. 238.) In 1995, Plaintiffs obtained a $2.1 million judgment against Mr. Murray. (Pls.' Ex.239.) Plaintiffs were unable to collect any money from Mr. Murray to satisfy the judgment. (Tr. at 326-27; Defs.' Ex. 697.)

107. Plaintiffs' legal victory against Mr. Murray received publicity in the trading card industry. (Tr. at 150-52; Pls.' Exs. 190, 191.)

108. Mr. Murray testified by deposition on behalf of Plaintiffs. (Dep. of Dennis Murray at 4.) The Court admitted Mr. Murray's deposition into evidence over Defendants' objection. (Tr. at 4-11.)

109. Mr. Murray suffers from mental illness. (Tr. at 5.) On the day of Mr. Murray's deposition, Mr. Murray was not taking any medication that would impair his ability to testify. (Murray Dep. at 7.) Peter Crummey, one of Plaintiffs' private investigators, witnessed Mr. Murray's deposition and testified that Mr. Murray appeared lucid during the deposition. (Tr. at 158.)

110. After testifying, Mr. Murray refused to read and sign his deposition. (Murray Dep. at 91-92.) Mr. Murray dislikes Plaintiff NBA and its attorneys. (Id. at 76-77, 84,

49

158-59.) Mr. Murray, however, likes Defendant Revels. (<u>Id.</u> at 80, 88.)

111. From 1993 to 1995, Mr. Murray supplied Defendant Revels with unlicensed trading cards. (Murray Dep. at 40; Tr. at 703-04; Pls.' Exs. 119, 121.) Mr. Murray testified that he sold over one and one quarter million cards to Defendants. (Murray Dep. at 52.) Wayne Grooms, one of Plaintiffs' private investigators, testified that he heard Defendant Revels say that Defendants bought 250,000 cards from Mr. Murray in 1994 alone. (Tr. at 70; Pls'. Ex. 98.)

112. Mr. Murray testified that Defendant Revels usually paid for the cards that he purchased from Mr. Murray with gold, but occasionally paid with cash or checks. (Murray Dep. at 35, 52, 73-74.) Mr. Murray believes that Defendant Revels paid Mr. Murray in cash in order to conceal Defendants' purchases of unlicensed trading cards. (<u>Id.</u> at 11, 52.) Defendant Revels, however, testified that he always paid Mr. Murray with checks and never paid in cash or gold. (Tr. at 631.)

113. Mr. Murray visited Defendants' Rossville, Georgia, facility on six or seven occasions. (Murray Dep. at 40.) During Mr. Murray's visits, Defendant Revels kept Mr. Murray away from his employees. (<u>Id.</u> at 57.) Defendant Revels brought Mr. Murray to the back of Defendants' facility, which

AO 72A
(Rev.8/82)