consists of an area enclosed with a cage that contains Defendants' safe. (_Id._ at 57.) Defendant Revels kept his cash and gold in the safe. (_Id._ at 58.) At the conclusion of Defendant Revels' transactions with Mr. Murray, Defendant Revels would retrieve cash and gold from the safe to pay Mr. Murray. (_Id._ at 58.) Defendant Revels' trial testimony confirmed that Defendants' Rossville, Georgia, facility contains a "cage" area. (Tr. at 710.)

114. Mr. Murray testified that Defendant Revels told Mr. Murray to obtain cheap cards that Defendants could resell at the highest profit to unsophisticated customers. (Murray Dep. at 13.) Mr. Murray also stated that Defendant Revels sold the cheap cards through the "twenty dollar a month club thing." (_Id._ at 14.) Mr. Murray testified that Defendant Revels knew that the cheap cards were not licensed by Plaintiffs and that Defendant Revels did not care that the cards were not licensed. (_Id._ at 64.) Mr. Murray believes that Defendant Revels knew that Defendants were infringing on Plaintiffs' trademarks and Defendant Revels continued to do so because selling unlicensed cards was profitable. (_Id._ at 37-39.) Mr. Murray testified that Defendant Revels said that Plaintiffs would not catch Defendants because "[Defendants] beat the South African coin thing and [Defendants] beat the thing about the Presidential coin in the White House or something like

51

that." (<u>Id.</u> at 39.)

115.   The South African government sued Defendants in 1984 for counterfeiting gold `Krugerrand" coins. (Pls.' Ex. 48, Answer No. 19.) Defendants settled another lawsuit filed by the Federal Trade Commission (`FTC") for selling `Hutt River Province" coins as legal tender. (Tr. at 640-42; Pls.' Ex. 53 at 1.) Defendant Revels denied that he told Mr. Murray about these prior lawsuits. (Tr. at 711.)

116.   Defendant Revels testified that he was holding 80,000 unlicensed trading cards for Mr. Murray. (Tr. at 633.) Defendant Revels stated that Mr. Murray arrived in Rossville, Georgia, unannounced with the 80,000 trading cards. (<u>Id.</u> at 633.) Defendant Revels testified that Mr. Murray tried to sell the cards to Defendant Revels, but Defendant Revels refused to accept them. (<u>Id.</u> at 633-34.) Defendant Revels stated that he agreed to store the cards for Mr. Murray. (<u>Id.</u>) Defendant Revels testified that he stored the cards in a manager's office located on the second floor of Defendants' Rossville, Georgia, facility. (<u>Id.</u> at 634.) Defendant Revels testified that he placed the cards there to prevent employees from selling the cards because the cards were Mr. Murray's property. (<u>Id.</u> at 634-35.) However, two of Defendants' employees, Ms. Hale and Ms. Burton, testified that they treated the cards located in the manager's office on the

AO 72A
(Rev.8/82)

second floor as inventory and sold the cards in the "collectors clubs." (Id. at 376, 418, 421.) When Plaintiffs' attorney confronted Defendant Revels on cross-examination with a letter that Defendant Revels' attorney had written to the Rossville Police Department pleading for the return of the cards, Defendant Revels admitted that the cards were of "great value [to Defendant Revels and] affect his livelihood." (Id. at 733; Pls.' Ex. 237.)

117. Mr. Murray testified that Defendant Revels stated that Defendants' customers were unsophisticated and could not distinguish between licensed and unlicensed cards. (Murray Dep. at 42-43.)

118. Mr. Murray also testified that Defendants possessed a printing press and reprinted several of the best-selling cards that Mr. Murray had provided to Defendants. (Murray Dep. at 14-15, 33, 65-65.) Defendant Revels confirmed that Defendant Choo-Choo Printing is a printing business. (Tr. at 651.) Mr. Murray testified that Defendant Revels brought him to the location of Defendants' printing operation but did not tell Mr. Murray that Defendants were reprinting the cards that Mr. Murray sold to Defendants. (Murray Dep. at 14-15.) Mr. Murray stated that Defendant Revels attempted to conceal the fact that Defendants were copying the cards that Mr. Murray had sold to them. (Id. at 14-15.) Mr. Murray testified that

when he learned that Defendants were copying his cards, Mr. Murray confronted Defendant Revels. (Id. at 16.) Mr. Murray testified that Defendant Revels begged Mr. Murray to continue supplying cheap trading cards to Defendants. (Id. at 19.) Mr. Murray testified that he agreed to sell more cards to Defendant Revels and that he, in fact, sold a piece of film containing a sports card design to Defendant Revels so that Defendants could print the card themselves. (Id. at 16, 20.) During his deposition, Mr. Murray identified several trading cards that Defendants had printed themselves. (Id. at 23, 28, 30.)

