public associates Plaintiffs' team colors with Plaintiffs' teams. (Findings of Fact Nos. 25, 30, 31, 53.) Additionally, Plaintiffs have proffered copies of Plaintiffs' registrations of Plaintiffs' team uniform designs with the team names and logos removed with the United States Patent and Trademark Office ("PTO") as evidence that the uniform designs themselves are protectible. (Findings of Fact Nos. 10, 36.)

The Court need not reach the question of whether the team colors or uniform designs constitute trademarks, however, for two reasons. First, Plaintiffs' evidence that their team colors and team uniform designs constitute separate, protectible trademarks primarily relates to product markets other than the sports trading card market. Plaintiffs' trademark registrations of Plaintiffs' team uniform designs also relate to product markets other than the sports trading card market. Plaintiffs' evidence thus is not dispositive with respect to whether consumers of sports trading cards consider team colors and team uniform designs on a particular sports trading card indicia that Plaintiffs licensed or approved that sports trading card. Second, the Court finds liability for all trading card designs based on Plaintiffs' "Team Marks" as a whole, and therefore need not determine whether Plaintiffs may protect the separate components of Plaintiffs' "Team Marks." The Court thus proceeds under the

theory that the trademarks that Plaintiffs assert in this case are the team uniform designs complete with team names and logos.

The Court concludes that Plaintiffs' "Team Marks" constitute protectible trademarks. When determining whether a mark is worthy of protection, courts first must classify the mark as generic, descriptive, suggestive, arbitrary, or coined. University of Ga. Athletic Ass'n, 756 F.2d at 1540. Marks that are generic are worthy of no protection whatsoever. Freedom Sav. & Loan Assoc. v. Way, 757 F.2d 1176, 1182 n.5 (11th Cir. 1985). Marks that are descriptive are worthy of protection only if the plaintiff shows that the marks have achieved "'secondary meaning--[t]he power of a name or other configuration to symbolize a particular business, product or company . . . .'" University of Ga. Athletic Ass'n, 756 F.2d at 1540 (quoting Universal City Studios, Inc. v. Nintendo Co., 578 F. Supp. 911, 923 (S.D.N.Y. 1983)). Marks that are suggestive, arbitrary, or coined, however, are worthy of protection without proof that the marks have achieved secondary meaning. University of Ga. Athletic Ass'n, 756 F.2d at 1540.

Fifty-three sports card designs depicting professional athletes in team uniforms with the team names and logos removed, partially removed, or obscured remain at issue in

this case.[5] Plaintiffs argue that the depiction of a professional athlete in a uniform that resembles a professional sports team uniform, but that does not depict a professional sports team name or logo, nevertheless infringes on Plaintiffs' "Team Marks." When considering this claim, the Court's analysis focuses on whether it is more likely than not that Defendants' use of the team uniform designs with the team names and logos removed creates a likelihood that consumers would believe that Plaintiffs licensed these sports cards.

Plaintiffs registered some of the marks underlying their claims with the United States Patent and Trademark Office ("PTO"). A PTO certificate of registration constitutes prima facie evidence of the registrant's right to use the mark, but it does not preclude one who is sued for trademark infringement from proving "any legal or equitable defense or defect which might have been asserted if such mark had not been registered." 15 U.S.C.A. § 1115(a); Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1184 (5th Cir. 1980).[6] If, however, a registrant has used his mark in connection with the goods or services specified on his registration for five

_____

[5] On June 3, 1998, the Court granted summary judgment to Plaintiffs on the issue of trademark liability with respect to the sixty-seven uncontested designs. (Order of June 3, 1998.)
[6] Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent. Bonner v. City of Prichard, 661 F.2d 1296, 1209-11 (11th Cir. 1981) (en banc).