119. Plaintiffs' private investigator, Mr. Grooms, also believes that Defendants printed unlicensed trading cards. (Tr. at 112.)

120. Mr. Murray testified that Defendant Revels worked with another dealer named Gary Fillers. (Murray Dep. at 40.) At trial, Defendant Revels confirmed that he has a personal and business relationship with Gary Fillers. (Tr. at 708.) Defendant Revels initially denied that he purchased Defendant Chattanooga Coin from Mr. Fillers. (Id. at 652.) Defendant Revels also testified that Mr. Fillers had nothing to do with Defendant Chattanooga Coin. (Id.) When Plaintiffs' attorney confronted Defendant Revels with an article that Defendant Revels wrote that describes Mr. Fillers as Defendant

54

Chattanooga Coin's founder who still influences Defendant Chattanooga Coin, however, Defendant Revels admitted that Mr. Fillers previously owned Defendant Chattanooga Coin. (<u>Id.</u> at 730.)

121. In 1994, the FTC sued Defendant Revels and Defendant Dahlonega Mint for violating 15 U.S.C.A. § 45. (Pls.' Ex. 148; Defs.' Ex. 48.) The FTC alleged that Defendant Revels and Defendant Dahlonega Mint engaged in deceptive trade practices by selling so-called "Hutt River Commemorative Coins" under the guise that the coins possessed "legally established monetary value." (Pls.' Ex. 148 at 2; Defs.' Ex. 48 at 2.) Defendant Revels and Defendant Dahlonega Mint eventually settled their lawsuit with the FTC without admitting any wrongdoing. (Pls.' Ex. 148 at 3; Defs.' Ex. 48 at 3.)

122. As part of their settlement agreement with the FTC, Defendant Revels and Defendant Dahlonega Mint consented to a Court-ordered injunction requiring them to cease "[f]alsely representing in any manner, directly or by implication, any material fact about the value, appreciation, origin, condition, scarcity, population, demand for, or authenticity of any collectibles," and to institute proper record keeping procedures for all transactions involving "collectibles." (Pls.' Ex. 148 at 5; Defs.' Ex. 48 at 5.) The term

"collectibles" includes sports cards. (Pls.' Ex. 148 at 3; Defs.' Ex. 48 at 5.) On January 5, 1995, the Court issued the injunction. (Pls.' Ex. 148; Defs.' Ex 48.)

123. Prior to the events giving rise to this lawsuit, Defendant Revels also executed two consent orders with the United States Postal Service in which Defendant Revels admitted falsely advertising "Ellis Island Coins" and "Susan B. Anthony Silver Dollars." (Tr. at 716.) At trial, Defendant Revels acknowledged that authenticity is an important component of the collectible coin business and that Defendant Revels has over thirty years' experience in the collectible coin business. (Id. at 663.)

124. Defendants failed to keep adequate records of their trading card transactions. (Dep. of Charles Phillips dated Jan. 29, 1999, at 12-14, 16.)

125. Defendants reported to the Internal Revenue Service on their 1995 income tax returns that they conducted $3,705,364.00 worth of gross sales. (Pls.' Ex. 149 ¶ 18.) Yet, Defendants do not employ or retain the services of an accountant to maintain their financial records. (Tr. at 505.) Instead, Defendant Revels created Defendants' record-keeping system. (Id.)

126. Defendants do not maintain a general ledger as part of their record-keeping system. (Tr. at 551.) Defendants

56

also lack a system for tracking sales. (Pls.' Ex. 110 at 9.)[2] Additionally, Defendants lack a complete set of descriptive invoices for their purchases. (Tr. at 479.) Defendants also do not possess a system for matching costs to sales. (Phillips Dep. at 18; Tr. at 543, 551, 553.) Similarly, Defendants do not maintain a system to track their inventory of trading cards by product line. (Pls.' Ex. 110 at 9.) Defendants thus failed to comply with the injunction that the Court issued on January 5, 1995, in the FTC case, which requires Defendants to maintain such records. (Pls.' Ex. 148 at 3; Defs.' Ex. 48 at 3.)