AO 72A

continuous years after the registration date, his mark is deemed "incontestable," 15 U.S.C.A. § 1065, and his registration constitutes "conclusive evidence" of his right to use the mark, subject only to the seven defenses enumerated in 15 U.S.C.A. § 1115(b). An "incontestable" mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be nondescriptive or to have acquired secondary meaning. Soweco, 617 F.2d at 1184; Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 377 (7th Cir. 1976).

Here, Plaintiffs only may use PTO certificates of registration that meet two requirements as prima facie evidence of Plaintiffs' right to use the trademarks. First, the certificate of registration must predate the alleged infringement. Investacorp, Inc. v. Arabian Banking Corp., 931 F.2d 1519, 1524-25 (11th Cir. 1991) (requiring plaintiff to establish prima facie case of trademark rights prior to time when defendant began using accused mark); Sodima v. International Yogurt Co., 662 F. Supp. 839, 843 (D. Or. 1987) (PTO registration "constitutes prima facie evidence . . . from the date of the filing of the application.") (emphasis added). Second, the certificate of registration must cover the type of goods that the defendant sold. Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1354 (9th Cir. 1985) (a registrant cannot rely on certificate of registration for pants as prima

79

facie evidence of secondary meaning in shirt market); <u>Miller Brewing Co. v. G. Heileman Brewing Co</u>, 561 F.2d 75, 78-79 (7th Cir. 1977) (holding certificate of registration for beer with no available carbohydrates is not prima facie evidence of rights when used by registrant on beer with available carbohydrates). Although some of Plaintiffs' PTO certificates satisfy both criteria for differing periods of time, none of Plaintiffs' PTO certificates satisfy both criteria for the entire time period relevant to this lawsuit. (Pls.' Exs. 1-3, 21-32.)

For instance, Plaintiff NBA's PTO Certificate of Registration Number 1,933,277 establishes Plaintiff NBA's trademark "ATLANTA HAWKS" with respect to trading cards and is dated December 26, 1995. (Pls.' Ex. 1.) Plaintiff NBA thus may only use this certificate as prima facie evidence of the protectibility of its "ATLANTA HAWKS" trademark on trading cards after December 26, 1995, which is over two years after Defendants began selling the trading cards at issue. Because none of Plaintiffs' registrations meet both criteria for the entire period that Defendants sold the trading cards at issue, the Court must independently determine whether Plaintiffs' trademarks are protectible.[7]

---

[7] The Court notes that the inquiry into whether a plaintiff may use a PTO registration certificate as prima facie evidence of the protectibility of a trademark is different from an inquiry into whether a defendant infringed on a registered

Courts protect trademarks to varying degrees, according to the category into which the trademarks fall. University of Ga. Athletic Ass'n, 756 F.2d at 1540. Trademarks falling into the generic category receive no protection whatsoever. Freedom Sav. & Loan Ass'n, 757 F.2d at 1182 n.5. Trademarks falling into the descriptive category are protected only if they have acquired a secondary meaning, so that customers associate a particular manufacturer with the descriptive mark at issue. See University of Ga. Athletic Ass'n, 756 F.2d at 1540 ("We therefore hold that . . . proof of secondary meaning is required in an action under section 43(a) only when protection is sought for a descriptive mark, as opposed to an arbitrary or suggestive mark."). Trademarks falling into the suggestive, arbitrary, or coined categories are protected even without proof that they have acquired secondary meaning. Id.

When classifying Plaintiffs' marks, the Court examines the marks' relationship to the ultimate source of the mark, not the product that Defendants sold, even though the Plaintiffs may assert the marks in different product markets.

trademark. A plaintiff only may use the PTO certificate to establish the trademark's protectibility for the type of goods described in the certificate. Levi Strauss, 778 F.2d at 1354; Miller Brewing, 561 F.2d at 78-79. A plaintiff, however, may prevail in an infringement action if the defendant uses the registered trademark in a different, but related product market. Sweetarts v. Sunline, Inc., 380 F.2d 923, 925 (8th Cir. 1967); 3 McCarthy, supra, §§ 24:5-66 (describing likelihood of confusion in infringement analysis for "related goods or services").