127. Defendants' inventory of trading cards exceeds fifty million cards. (Pls.' Ex. 149 ¶ 17.) Defendants, however, have no system to keep track of the total number of cards or the number of cards of each design currently in inventory at any point in time. (Tr. at 440-41, 444, 550.) Defendants' only inventory control procedure consists of performing a "random count" of their inventory at the end of each year for income tax purposes. (Id. at 731.) Defendants do not maintain a system that enables them to match the purchase price of trading cards to the sales of cards to calculate the

---

[2] Defendants' expert witness, Terry Gentle, testified that Defendants maintain a sales journal. (Tr. at 496.) The Court finds that this testimony lacks credibility. If Defendants possess a sales journal, Defendants would have presented the journal to Plaintiffs because Plaintiffs requested the sales journal during discovery. (Pls.' Ex. 151.)

cost of sales.  (Id. at 543, 551, 553.)

### 4. Confusion Among Defendants' Customers Regarding Quality of Unlicensed Trading Cards

128.  Defendant Revels believed that his customers were unsophisticated and could not distinguish between licensed and unlicensed cards.  (Murray Dep. at 42-43.)

129.  Defendants misrepresented to their customers that Defendants' unlicensed trading cards had tremendous value as an investment.  (Tr. at 722-30.)  At trial, Defendant Revels initially denied that Defendants advertised their unlicensed trading cards as good investments.  (Id. at 722.)  When confronted with copies of four of Defendants' advertisements in which Defendants stated that Defendants' unlicensed trading cards possessed large investment value, Defendant Revels conceded that Defendants advertised unlicensed trading cards as good investments.  (Id. at 723-30; Pls.' Exs. 56, 57, 64, 75.)  Additionally, in January 1995, Defendants published an article in The Sports Card Forecasting Newsletter that opines that unlicensed trading cards have investment value.  (Pls.' Ex. 147.)  Defendant Revels admitted that he urged customers on several other occasions to "buy low, sell high" with respect to unlicensed trading cards.  (Tr. at 726.)

130.  In 1993, Robert Malcom, a collector in south Georgia, paid $25 for Defendants' Shaquille O'Neal "Gold

Prism" cards at a card show in Jacksonville, Florida. (Tr. at 141.) He bought the cards because he thought that the cards possessed value as an investment. (<u>Id.</u> at 141.) When Mr. Malcom purchased the cards, he believed that they were licensed by Plaintiff NBA. (<u>Id.</u> at 146, 154.) After the purchase, Mr. Malcom asked several dealers about the value of the cards. (<u>Id.</u> at 147.) The dealers told Mr. Malcom that the cards were worthless. (<u>Id.</u>) Mr. Malcom would not have purchased the cards if he had known that they were unlicensed. (<u>Id.</u>)

### 5. Plaintiffs' Investigation of Defendants

131. In late 1995, Plaintiff NBA asked its private investigator, Wayne Grooms, to investigate Defendants. (Tr. at 61.)

132. During the course of his investigation, Mr. Grooms learned that Defendants bought sports trading cards from Dennis Murray. (Tr. at 61.) In early 1996, Mr. Grooms bought unlicensed trading cards from Defendants. (<u>Id.</u> at 62-63.) In September 1996, Defendants sent <u>The Coin & Sportscard Wholesaler</u> to Mr. Grooms. (<u>Id.</u> at 63.) Mr. Grooms believed that Defendants had placed his name on their mailing list as a result of Mr. Grooms' previous trading card purchase. (<u>Id.</u>)

134. During the course of his investigation, Mr. Grooms informed Plaintiffs that Defendants were advertising unlicensed basketball and football cards in The Coin & Sportscard Wholesaler. (Tr. at 63-64.) At Plaintiffs' request, Mr. Grooms purchased additional trading cards from Defendants. (Id.; Pls.' Ex. 188.) Mr. Grooms determined that the additional basketball and football cards that he received from Defendants were unlicensed. (Tr. at 64.) Plaintiffs then asked Mr. Grooms to conduct a further investigation of Defendants' sports card operation. (Id. at 64, 319-20.)