81

See id. at 1541 (examining bulldog trademark's relationship to the plaintiff's sports teams, rather than examining the mark's relationship to the beer sold by defendant); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204 (2d Cir. 1979) (examining cheerleader uniform design's relationship to cheerleading services rather than to the film shown by defendant). Stated differently, rather than examining the marks' relationship to trading cards, the Court must examine whether Plaintiffs' marks are suggestive, arbitrary, or coined with respect to NBA and NFL teams, which are the ultimate source of the marks. University of Ga. Athletic Ass'n, 756 F.2d at 1541.

A suggestive mark subtly connotes something about the service that it represents. Id. An arbitrary or coined mark is completely fanciful, bearing no relationship to the service that it represents. Id. Here, the marks consist of uniforms with team names and logos, which Plaintiffs created to generate recognition and enthusiasm among sports fans. The relationship between the marks and the services provided by Plaintiffs thus is, at most, suggestive. For instance, the team name "Orlando Magic" is suggestive with respect to the basketball team that the name represents because the name subtly suggests that the team is composed of players with magical basketball talents.

82

Plaintiffs' team uniform designs and team colors tend to be more fanciful or arbitrary. Plaintiffs carefully select and promote the team colors and team uniform design based on Plaintiffs' desire to attract attention to Plaintiffs' teams. (Tr. at 174, 176, 216-17; Colin Dep. at 24-26.) The Court thus concludes that Plaintiffs' "Team Marks" range from suggestive to arbitrary and do not approach the domain of "descriptive" marks that only receive protection if they have achieved secondary meaning. University of Ga. Athletic Ass'n, 756 F.2d at 1541; Freedom Sav. & Loan Ass'n, 757 F.2d at 1182 n.5. Plaintiffs' marks therefore are strong and protectible even without a showing that the marks have acquired secondary meaning. University of Ga. Athletic Ass'n, 756 F.2d at 1541; Freedom Sav. & Loan Ass'n, 757 F.2d at 1182 n.5.

2. Likelihood of Confusion

The Court next determines whether Defendants' use of Plaintiffs' team colors and uniform designs on trading cards creates a likelihood that consumers will be confused regarding Plaintiffs' sponsorship of the cards. The Eleventh Circuit has identified seven factors to consider when deciding whether a likelihood of confusion exists between a trademark and an allegedly infringing mark: (1) the type of trademark at issue; (2) similarity of design; (3) similarity of services; (4)

83

identity of purchasers and similarity of retail outlets; (5) similarity of advertising campaigns; (6) the defendant's intent; and (7) actual confusion. <u>Freedom Sav. & Loan Ass'n.</u>, 757 F.2d at 1176, 1182; <u>Safeway Stores, Inc. v. Safeway Discount Drugs</u>, 675 F.2d 1160, 1164 (11th Cir. 1982); <u>Roto-Rooter Corp. v. O'Neal</u>, 513 F.2d 44, 45 (5th Cir. 1975);[8] <u>Continental Motors Corp. v. Continental Aviation Corp.</u>, 375 F.2d 857, 861 (5th Cir. 1967).

In deciding whether Defendants' use of the team uniform designs with the team names and logos removed created a likelihood of confusion, the Court applies the Eleventh Circuit's seven factors analysis. <u>Freedom Sav. & Loan Ass'n</u>, 757 F.2d at 1182; <u>Safeway Stores</u>, 675 F.2d at 1164. The Court concludes that a likelihood of confusion exists in this case because all seven factors weigh in favor of a such a conclusion.

### a. Type of Mark

The Court already has concluded that Plaintiffs' "Team Marks" are strong and protectible even without a showing that the marks have acquired secondary meaning. (<u>Supra</u> Part II.B.1.) This factor thus weighs in favor of a finding of

---

[8]    Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. <u>See</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

confusion.