135. During his investigation, Mr. Grooms learned that: (1) the FTC had sued Defendant Revels and Defendant Dahlonega Mint for deceptive trade practices; (2) the Better Business Bureau possessed many complaints against Defendants; and (3) an outstanding warrant existed for Defendant Revels' arrest for theft by taking. (Tr. at 79-81.)

136. Mr. Grooms subsequently informed the Rossville, Georgia Police Department ("RPD") and the Georgia Bureau of Investigation ("GBI") that Defendants were violating the Georgia anti-counterfeiting statute, O.C.G.A. § 10-1-454. (Tr. at 64-65; Pls.' Ex. 97.)

137. A GBI agent asked Mr. Grooms to verify that Defendants possessed a large quantity of counterfeit trading cards. (Tr. at 66.) In response to this request, Mr. Grooms

called Defendants' facility and spoke to Defendants' sports card manager, Melissa Burton. (Id. at 67.) During this conversation, Ms. Burton told Mr. Grooms that Defendants possessed a large quantity of unlicensed cards "upstairs." (Id.) In fact, Defendants kept the 240,000 unlicensed trading cards that Defendants had obtained from Mr. Murray in a manager's office located on the second floor of Defendants' Rossville, Georgia facility. (Id. at 634.)

138. On February 24, 1997, the RPD and the GBI searched Defendants' Rossville, Georgia, facility pursuant to a search warrant. (Tr. at 67.)

139. Mr. Grooms accompanied the RPD officers and GBI agents during the search to assist the officers and agents in identifying the counterfeit trading cards. (Tr. at 67, 321.) During the search of Defendants' facility, the GBI and RPD seized approximately 30,000 counterfeit cards. (Id. at 68; Pls.' Ex. 97.)

140. Mr. Grooms prepared a report for Plaintiffs documenting Mr. Grooms' observations during the search of Defendants' premises. (Pls.' Ex. 98.) Mr. Grooms witnessed Defendant Revels make a statement to GBI agent Harris. (Id.) Specifically, Mr. Grooms heard Defendant Revels state: (1) Defendants purchased 250,000 cards from Kevin Brady, also known as Dennis Murray; (2) Defendant Revels knew that Mr.

61

Murray was "busted" in Florida for selling identical cards; (3) Defendant Revels remembered receiving letters from Plaintiff NBA in 1993; and (4) Defendants believed that Plaintiff NBA permitted Defendants to sell the unlicensed cards in Defendants' own publication. (Tr. at 70; Pls.' Ex. 98.) The GBI Agent prepared a report after the search documenting Defendant Revels' statements. (Defs.' Ex. 211.) At trial, Defendant Revels denied that he made some of the statements that Mr. Grooms and the GBI Agent documented. (Tr. at 637-39.)

141. During the search, Ms. Burton escorted the law enforcement officials and Mr. Grooms through Defendants' facility. (Tr. at 420.) Ms. Burton testified that she did not remember what she said to the police. (Id. at 423.) Mr. Grooms, however, heard Ms. Burton state: (1) Defendants' employees expected the police to investigate Defendants' conduct; (2) Defendants' employees thought that Defendants were doing something wrong; (3) Defendants had been selling the counterfeit trading cards for four to five years; and (4) Defendants identified the counterfeit cards with an "LM" stock number. (Id. at 76; Pls.' Ex. 98 at 2; Defs.' Ex. 212 at 2.)

142. On the evening of the police search, Ms. Burton spoke to Defendant Revels about Defendants' conduct with respect to unlicensed trading cards. (Tr. at 419.) Ms.

Burton informed Defendant Revels that Ms. Burton would give another statement to the police. (Id.) On the following day, February 25, 1997, Ms. Burton gave another statement to GBI and RPD officers that omits any discussion of her previous suspicion about Defendants' conduct. (Tr. at 403-04; Defs.' Ex. 205.) At trial, Ms. Burton denied that she made the statements that Mr. Grooms attributed to her with the exception of the statement that Defendants had been selling the counterfeit cards for four to five years. (Tr. at 423-24.)