### b. Similarity of Design

In examining the similarity of the two marks, the Court compares the overall design of Plaintiffs' "Team Marks" with the overall design of Defendants' trading cards and inquires whether any significant differences exist between the two. Freedom Sav. & Loan Ass'n, 787 F.2d at 1183. Defendants' designs are identical to Plaintiffs' designs except that Defendants have removed the team names and logos.

Defendants' designs depict players with well-known reputations as professional athletes in their team uniforms with team colors. (Pls.' Ex. 49.) Defendants' designs contain descriptions of the players' performance in Plaintiffs' professional athletic events. (Id.) Defendants' designs often depict players performing during Plaintiffs' professional athletic events.

When Plaintiffs use their marks on sports cards, they include a special logo, demonstrating that the cards are officially licensed by Plaintiffs. Defendants did not include Plaintiffs' licensing insignia on Defendants' card designs. (Id.) The Court believes that Defendants' removal of Plaintiffs' team names, logos, and licensing insignia, however, is not a significant alteration of Plaintiffs' "Team Marks." The Court thus concludes that this factor weighs in

AO 72A
(Rev. 8/82)

favor of a finding of confusion.

### c. Similarity of Services

Plaintiffs license the use of their "Team Marks" to sports trading card manufacturers. (Tr. at 263; Hagen Dep. at 17.) Plaintiffs thus employ their marks in a manner that is similar, if not identical, to the manner in which Defendants utilized their marks. The Court concludes that this factor weighs in favor of a finding of confusion.

### d. Identity of Purchasers and Similarity of Retail Outlets

Defendants sold their trading card designs in retail outlets identical to the outlets in which Defendants and other retailers sold Plaintiffs' licensed trading cards. Prior to 1993, Defendants sold their trading cards in hobby magazines such as "Sports Collectors Digest, Tuff Stuff Magazine, Baseball Hobby News, and perhaps others." (Tr. at 669; Pls.' Ex. 48 (Answer to Interrog. No. 12).) These magazines advertised numerous products bearing the NBA Team Marks and the NFL Trademarks that Plaintiffs had licensed. (Hagen Dep. at 44-45.)

Since 1993, Defendants only have sold cards through their own magazine called <u>The Coin & Sportscard Wholesaler</u>. (Tr. at 664; Pls.' Exs. 52-94.) Defendants advertised trading cards that Plaintiffs had licensed next to trading cards that

AO 72A
(Rev.8/82)

Plaintiffs had not licensed in <u>The Coin & Sportscard</u> <u>Wholesaler</u> without distinguishing between the two types of cards. (Tr. at 665; Pls.' Exs. 52-94.)

Because Defendants sold their trading cards through retail outlets identical to those through which Plaintiffs' licensed trading cards were sold, the identity of the consumers who purchased Defendants' cards also is identical to the consumers who purchased Plaintiffs' licensed trading cards. The Court thus concludes that this factor weighs in favor of a finding of confusion.

### e. Similarity of Advertising Campaigns

Defendants advertised their unlicensed sports cards in the same publications as Plaintiffs' officially licensed sports cards. (Tr. at 665; Pls.' Exs. 52-94.) Indeed, Defendants included both unlicensed trading cards and Plaintiffs' licensed trading cards in the same advertisements. (Tr. at 665; Pls.' Exs. 52-94.) The Court thus concludes that this factor weighs in favor of a finding of confusion.

### f. Defendants' Intent

Plaintiffs have adduced abundant evidence that compels the Court to conclude that Defendants intentionally copied Plaintiffs' "Team Marks." Defendants were experienced dealers in collectible coins prior to entering the sports trading card

business. (Tr. at 663.) Authenticity is an important aspect of the collectible coin business. (Id.) Defendants previously had several problems with authenticity including several lawsuits. Supra at 53-54. Defendants thus should have made an extra effort to determine whether the sports trading cards that they sold were authentic.