143. A GBI agent prepared a report documenting Ms. Burton's February 25, 1997, conversation with the RPD and GBI. (Tr. at 406-07; Defs.' Ex. 205.) The GBI agent's report indicates that Ms. Burton said that Defendants possessed the unlicensed trading cards before Ms. Burton began her employment with Defendants and that Defendant Revels had told Ms. Burton that Defendants would not be receiving any more unlicensed trading cards to replace the cards currently in inventory. (Tr. at 406-07; Defs.' Ex. 205.) At trial, Ms. Burton also denied making this statement. (Tr. at 409.)

144. The District Attorney did not prosecute Defendants for possessing counterfeit registered marks because the District Attorney believed that Plaintiffs' civil lawsuit was sufficient "punishment for the activity." (Tr. at 82; Defs.'

63

Ex. 694.)

### 6. Damages

145. Both Plaintiffs and Defendants retained expert witnesses to calculate Plaintiffs' damages in this case. (Phillips Dep. at 1-10.; Tr. at 457-60, 465-66.)

146. Defendants failed to keep adequate records of its trading card transactions. (Phillips Dep. at 12-14, 16.) Defendants do not employ or retain the services of an accountant to maintain their financial records. (Tr. at 505.) Instead, Defendant Revels created Defendants' record-keeping system. (Id.)

(a) Defendants do not maintain a general ledger as part of their record-keeping system. (Tr. at 551.) Defendants also lack a system for tracking sales. (Pls.' Ex. 110 at 9.) Additionally, Defendants lack a complete set of descriptive invoices for their purchases. (Tr. at 479.) Defendants also do not possess a system for matching costs to sales. (Phillips Dep. at 18; Tr. at 543, 551, 553.) Similarly, Defendants do not maintain a system to track their inventory of trading cards by product line. (Pls.' Ex. 110 at 9.) Defendants thus failed to comply with the injunction that the Court issued on January 5, 1995, in the FTC case requiring Defendants to maintain such records. (Pls.' Ex. 148 at 3;

Defs.' Ex. 48 at 3.)

(b)  Defendants have no system to keep track of the total number of cards or the number of cards of each design in inventory at any point in time.  (Tr. at 440-41, 444, 550.) Defendants' only inventory control procedure consists of performing a "random count" of their inventory at the end of each year for income tax purposes.  (Id. at 731.)  Defendants do not maintain a system that enables them to match the purchase price of trading cards to the sales of cards to calculate the cost of sales.  (Id. at 543, 551, 553.)

147.  Plaintiffs' expert witness, Charles Phillips, experienced difficulty calculating damages in this case because Defendants failed to keep adequate records.  (Phillips Dep. at 17.)

148.  Mr. Phillips analyzed Defendants' records for the purpose of determining the dollar value of unlicensed trading cards that Defendants sold.  (Phillips Dep. at 6.)  Mr. Phillips prepared a report summarizing his findings.  (Id.)

149.  Mr. Phillips concluded that Defendants' total sales of goods for the period of January 1, 1993, through October 2, 1997, constituted $14,891,696.00.  (Pls.' Ex. 110 at 4.)

150.  Mr. Phillips also concluded that Defendants' sales of trading cards for the period of August 9, 1993, through October 1, 1997, constituted $2.9 million.  (Pls.' Ex. 110 at

4.)

151. Mr. Phillips also concluded that Defendants' sales of the cards depicted in Plaintiffs' Exhibit for the period of January 1, 1993, through October 2, 1997, constituted $168,925.00. (Pls.' Ex. 110 at 4.)

152. Mr. Phillips also found that Defendants sold $152,517.00 of unlicensed trading cards in Defendants' "collector's clubs" for the period of January 1, 1993, through October 10, 1997. (Pls.' Ex. 110 at 4; Pls.' Ex. 222.) To arrive at this figure, Mr. Phillips added the entire sales price for each collector's club set of cards that contained an unlicensed card. (Phillips Dep. at 45; Tr. at 475.)

153. Mr. Phillips concluded that Defendants sold $32,256.00 of unlicensed trading cards in Defendants' "Monster Boxes." (Phillips Dep. at 15-16; Pls' Ex. 222.)