Even if Defendants were unaware of the authenticity issue prior to 1993, Defendants learned in 1993 that they could not sell unlicensed sports trading cards depicting Plaintiffs' "Team Marks" without infringing on Plaintiffs' trademarks. Plaintiffs' letters to Defendants adequately informed Defendants that selling trading cards depicting Plaintiffs' professional athletes in "airbrushed" uniforms infringed on Plaintiffs' trademark rights.

Defendant Revels testified at trial that Defendants were unaware that they were infringing on Plaintiffs' trademark rights. (Tr. at 679.) The Court rejects Defendant Revels' testimony for two reasons. First, Defendants' conduct demonstrates that Defendants intentionally infringed on Plaintiffs' trademarks. Defendants maintained unsatisfactory records despite being subject to a Court order to maintain adequate records. Supra at 54-55. The Court infers from Defendants' poor record-keeping that Defendants knew that they were infringing on Plaintiffs' trademark rights and were

88

attempting to cover their tracks.

Additionally, Mr. Murray testified that Defendant Revels admitted that Defendants knew that they were violating Plaintiffs' trademark rights but continued to do so because Defendants were making a lot of money selling the unlicensed trading cards. (Murray Dep. at 37-39.) Although Mr. Murray is mentally ill and recanted his testimony the day after his deposition, Mr. Murray's testimony is corroborated by other facts in the record. First, Mr. Murray's account of how Defendants obtained the 80,000 unlicensed trading cards that the RPD and GBI seized is more credible that Defendant Revels' account. Supra at 47-51. Second, Mr. Murray testified about facts that he would not have known about unless his testimony was true. For instance, Defendant Revels denied discussing his legal troubles with Mr. Murray, yet, Mr. Murray knew about all of Defendant Revels' prior lawsuits. (Murray Dep. at 39.) Mr. Murray also had detailed knowledge about the inside of Defendants' premises, Defendants' relationship with Gary Fillers, Defendants' printing operation, and Defendants' sales practices that Mr. Murray would not have known unless Defendant Revels told him. The Court thus believes that Mr. Murray's testimony that Defendant Revels intentionally infringed on Plaintiffs' trademarks to maximize Defendants'

AO 72A

profits is more likely than not true.[9]

The second reason that the Court rejects Defendant Revels' denial that Defendants knew they were infringing on Plaintiffs' trademarks is Defendant Revels' lack of credibility. Defendant Revels' trial testimony was evasive and contradicted more credible evidence. For example, Defendant Revels denied that Mr. Fillers had anything to do with Defendant Chattanooga Coin. (Tr. at 652.) When Plaintiffs' attorney showed Defendant Revels an article that Defendant Revels wrote that discussed Mr. Fillers' strong ties to Defendant Chattanooga Coin, however, Defendant Revels admitted that Mr. Fillers is the founder and previous owner of Chattanooga Coin. (Tr. at 730.)

Another Example of Defendant Revels' lack of credibility is Defendant Revels' bizarre account of how Defendants obtained the 80,000 unlicensed trading cards from Mr. Murray. Defendant Revels testified that Mr. Murray arrived at Defendants' Rossville, Georgia, facility unannounced and left 80,000 trading cards for Defendants to store. (Tr. at 633.) Yet, Defendant Revels' attorney wrote a letter to the RPD pleading for the return of the 80,000 trading cards. (Pls.' Ex. 237.) The letter stated that the cards were important to

---

[9]  The Court notes that, even without Mr. Murray's testimony, the Record contains enough evidence to convince the Court that Defendants knew that they were infringing on Plaintiffs' trademarks.

Defendant Revels' livelihood. (Id.) Defendant Revels' employees' testimony that they used the 80,000 unlicensed trading cards as inventory to sell also contradicts Defendant Revels' account. (Tr. at 376, 418, 421.)