154. Mr. Phillips concluded that Defendants' total sales of unlicensed cards constituted $353,698.00. (Phillips Dep. at 10; Pls.' Ex. 222.) Mr. Phillips did not subtract Defendants' costs from this figure in order to determine Defendants' profits from these sales. (Id. at 28.) Mr. Phillips, however, did state how he would calculate Defendants' costs. (Id. at 25-26.) Mr. Phillips would allow Defendants to claim two percent of their sales revenue as advertising expenses. (Id. at 25-26.) Mr. Phillips gleaned

66

this two percent figure from Defendants' 1993 income tax returns. (<u>Id.</u> at 25.) Because Defendants had claimed two percent of their income as advertising expenses on their 1993 income tax returns, Mr. Phillips concluded that the two percent ratio is appropriate to determine Defendants' advertising costs in the context of Defendants' trading card sales. (<u>Id.</u> at 25-26.) Mr. Phillips provided no method to calculate Defendants' cost of trading cards sold. (<u>Id.</u> at 60.) Mr. Phillips attributes his inability to calculate Defendants' costs of goods sold to Defendants' poor record keeping practices. (<u>Id.</u> at 58-59.)

155. Defendants' expert witness, Terry Gentle, also analyzed Defendants' sales figures for unlicensed trading cards and prepared a report. (Tr. at 466.) Mr. Gentle did not determine independently Defendants' sales of unlicensed trading cards. (<u>Id.</u> at 505.) Mr. Gentle used the figures that Mr. Phillips had calculated for Defendants' sale of trading cards and Defendants' sales of "collector's clubs," as a starting point, and deducted certain amounts from Mr. Phillips's sales figures. (<u>Id.</u> at 505-06.)

156. Mr. Gentle first analyzed Mr. Phillips's figure of $168,025.00 for sales of infringing trading cards. (Tr. at 505-06.)

157. Mr. Gentle then deducted $94,329.00 for sales of

67

"non-infringing cards." (Tr. at 472.)

(a) The first component of this deduction is $63,112.00 for the sale of cards that are properly licensed. (Tr. at 476.) For instance, Mr. Phillips included in his sales figure $48,527.00 for Defendants' sales of a 408 card "Topps Gold Card" set. (Id. at 472.) Plaintiff NBA had licensed the "Topps Gold Card" set. (Id. at 473.) Defendants sold this 408-card set along with a six-card set of infringing "Shaq" cards, a total of 414 cards, for the price of $49.00. (Id. at 472, 510.) Mr. Gentle deducted the entire amount of sales of these card sets from Mr. Phillips's figure because 408 of the 414 cards in this set were licensed. (Id. at 472.) Defendants sold the six-card "Shaq" set by itself for $29.00. (Id. at 513.) Mr. Gentle deducted $10.00 for each sale of the six-card set of "Shaq" cards because Mr. Gentle believed that one of the six cards in the set did not infringe on Plaintiffs' trademarks. (Id.)

(b) The second component of this deduction is $10,723.00 for the sale of cards depicting players in their college uniforms. (Tr. at 476.)

(c) The third component of this deduction is $2,212.00 for the sale of cards depicting players in street clothes. (Tr. at 472.)

(d) The fourth component of this deduction is $1,172.00

68

for the sale of cards that are not related to basketball or football. (Tr. at 477.)

(e) The fifth component of this deduction is $831.00 for the sale of "Team U.S.A." cards. (Tr. at 477.)

(f) The sixth component of this deduction is $15,413.00 for sales of cards depicting players in their team uniforms with the team names and logos removed. (Tr. at 477.) Mr. Gentle deducted this amount because he believes that these cards do not infringe on Plaintiffs' trademarks. (Id.) Mr. Gentle noted that Defendants' cost for these cards was $5,392.00. (Id.)[3]

158. Mr. Gentle deducted $33,057.00 for sales that occurred prior to August 8, 1993. (Tr. at 477.) Mr. Gentle deducted this amount because he believed that Plaintiffs had "waived" their claims for trademark infringement that occurred prior to August 8, 1993. (Id. at 478.)

159. Mr. Gentle deducted $10,213.00 for costs of sales of the infringing cards. (Tr. at 478.) Defendants do not maintain a system for tracking costs of sales. (Id. at 543, 551, 553.) Mr. Gentle instead relied on Defendant Revels' "guesstimates" of Defendants' costs. (Id. at 519; see Defs.' Ex. 730 at 13 (stating that Mr. Gentle relied on "Cost

---

[3] The components of Mr. Gentle's deduction only add up to $93,376.00. Mr. Gentle does not explain how he calculated the additional $953.00 of his deduction. (Tr. at 472-77.)