Finally, Defendant Revels' denial is contradicted by the fact that he is an experienced collectible coin dealer with prior legal problems. Supra at 53-54. Given this background, Defendant Revels would have ensured the authenticity of Defendants' trading cards unless Defendants were intentionally selling infringing trading cards.

### g.  Actual Confusion

Plaintiffs have proffered circumstantial evidence that consumers were confused as to the source of Defendants' unlicensed trading cards. Supra Part II.C.4. Plaintiffs also presented one witness, Mr. Macolm, who actually purchased one of Defendants' unlicensed trading card designs thinking that it was licensed by Plaintiff NBA. (Finding of Fact 130.) Plaintiffs' evidence is sufficient to tip this factor in favor of a finding of confusion.

### h.  Summary

All the factors favor a finding of confusion. The Court thus concludes that Defendants' sale of the contested trading card designs created a likelihood that consumers would believe

AO 72A
(Rev.8/82)

that Plaintiffs had licensed or approved the designs. Because Plaintiffs' marks were registered during a portion of the infringement period, the Court finds trademark infringement liability under both the Lanham Act and common law.

### C. Plaintiffs' Counterfeiting Claims

The Court also finds liability with respect to Plaintiffs' counterfeiting claims. In order to prevail on a counterfeiting claim, a plaintiff must demonstrate that the defendant infringed on a registered trademark in violation of 15 U.S.C.A. § 1114(1)(a), and that the defendant "intentionally used a mark, knowing such mark is a counterfeit mark." 15 U.S.C.A. § 1117(b); Babbit Elec., Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994). As discussed in the prior section of this Order, the record contains ample evidence that Defendants intentionally used Plaintiffs trademarks and that Defendants knew that the marks were counterfeit.

### D. Plaintiffs' Remaining Claims

Because the Court already has concluded that Defendants are liable under the Lanham Act and common law for trademark infringement and counterfeiting, the Court need not address Plaintiffs' remaining claims. The Court's only remaining task

is to calculate damages. <u>University of Ga. Athletic Ass'n</u>, 756 F.2d at 1539 n.11.[10]

## III. Damages

### A. Monetary Relief

The Lanham Act and common law provide the Court with substantial discretion in fashioning monetary relief.[11] 15 U.S.C.A. § 1117(a); <u>Ramada Inns, Inc. v. Gadsden Motel Co.</u>, 802 F.2d 1562, 1564 (11th Cir. 1986); <u>American Farm Bureau Fed'n v. Alabama Farmers Fed'n</u>, 935 F. Supp. 1533, 1549 (M.D. Ala. 1996). Here, the Court awards Plaintiffs monetary relief in the form of Defendants' profits for three reasons: (1) such a measure represents a rough approximation of the amount that Plaintiffs lost in potential sales as a result of Defendants' infringement; (2) such a measure prevents unjust enrichment; and (3) such a measure will deter Defendants from future infringement. <u>George Basch Co. v. Blue Coral, Inc.</u>, 968 F.2d 1532, 1537 (2d Cir. 1992); <u>Frisch's Restaurant v. Elby's Big</u>

---

[10] Defendants have three affirmative defenses: (1) laches; (2) acquiescence; and (3) accord and satisfaction. Defendants have failed to prove these defenses by a preponderance of the evidence. Indeed, the Court finds that no evidence exists in the record whatsoever to support Defendants' affirmative defenses.

[11] The Court finds that Defendants have infringed on Plaintiffs' registered trademarks and common law trademarks. The Court thus may award relief under both the Lanham Act and common law.

Boy, 661 F. Supp. 971, 989 (S.D. Ohio 1987).

"An accounting for profits has been determined by [the Eleventh Circuit] to further the congressional purpose by making infringement unprofitable, and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity." Burger King Corp. v. Mason, 855 F.2d 779, 781 (11th Cir. 1988); accord Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 584-85 (5th Cir. 1980). Thus, "the law in this Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits," nor does such an award require "a higher showing of culpability." Burger King, 855 F.2d at 781; see also Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1487 (11th Cir. 1987).