69

analyses" prepared by Defendant Revels).) Mr. Gentle, however, could not match the costs of cards to the sales of those cards. (Tr. at 519.) Mr. Gentle estimated that Defendants' cost per card was twenty-two cents and computed his cost of goods sold using this estimate. (Id.)

160. Mr. Gentle deducted $25,880.00 for Defendants' advertising costs associated with the infringing cards. (Tr. at 483.)

161. Mr. Gentle concluded that Defendants' net income from infringing cards constituted $5,392.00. (Defs.' Ex. 730 at 9.)

162. Mr. Gentle also recalculated Mr. Phillips' amount of sales from Defendants' "collectors' clubs." (Tr. at 486.) Mr. Gentle started his analysis with Mr. Phillips' figure of $152,517.00 and made several deductions from this amount. (Id.)

163. Mr. Gentle first deducted $141,203.00 for the licensed cards that Defendants sold through the "collector's clubs." (Tr. at 487.) Mr. Gentle deducted this amount because Ms. Hale guessed that only 7.3 percent of the cards that she placed in the "collector's club" card sets were infringing cards. (Id. at 397.) Ms. Hale did not keep a list of card designs or cards provided to members each month. (Id. at 388, 392-95.) Ms. Hale also cannot tell the difference

between licensed and unlicensed trading cards. (_Id._ at 394.)
When Ms. Hale selected the cards for the monthly "collector's
club" sets, Ms. Hale's main concern was to provide a variety
of cards. (_Id._ at 395.) Defendant Revels decided which cards
Ms. Hale could select for the monthly "collector's club" sets.
(_Id._ at 375-76.) Defendants used the "collector's clubs" to
sell "surplus" and "remnant[]" cards. (_Id._ at 379.)

164. Mr. Gentle deducted $5,829.00 for Defendants' costs
for preparing the "Sportscard Forecaster Newsletter." (Defs.'
Ex. 730 at 10.) The "Sportscard Forecaster Newsletter" is the
newsletter that Defendants use to advertise their "collector's
clubs." (Tr. at 488-89.) Mr. Gentle concluded that
Defendants' total cost of preparing the "Sportscard Forecaster
Newsletter" was $79,853.00. (_Id._; Defs.' Ex. 730 at 10.) Mr.
Gentle only deducted 7.3 percent of the total cost of
preparing the newsletter because Mr. Gentle believed that only
7.3 percent of the cards in the "collector's club" card sets
infringed on Plaintiffs' trademarks. (Tr. at 488-89.)

165. Defendants sold at least nine different
"counterfeit" trading card designs after July 2, 1996, (the
date of enactment of the statutory damages provision of 15
U.S.C. § 1117), which infringe Plaintiffs' federal
registrations of marks for trading cards. Plaintiffs'
registered these marks in International Class 41, which covers

entertainment services but does not cover trading cards.

Plaintiffs' registrations are:

a. ATLANTA HAWKS (Reg. 1,944,277), registered December 26, 1995 (Pls.' Ex.1) infringed by card 3-A-1 sold as part of set MCD-12, on February 26, 1997. (Tr. at 534-36);

b. CHICAGO BULLS & Design (Reg. 1,996,894), registered August 27, 1996 (Pls.' Ex.2), infringed by card 3-A-4 sold as part of set MCD-12 on February 26, 1997. (Tr. at 536);

c. ORLANDO MAGIC & Design (Reg. 1,985,838), registered July 9, 1996 (Pls.' Ex.3), infringed by card 3-A-38 sold as part of MCD-29 on October 3, 1996. (Tr. at 537);

d. DALLAS COWBOYS (Reg. 1,930,385), registered October 31, 1995 (Pls.' Ex.22), infringed by the sale of card 3-B-6 as LM-95 on December 18, 1996. (Tr. at 537-38);

e. Detroit Lions helmet design (Reg. 1,850,662), registered August 23, 1994 (Pls.' Ex.23), infringed by sale of card 3-B-20 as LM-96 on December 3, 1996. (Tr. at 538);

f. Miami Dolphins helmet design (Reg. 1,864,650), registered November 29, 1994 (Pls.' Ex.27), infringed by sale of card 3-B-28 at LM-110 on August 26, 1996. (Tr. at 539);