### 1. Plaintiffs' Burden: Proving Gross Sales

In calculating profits, the Lanham Act provides that the plaintiff "shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claims." 15 U.S.C. § 1117(a) (1994); see Wesco, 833 F.2d at 148 ("It is enough that the plaintiff proves the infringer's sales. The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales.").

In this case, the Court cannot determine Defendants' precise revenue from its sales of the unlicensed cards because of Defendants' poor record-keeping practices. Under these circumstances, the Court may use Plaintiffs' "reasoned basis for calculating defendant's infringing sales." Louis Vuitton S.A. v. Wright, 24 U.S.P.Q.2d 1706, 1708 (N.D. Ga. 1992). Defendants then must prove that a different calculation of their profits is superior to Plaintiffs' calculation. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931) ("It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."); Wesco, 833 F.2d at 1488 ("[a]lthough the exact amount of infringing sales cannot be determined from the [evidence], exactness is not required. [The defendant] is in the best position to ascertain exact sales and profits, and it bears the burden of proving so . . . . ."); see Ramada Inns, 804 F.2d at 1565 ("The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of injury."); see also Chesa Int'l Ltd. v. Fashion Assocs., 425 F. Supp. 234, 238 (S.D.N.Y.)

(calculating profits "at the highest reasonably ascertainable value."), aff'd, 573 F. Supp. 1288 (2d Cir. 1977).

Here, Plaintiffs' expert witness, Charles Phillips has established that Defendants sold $168,925.00 of trading card sets that contained infringing cards, $152,517.00 of "collector's clubs" sets that contained infringing cards, and $32,256.00 of "Monster Boxes" that contained infringing trading cards. (Phillips Dep. at 10-16; Pls.' Exs. 110, 222.) Mr. Phillips thus calculated that Defendants' total sales of infringing cards constituted $353,698.00. (Phillips Dep. at 10-16; Pls.' Ex. 110.) The Court finds that Mr. Phillips' calculations satisfy Plaintiffs' burden of proving Defendants' sales of infringing merchandise. 15 U.S.C. § 1117(a); Wesco, 833 F.2d at 148.


### 2. Defendants' Burden: Proving Expenses and Deductions

Once a plaintiff satisfies its burden of proving the total sales of infringing merchandise, the burden shifts to the defendant to "prove its expenses and other deductions from gross sales." Wesco, 833 F.2d at 148. Defendants' expert witness, Terry Gentle, recommended that the Court make certain deductions to Mr. Phillips' figures. (Tr. at 472.) The Court reviews each of these deductions in turn.

Mr. Gentle's first deduction is $94,329.00 for sales of

"non-infringing cards." (Tr. at 472.) In calculating this deduction, Mr. Gentle opined that the sales for some of the contested designs that Mr. Gentle believes do not infringe on Plaintiffs' trademarks should not have been included in Mr. Phillips' figures. Mr. Gentle also contended that when Defendants sold infringing cards in sets with licensed cards, these sales should not have been included in Mr. Phillips' figure.

The Court rejects Mr. Gentle's first deduction for two reasons. First, the Court already has determined that all the contested designs infringe on Plaintiffs' trademarks. Second, the evidence in the record indicates that the Defendants "induced" sales of the licensed sets with infringing cards, even if the majority of the cards in the sets were licensed. In determining Defendants' profits, the Court may include both the sales of infringing items and the sales of non-infringing items "induced" by the infringing items:

> If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher.
> * * *
> There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.

97

<u>Mishawaka Rubber & Woolen Mfg., Co. v. S.S. Kresge Co.</u>, 316 U.S. 203, 206, 207 (1942). Because Defendants have proffered no evidence that consumers bought the sets for any reason other than because Defendants included infringing cards in the sets, the Court refuses to accept Mr. Gentle's first deduction.