g. New England Patriots helmet design (Reg. 2,029,693), registered January 14, 1997 (Pls.' Ex.29), infringed by sale of card 3-B-32 as LM-73 on March 25, 1997. (Tr. at 539-40);

h. San Francisco Forty-Niners helmet design (Reg. 1,809,130), registered December 7, 1993 (Pls.' Ex.30), infringed by sale of card 3-B-33 as LM-74 on December 27, 1996. (Tr. at 540); and

i. Washington Redskins helmet design (Reg. 1,861,766), registered November 8, 1994 (Pls.' Ex.32), infringed by sale of card 3-B-38 at LM-55 on December 16, 1996. (Tr. at 540-41).

## III. Conclusions of Law

### A. Burden of Proof

Plaintiffs have the burden of proving their trademark infringement claims by a preponderance of the evidence. Playboy Enters. v. Webbworld, Inc., 991 F. Supp. 543, 557 (N.D. Tex. 1997); International Data Group, Inc., v. J&R Elec., Inc., 798 F. Supp. 135, 138 (S.D.N.Y. 1992). Defendants have the burden of proving their affirmative defenses by a preponderance of the evidence. Flav-O-Rich, Inc. v. Rawson Food Serv., Inc., 846 F.2d 1343, 1349 (11th Cir. 1988).

### B. Plaintiffs' Trademark Infringement Claims

Plaintiffs bring their trademark infringement claims under Section 32 of the Lanham Act and under common law. The Lanham Act provides a cause of action for trademark infringement for any use of a mark that is "likely to cause confusion, or to cause mistake, or to deceive" consumers regarding the source of a product or service. 15 U.S.C.A. § 1114. In order to prevail in a trademark infringement case, a plaintiff must show that: (1) it holds a registered trademark that is worthy of protection; and (2) the defendant's use of the allegedly infringing mark created a

likelihood of confusion among customers regarding the origin of the goods that the defendant sold using the mark. _University of Ga. Athletic Ass'n v. Laite_, 756 F.2d 1535, 1540-43 (11th Cir. 1985) (determining first whether mark was worthy of protection and then determining whether the allegedly infringing mark created a likelihood of confusion).

A trademark may consist of "any word, name, symbol, or device" that identifies and distinguishes the goods of one person or entity from those of another. 15 U.S.C.A. § 1127.[4]

### 1. Whether Plaintiffs' "Team Marks" Constitute Protectible Trademarks

Plaintiffs contend that Plaintiff NBA's and Plaintiff NFL's "Team Marks" constitute protectible trademarks in the form of "trade dress." "Trade dress" is a type of trademark composed of "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." _AmBrit, Inc. v. Kraft, Inc._, 812 F.2d 1531, 1535 (11th Cir.

---

[4] A service mark may consist of "any word, name, symbol, or device" that identifies and distinguishes the services of one person or entity from those of another." _Id._ In this Order, the Court uses the term "trademark" in its broadest sense to refer to both trademarks, service marks, trade dress and other source identifying indicia for goods or services. _See Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc._, 510 F.2d 1004, 1009 (5th Cir. 1975) ("terms can be used interchangeably").

1986); see also Bauer Lamp Co. v. Shaffer, 941 F.2d at 1170 (applying trade dress analysis to design of lamp); John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983) (applying trade dress analysis to design of checkbook). In its ordinary state, Plaintiffs' trade dress with respect to sports trading cards consists of Plaintiffs' team uniform designs, complete with team colors, team names, team logos, and word marks. (Tr. at 273-80; Hagen Dep. at 21.)

Plaintiffs also contend that the various components of Plaintiffs' "Team Marks" such as Plaintiffs' team uniform designs (with the team names and logos removed) or Plaintiffs' team colors constitute separate, protectible trademarks. A background design may constitute a separate protectible trademark only when the background design creates a separate commercial impression on the ordinary buyer. In re Chemical Dynamics, Inc., 839 F.2d 1569, 1570 (Fed. Cir. 1988); 1 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 7:27 (4th ed. 1998). A plaintiff may not sever a trademark that the plaintiff uses as a complete mark into components and protect each separate component unless each component creates an independent commercial impression with consumers. In re Chemical Dynamics, Inc., 839 F.2d at 1570; 1 McCarthy, supra § 7:27. Plaintiffs have proffered abundant evidence that the

75