Mr. Gentle's second deduction is $33,057.00 for sales that occurred prior to August 8, 1993. (Tr. at 477.) Mr. Gentle deducted this amount because he believed that Plaintiffs had "waived" their claims for trademark infringement that occurred prior to August 8, 1993. (<u>Id.</u> at 478.) The Court rejects this deduction because no evidence in the record indicates that Plaintiffs waived trademark claims occurring prior to August 8, 1993.

Mr. Gentle's third deduction is $10,213.00 for Defendants' "cost of sales" for the infringing cards. (Tr. at 478.) Defendants bear the burden of demonstrating that any claimed deductions are directly related to, or necessitated by, Defendants' production and sale of the infringing goods. <u>See</u> <u>Maltina</u>, 613 F.2d at 586 (requiring defendant to demonstrate that expenses claimed "actually related" to sales under infringing trademark). These deductions must be particular costs, and cannot be in the form of undifferentiated and unexplained expenses, nor can they

98

consist of "general" overhead. See id. at 586-87 (disallowing defendant's attempt to deduct unspecified expenses); see also Duro Co. of Ohio v. Duro Co. of N.J., 56 F.2d 313, 315 (3d Cir. 1932) (disallowing attempted deduction of "general" expenses).

Defendants do not maintain a system for tracking costs of sales. (Tr. at 543, 551, 553.) Mr. Gentle instead relied on Defendant Revels' "guestimates" of Defendants' costs. (Id. at 519; see Defs.' Ex. 730 at 13 (stating that Mr. Gentle relied on "Cost analyses" prepared by Defendant Revels).) Mr. Gentle, however, could not match the costs of cards to the sales of those cards. (Tr. at 519.) Mr. Gentle estimated that Defendants' cost per card was twenty-two cents and computed his cost of goods sold using this estimate. (Id.) The Court finds that Mr. Gentle's calculation of Defendants' costs of goods sold is not credible and rejects Mr. Gentle's third deduction. See Contemporary Restaurant Concepts, Ltd. v. Las-Tapas Jacksonville, Inc., 19 U.S.P.Q.2d 1411, 1417 (M.D. Fla. 1991) (rejecting defendant's claimed deductions for costs because defendant "failure[d] to produce a single item of evidence corroborating [claimed] deductions.")

Mr. Gentle's fourth deduction is $25,880.00 for Defendants' advertising costs associated with the infringing cards. (Tr. at 483.) Again, Defendants bear the burden of

AO 72A
(Rev.8/82)

demonstrating that any claimed deductions are directly related to, or necessitated by, Defendants' production and sale of the infringing goods. See <u>Maltina</u>, 613 F.2d at 586 (requiring defendant to demonstrate that expenses claimed 'actually related" to sales under infringing trademark). These deductions must be particular costs, and cannot be in the form of undifferentiated and unexplained expenses, nor can they consist of 'general" overhead. See <u>id.</u> at 586-87 (disallowing defendant's attempt to deduct unspecified expenses); <u>see also</u> <u>Duro</u>, 56 F.2d at 315 (disallowing attempted deduction of 'general" expenses). Mr. Gentle sufficiently demonstrated that these expenses were related to Defendants' sales of infringing trading cards. The Court thus allows Mr. Gentle's fourth deduction.

Mr. Gentle's fifth deduction is $141,203.00 for the licensed cards that Defendants sold through the 'collector's clubs." (Tr. at 487.) Mr. Gentle deducted this amount because Opal Hale, Defendants' employee who assembled the 'collector's club" sets, guessed that only 7.3 percent of the cards that she placed in the 'collector's club" card sets were infringing cards. (<u>Id.</u> at 397.)

Ms. Hale's guess is not credible. Ms. Hale did not keep a list of card designs or cards provided to members each month. (<u>Id.</u> at 388, 392-95.) Ms. Hale also cannot tell the

100