

**The Upper Deck Company**
**Contract No. ML-2302H(mb)**

## MAJOR LEAGUE BASEBALL PROPERTIES, INC.
## LICENSE AGREEMENT

This license agreement (the "Agreement") is by and between Major League Baseball Properties, Inc., 245 Park Avenue, New York, NY 10167 (hereinafter referred to as "Licensor"), on its own behalf and as agent for each of the entities specified in **Schedule A** (collectively, the "MLB Entities"), and the individual/entity identified in **Schedule B** (hereinafter referred to as "Licensee"). This Agreement is not effective until signed by the parties hereto.

### THIS WILL CONFIRM OUR AGREEMENT AS FOLLOWS:

1. **GRANT OF LICENSE:** Licensor grants to Licensee for the term of this Agreement, subject to the terms and conditions hereinafter contained (including, without limitation, the additional miscellaneous terms and conditions contained in **Schedule P** hereto and the limitations set forth in the attached **Exhibit 1**), the limited exclusive (as set forth in **Schedule P, Exclusivity**) and the non-exclusive license to utilize certain specified names, trademarks, service marks, trade dress and copyrights, including word marks, logos, uniform designs, mascots, images, colors and color combinations, characters, symbols, designs, likenesses and visual representations associated with and/or related to the various Major League Baseball-affiliated entities and their products and services, as described in **Schedule D** attached hereto (herein such names, trademarks, service marks, trade dress and copyrights, including word marks, logos, uniform designs, mascots, images, colors and color combinations, characters, symbols, designs, likenesses and visual representations are collectively called the "Licensed Properties"), to be used solely in connection with the manufacture, distribution, promotion, advertisement and sale of the article or articles specified in **Schedule E** attached hereto (herein such article or articles are called "Licensed Products"). Licensee acknowledges and agrees that all Licensed Products shall conform to Licensor's then-current labeling requirements and, except to the extent specifically set forth in **Schedule E** below, only then-current Licensed Properties shall be featured in the Licensed Products. For purposes of this Agreement, "then-current" shall mean current at the time of Licensee's production of each Licensed Product as specified in Licensor's Official Style Guides or as otherwise specified by Licensor. This license does not constitute and may not be used so as to imply the endorsement of the Licensed Products or any other product of Licensee by Licensor and/or each of the Licensor Indemnitees (as defined in **Schedule C**). While the Licensed Properties may be used as trademarks or service marks subject to the terms of this Agreement, the Licensed Properties are not licensed herein for use as certification marks or indications of a particular standard of quality. Any exclusivity granted hereunder shall be subject to (i) presently outstanding agreements granted by the Clubs; (ii) the rights of Licensor and the Licensor Indemnitees, and each of their respective affiliates to distribute (directly or indirectly) products throughout the world (through any means or medium); and (iii) the grant by Licensor to the Major League Baseball Players Alumni Association (the "MLBPAA") of worldwide rights to utilize the word marks "Major League" and "Major League Baseball" as part of the MLBPAA's name, logos, designs, symbols and other visual representations (the "MLBPAA Marks"), which include the right to grant to third parties the right to use the MLBPAA Marks. Further, any exclusivity granted hereunder shall pertain only to the extent of the Licensed Products described, if and as specified in this Agreement. Licensor warrants and represents that as the agent for the MLB Entities, pursuant to authority granted by the MLB Entities, it has the full authority to license the Licensed Properties in connection with the manufacture, distribution, promotion, advertisement and sale of the Licensed Products.

**2.     TERRITORY:** Licensee shall be entitled to use the license granted hereunder only in the territory described in **Schedule F** attached hereto (herein such territory is called the "Licensed Territory"). Licensee will not make use of or authorize any use of this license or the Licensed Products outside the Licensed Territory or distribute or sell the Licensed Products directly or

# Redacted

Licensee may use manufacturers outside the Licensed Territory in accordance with Paragraph 13(U) below, provided that such manufacturers are identified in **Schedule Q** and such manufacturers do not sell the Licensed Products to anyone other than Licensee. Licensee may also distribute the Licensed Products to other licensees of Licensor as and to the extent Licensor authorizes such other licensees to purchase such Licensed Products from Licensee. The parties hereby acknowledge and agree that, in respect of the provision of Licensed Products pursuant to Paragraph 13(M) below directly to the Clubs, or the Clubs belonging to The National Association of Professional Baseball Leagues d/b/a Minor League Baseball ("Minor League Clubs"), located in Canada or their owned or controlled retail operations, the Licensed Territory shall include Canada.

**3.     LICENSE PERIOD:** The license granted hereunder shall be effective and expire as of the dates specified in **Schedule G** attached hereto (herein such period is called the "License Period") and except as otherwise provided for sell-off purposes as specified in Paragraph 17 hereof, unless sooner terminated in accordance with the terms and conditions hereof.

**4.     CONSIDERATION:**

   **A.     Advance and Guaranteed Compensation:** Licensee agrees to pay Licensor the sums specified in **Schedule K** attached hereto, as advance minimum compensation (herein called "Advance Compensation") and as guaranteed minimum compensation (herein called "Guaranteed Compensation" and together with Advance Compensation, the "Total Guaranteed Compensation"). The Advance Compensation shall be paid as set forth in **Schedule K**, and shall apply against Guaranteed Compensation as defined below. The Guaranteed Compensation shall be paid as provided in **Schedule K** except to the extent that paid Advance Compensation and annual cumulative payments of Royalties shall theretofore have offset all or a portion of the total of such Guaranteed Compensation. Notwithstanding the foregoing, no part of Royalties which may be attributable to Premium sales (as defined hereunder) of the Licensed Products shall serve to offset any part of the Total Guaranteed Compensation specified in **Schedule K**. No part of such Advance Compensation and no part of such Guaranteed Compensation shall be repayable to Licensee in any event, except as is expressly provided for herein. No part of any amounts paid or payable hereunder may be used to offset or apply against any other amount owed by Licensee to Licensor, any MLB Entities or Licensor Indemnitees or to any other Major League Baseball-affiliated entity. In the event of a work stoppage delaying or interrupting the playing of Major League Baseball games, the parties agree that this Agreement shall continue in full force and, Licensee shall not be entitled to any other form of compensation nor shall Licensor or the Licensor Indemnitees be otherwise liable to Licensee for any losses incurred by Licensee on account of any such work stoppage.

   **B.     Royalties:** Licensee agrees to pay Licensor a sum equal to either the per unit minimum specified in **Schedule L** (if any) or the percentage of all "Net Wholesale Sales" or "Net Retail Sales", as applicable, (each as defined below) specified in **Schedule L** by Licensee of the Licensed Products covered by this Agreement. (Such per unit minimum and/or percentage of Net Wholesale Sales or Net Retail Sales is herein called "Royalties.") Licensee shall pay to Licensor Royalties based on the greatest of, as applicable, the (i) per unit minimum (if stated), (ii) percentage of Net Wholesale Sales, and (iii) Net Retail Sales, if specified. If Licensee sells the Licensed Products to any of Licensee's affiliated,

associated or subsidiary entities (collectively, the "Licensee Affiliates"), and such Licensee Affiliates sell the Licensed Products, Licensee shall pay Royalties on the price at which Licensee sells the Licensed Products or the price at which the Licensee Affiliates sell the Licensed Products, whichever is greater. In addition, Royalties shall be payable concurrently with the periodic statements required in Paragraph 5 below, except to the extent offset by Total Guaranteed Compensation theretofore remitted. The term "Net Wholesale Sales" shall mean, with respect to wholesale sales of the Licensed Products, gross sales based on the wholesale price to the retail trade less quantity discounts and actual returns, but no deduction shall be made for uncollectible accounts, commissions, taxes, discounts other than quantity discounts, such as cash discounts and discounts attributable to the issuance of a letter of credit, or any other amount. The term "Net Retail Sales" shall mean, with respect to retail sales of the Licensed Products, gross sales based on the greater of Licensee's or, as the case may be, Licensee Affiliates' (a) usual retail price charged to consumers for such Licensed Products (or, if no such Licensed Products were previously sold, for similar Licensed Products) or (b) actual retail price charged to consumers less quantity discounts (if pre-approved in writing by Licensor) and actual returns, but no deduction shall be made for uncollectible accounts, commissions, taxes, or discounts of any kind. Notwithstanding the foregoing, with regard to Canadian sales, if authorized hereunder, Licensee shall pay Royalties on the price of the Licensed Products excluding "GST" and any duty and shall submit all statements and Royalties payments to such party designated by Licensor and as required by this Agreement. Licensee shall account separately for all sales of each Licensed Product (itemized by Licensed Product, Licensed Properties depicted on such Licensed Product, distribution channel through which the Licensed Product is sold and as Licensor shall otherwise require from time to time), pursuant to the requirements of Paragraph 5 below. No costs incurred in the manufacture, sale, distribution, promotion or advertisement of the Licensed Products shall be deducted from any Royalties payable by Licensee. Said Royalties shall also be paid by Licensee to Licensor on all Licensed Products (including, without limitation, any irregulars, seconds, etc. distributed pursuant to the provisions of Paragraph 10 of this Agreement) distributed by Licensee or any Licensee Affiliate, even if not billed or billed at less than usual Net Wholesale Sales price or Net Retail Sales price, as applicable, for such Licensed Products, and shall be based upon the greater of the usual Net Wholesale Sales price or Net Retail Sales price, as applicable, sold to the trade by Licensee or, as the case may be, Licensee Affiliates for (i) such Licensed Products, or (ii) if such Licensed Products have not been so sold, products similar to the Licensed Products. Licensor acknowledges that units of the Licensed Products that are exported by Licensee or, as the case may be, Licensee Affiliates to other licensees of Licensor authorized to distribute such Licensed Products outside the Licensed Territory may, with Licensor's written approval, be sold without any obligation on Licensee to pay Royalties to Licensor on such units. Royalties payable on sales of the Licensed Products to Licensor affiliates per Paragraph 13(M) shall be calculated on Licensee's or, as the case may be, Licensee Affiliates', actual Net Wholesale Sales price or Net Retail Sales price, as applicable, charged.

      **C.**    **Product Credit:** Licensee shall provide to Licensor merchandise credit in the amount or in the form specified in **Schedule N**. Licensee shall ship at Licensee's expense and at Licensor's direction such merchandise as Licensor shall request from time to time under this merchandise credit. Licensee acknowledges and agrees that to the extent Licensor does not use the entire merchandise credit during any such year, Licensor shall be entitled to receive such unused portion in the following calendar year, notwithstanding the expiration or termination of the License Period.

      **D.**    **Advertising, Marketing and Promotion:** Licensee acknowledges that it is required to promote the Licensed Products under this Agreement. Accordingly, Licensee agrees to perform each of the obligations, if any, specified in **Schedule O**. Unless otherwise specified, Licensee acknowledges and agrees that any financial or other commitments under any item identified in **Schedule O** shall not offset or apply against any obligations under any other item thereunder.

E. **Currency:** All amounts payable pursuant to this Agreement shall be in the currency identified in **Schedule K**.

F. **Payment Terms:** Licensee agrees to pay Licensor all sums due and payable to Licensor relating to this Agreement, regardless of whether Licensee has received an invoice in connection with such amount payable.

G. **Late Payment Penalties:** Any late payments shall require Licensee to pay Licensor, in addition to the amount due, interest (accruing at the time such obligation was first owed) at one percent (1%) per month or the highest prime lending rate of JP Morgan Chase Bank (or its successor bank, if any), whichever is greater, on the amounts delinquent for the period of the delinquency, without prejudice to any other rights of Licensor in connection therewith.

H. **Licensor's Use of Licensee Marks and Licensed Product Depictions:** Licensee agrees that Licensor shall have the right in its sole discretion and in a manner in which it chooses, subject to and in accordance with Licensee's style guide, if and as provided, to produce and allow others to produce on its behalf catalogs, sales sheets or brochures (hereinafter "catalogs") wherein merchandise from licensees of Licensor shall be displayed. Subject to the immediately preceding sentence, Licensee hereby grants to Licensor the right to feature (i) the Licensed Products and to use Licensee's trademarks and, (ii) subject to Licensee's reasonable prior approval, corporate identification (including, without limitation, the brand names of the Licensed Products as identified in **Schedule T**) on a free standing basis (i.e., not when featured on the Licensed Products) (x) in any and all media for purposes of promoting and advertising either the Licensed Products and/or Licensor, its affiliates, and promotions for the foregoing, and (y) in trade materials, sales presentations, and industry meetings, without compensation. Licensee acknowledges and agrees that nothing in this Paragraph 4(H) shall be construed as Licensor's grant, approval, or acceptance of such brand names.

5. **PERIODIC STATEMENTS:** Within thirty (30) days after the first day of the License Period, and promptly on or before the last day of every reporting period specified in **Schedule I** (herein such period is called the "Reporting Period") thereafter, Licensee shall furnish to Licensor complete and accurate statements, certified to be accurate by Licensee, or if a corporation, by an officer of Licensee, showing the sales volume of each Licensed Product (itemized by Licensed Product, distribution channel through which the Licensed Product is sold and as Licensor shall otherwise require from time to time), gross sales price, allowable itemized deductions from gross sales price, and Net Wholesale Sales price or Net Retail Sales price, as applicable, of the Licensed Products distributed and/or sold by Licensee or any Licensee Affiliate during the preceding Reporting Period, together with any returns made during the preceding Reporting Period. The statements required pursuant to this Paragraph 5 shall be furnished to Licensor whether or not any of the Licensed Products have been sold, or any payment is shown to be due Licensor, during the Reporting Periods in which such statements are due. Licensee shall furnish to Licensor sufficient background information so as to make such statements intelligible to Licensor, and on request of Licensor, a complete list of Licensee's customers to whom Licensed Products have been sold and corresponding information regarding distribution to such accounts. Licensor agrees that such list shall be deemed complete if Licensee lists the twenty (20) hobby purchasers and twenty (20) retail purchasers buying the largest quantity of Licensed Products during such period. Licensor agrees that it will not divulge said customer list to any other licensee of Licensor, or to any non-Major League Baseball-affiliated entity (including competitor licensing organizations, and competitors of Licensee as identified by Licensee in writing), except as otherwise required by law. Receipt or acceptance by Licensor of any of the statements furnished pursuant to this Agreement or of any sums paid hereunder shall not preclude Licensor from questioning the correctness thereof at any time, and in the event that any inconsistencies or mistakes are discovered in such statements or payments, they shall immediately be rectified and the appropriate payments made by Licensee.

## 6. BOOKS AND RECORDS:

**A.** Licensee shall keep, maintain and preserve in its principal place of business for at least four (4) years following termination or expiration of this Agreement or any renewal thereof, complete and accurate records and accounts covering all transactions relating to this Agreement and pertaining to the various items required to be shown on the statements to be submitted by Licensee, including, without limitation, invoices, correspondence and banking, financial and other records in Licensee's possession or under its control (it being understood that if such records are maintained only as a non-separable part of other business records of Licensee, Licensor shall nonetheless be entitled to review all of Licensee's records relating to this Agreement, but shall keep in confidence (as per **Schedule P, Miscellaneous** No. 11 below) information unrelated to this Agreement). Such records and accounts shall be available for inspection and audit (and copying at Licensor's expense) at Licensee's principal place of business or such other Licensee-controlled facility as Licensor shall request at any time or times during or after the License Period or "Sell-Off Period" (as defined in Paragraph 17 below) of this Agreement during reasonable business hours and upon reasonable notice (not to exceed thirty (30) days) by Licensor or its representatives; .

# Redacted

with this Paragraph 6(A) and Paragraph 10 below. Licensee agrees not to cause or permit any ., to ensure compliance interference with Licensor or representatives of Licensor in the performance of their duties of inspection and audit. To the extent that Licensee does not have all records and management personnel available during Licensor's scheduled audit and such audit needs to be rescheduled, the cost of the rescheduled audit will be the responsibility of Licensee.

**B.** The exercise by Licensor, in whole or in part or at any time or times, of the right to audit records and accounts or of any other right herein granted, the acceptance by Licensor of any statement or statements or the receipt and deposit by Licensor of any payment tendered by or on behalf of Licensee shall be without prejudice to any rights or remedies of Licensor and shall not estop or prevent Licensor from thereafter disputing the accuracy of any such statement or payment.

**C.** If pursuant to its rights hereunder to audit and inspect Licensor causes an audit and inspection to be instituted which thereafter discloses a deficiency of . or more between the amount found to be due to Licensor and the amount actually paid or credited to Licensor, then Licensee shall be responsible for payment of the entire deficiency, together with interest thereon at the then current prime rate of JP Morgan Chase Bank (or its successor bank, if any) from the date such amount became due until the date of payment, and the costs and expenses of such audit and inspection. If the audit discloses a deficiency of less than ) between the amount found to be due to Licensor and the amount actually paid or credited to Licensor, then Licensee shall pay Licensor the amount of the deficiency plus interest as calculated above. To the extent that Licensee does not have all records and management personnel requested by Licensor available during Licensor's scheduled audit and such audit needs to be rescheduled, the reasonable, actual out of pocket cost of the rescheduled audit will be the responsibility of Licensee.

**D.** Upon demand of Licensor, Licensee shall at its own expense, but not more than once in any twelve (12) month period, furnish to Licensor a detailed statement, certified by an officer of Licensee authorized to prepare and affirm such statement, showing the sales volume of each Licensed Product (itemized by Club and, as requested by Licensor, by country or other territory, for each applicable Licensed Product upon Licensor's written request, and not more than once per year), gross sales price, itemized deductions from gross sales price and Net Wholesale Sales price or Net Retail Sales price, as applicable, of the Licensed Products covered by this Agreement distributed and/or sold by Licensee and Licensee Affiliates to the date of Licensor's demand. Licensee shall provide to Licensor, within ten (10) business days after its completion, the general balance sheet, certified by an officer of Licensee (or the Licensee Affiliate, as applicable) and prepared annually in the ordinary course of business, relating to Licensee and each identified Licensee Affiliate hereunder for the preceding Reporting Period. Licensor agrees to keep such information in confidence subject to **Schedule P, Miscellaneous** No. 11.

7.      **INDEMNIFICATIONS AND PROTECTIONS:**

**A.** Licensor hereby agrees to indemnify, defend and hold Licensee and its owners, shareholders, directors, officers, employees, agents, representatives, successors and assigns harmless from any claims, suits, damages or costs (including reasonable attorneys' fees and expenses) arising from (i) challenges to Licensor's authority as agent for and pursuant to authority granted by the MLB Entities to license the Licensed Properties in connection with the manufacture, distribution, promotion, advertisement and sale of the Licensed Products, (ii) assertions to any claim of right or interest in or to the Licensed Properties as authorized and used on the Licensed Products, or (iii) any breach by Licensor of its obligations under this Agreement, provided in each case that Licensee shall give prompt written notice, cooperation and assistance to Licensor relative to any such claim or suit, and provided further in each case that Licensor shall have the option, in its sole discretion, to undertake and conduct the defense of any suit so brought (including, without limitation, selecting counsel therefor) and to engage in settlement thereof at its sole discretion.

**B.** Licensee shall reasonably assist Licensor, to the extent necessary, in the procurement of any protection or to protect any of Licensor's rights to the Licensed Properties, and Licensor, if it so desires and in its sole discretion, may commence or prosecute any claims or suits in its own name or in the name of Licensee or join Licensee as a party thereto. Licensee shall notify Licensor in writing of any infringements or imitations by others of the Licensed Properties of which it is aware. Licensor shall have the sole right to determine whether or not any action shall be taken on account of such infringements or imitations. Licensee shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of Licensor to do so. Licensee agrees that it is not entitled to share in any proceeds received by Licensor (by settlement or otherwise) in connection with any formal or informal action brought by Licensor hereunder.

**C.** (i) In the event that a claim is made, or an action or suit is instituted, against Licensor and/or any Licensor Indemnitee, arising out of or related to:

(a)     any actual or alleged use of or infringement of any trademark, service mark, copyright, patent, or other proprietary rights of Licensor or third parties by Licensee, its agents, employees, representatives, or others under its control in connection with the Licensed Products covered by this Agreement and not involving a claim of right to the Licensed Properties, as and to the extent used as authorized in this Agreement;

(b)     any actual or alleged product defects in said Licensed Products or the use thereof, or false advertising, fraud, misrepresentation or other claims related to the Licensed Products not involving a claim of right to the Licensed Properties;

(c)     any use, other than any use authorized by Licensor hereunder, by Licensee, its agents, employees, representatives, or others under its control of the MLB Marks (as defined below). For purposes of this Agreement, "MLB Marks" shall mean the Licensed Properties and any other names, trademarks, service marks, trade dress and copyrights, including word marks, logos, uniform designs, ascots, images, colors and color combinations, characters, symbols, designs, li   esses and visual representations owned, controlled, or cleared for use by or  o.   behalf of and/or applied for in or registered with the U.S. Patent and Trademark Office (irrespective of the class or nature of goods or services for which an application has been made or registration issued), or any combination or derivative of same, by Licensor or any of the MLB Entities;

(d)     any breach of this Agreement by Licensee, its agents, employees, representatives, or others under its control;

(e)     any actual or alleged libel or slander against, or invasion of the right of privacy, publicity or property of, or violation or misappropriation of any other right of any third party by Licensee, its agents, employees, representatives, or others under its control;

(f)     any agreements or alleged agreements made or entered into by Licensee, its agents, employees, representatives, or others under its control to effectuate the terms of this Agreement;

(g)     any distribution methods, practices, or policies relating to the Licensed Products; and/or

(h)     any promotional, marketing, or advertising activities involving or related to the Licensed Products or to Licensor or any of its affiliates;

then Licensee shall indemnify, defend and hold each such Licensor Indemnitee and its respective former or current owners, shareholders, partners, members, directors, officers, employees, agents, representatives, successors and assigns harmless from all such actions, claims, suits, damages and costs (including reasonable attorneys' fees and expenses) and afford Licensor the option to participate in any such action or to allow Licensee to handle Licensor's defense subject to Licensor's approval,

# Redacted

**Redacted**

Licensor agrees to give Licensee notice of the commencement of any such claim or action against any of the Licensor Indemnitees.

(ii)    In the event that a claim is made, or an action or suit is instituted, against Licensee relating to the Licensed Properties or the Licensed Products, then Licensee shall promptly notify Licensor in writing of any claims, actions or suits commenced against it, apprise Licensor of the forum and all other reasonably relevant details relating to such claims, actions or suits, and afford Licensor the option (exercisable at Licensor's sole discretion) of (a) taking on the defense of such action on behalf of Licensee or (b) consulting with Licensee in the defense of such action. Except to the extent such claim, action, or suit involves, as a litigated issue, the unauthorized use of the MLB Marks (in which case such costs shall be treated as if incurred in connection with Paragraph 7(C) above), Licensor shall bear the costs of such participation.

**8.    INSURANCE:** Licensee must obtain, and continuously maintain throughout the License Period and Sell-Off Period, at its own expense, the following insurance policies in the amounts specified in **Schedule M** worldwide to protect against any claims or suits arising out of any of the circumstances described in Paragraph 7(C) above.

A.    An Insurance Services Office occurrence based Commercial General Liability Insurance Policy, including contractual liability, products/completed operations liability and advertising liability coverage.

B.    Errors & Omissions Liability Insurance.

C.    Umbrella Liability Insurance, in excess of 8(A) above.

All insurance polices must be issued by an admitted insurance carrier. Licensor, the Licensor Indemnitees, and their subsidiary or affiliated companies and its and their directors, officers and employees must be named as Additional Insureds under the Commercial General Liability and Umbrella Liability Policies. All of these policies must contain Cross Liability Endorsements. Further, coverage for the Additional Insureds shall apply on a primary basis irrespective of any other insurance, whether collectible or not. All policies shall be endorsed to provide that in the event of cancellation, non-renewal or material modification Licensor shall receive thirty (30) days written notice thereof. Licensee shall furnish Licensor with certificates of insurance evidencing compliance with all insurance provisions noted above prior to the commencement of use of the Licensed Properties and annually prior to the expiration of each required insurance policy.

**9.    COPYRIGHT AND TRADEMARK NOTICES AND REGISTRATIONS:**

A.    Licensee further agrees that, unless otherwise directed in writing by Licensor, in any instance wherein the Licensed Properties are used, the following general notice shall be included (i.e., on the product, on a label, on the packaging material or on a separate slip of paper attached to the product): "Major League Baseball trademarks and copyrights are used with permission of Major League Baseball Properties, Inc." Further, all products containing the Licensed Properties shall contain, as Licensor shall direct, a removable decal with Licensee's name and the Major League Baseball silhouetted batter logo, a Major League Baseball hologram, a hangtag and/or label with Licensee's name, and the Major League Baseball hangtag with the Major League Baseball silhouetted batter logo, and the "Genuine Merchandise" logo or the logos of Licensor's other applicable collections (e.g. Major League Baseball Cooperstown Collection or MLB Authentic Collection). All Licensed Products shall display or otherwise identify Licensee's name either on a permanently affixed label or such other manner approved in writing by Licensor. All Licensed Products components which bear any of the Licensed Properties (embroidered

emblems, cloth or paper labels, hangtags, etc.) shall, if Licensor permits, be manufactured in-house by Licensee or by a manufacturer pre-approved in writing by Licensor in accordance with Paragraph 14 below or shall be obtained only from one or more suppliers officially authorized by Licensor to produce those components. All Licensee advertisements displaying the Licensed Properties, all retailer advertisements featuring Licensed Products and of which Licensee has knowledge or any Licensed Products shall contain the words "Genuine Merchandise" (or such other applicable Major League Baseball collection name designated by Licensor) and the silhouetted batter logo. Licensee shall require those to whom it sells Licensed Products directly or indirectly to display the appropriate notice and collection mark, as directed by Licensor, and the silhouetted batter logo in all advertisements. All uses of the Licensed Properties shall also include any designations legally required or useful for enforcement of copyright, trademark or service mark rights (e.g., "©", "®", "™" or "℠") as specified by Licensor. Licensee shall submit a copy of its specifications for all of the above notices (including copies of its artwork, layouts or mold blueprints) to Licensor for its review. Licensor shall have the right to revise the above notice requirements and to require such other notices as shall be reasonably necessary to protect the interests of Licensor and/or the Licensor Indemnitees in the MLB Marks and Licensee shall, at its cost and expense, fully comply with such requirements and notices, and purchase of such holograms, as Licensor shall request.

B. Licensee agrees to advise Licensor of the initial date of the marketing of each Licensed Product and, upon request, to complete all reasonable forms generated by Licensor and deliver to Licensor the number and type of specimen samples of the Licensed Product, labels or the like upon which the Licensed Properties are used as are actually required for use in procuring and/or maintaining copyright, trademark and/or service mark registrations or Customs recordations in the name of and at the expense of the person, firm, corporation or other legal entity owning the Licensed Properties, in compliance with any laws relating to copyright, trademark and service mark registrations or Customs recordations. Licensee acknowledges and agrees that with respect to the completion of forms generated by Licensor pursuant to the preceding sentence, Licensee shall provide (i) all documentary information requested thereby (including, without limitation, a listing of all of the Licensed Properties included on each Licensed Product), (ii) a description of all Licensor authorized uses of each of the MLB Marks (whether such use was made during the License Period or an earlier period within which Licensee was licensed to use such MLB Marks), (iii) a listing of the quantity of sales of the Licensed Products, and (iv) a description of the identity of the purchasers of such Licensed Products and their addresses. Except to the extent set forth in any schedules attached to this Agreement, Licensor and/or the Licensor Indemnitees shall be solely responsible for taking such action as it or they deem appropriate to obtain such copyright, trademark or service mark registrations or Customs recordations for the MLB Marks. If it shall be necessary for Licensee to be the applicant to effect any such registrations, Licensee shall and hereby does assign all of its rights in each such application and any resulting registration to Licensor or any other appropriate owner thereof, and further agrees to execute all papers necessary to effectuate and/or confirm such assignments. Licensee shall perform all acts necessary and execute all documents necessary to effectuate its registration as a user of the Licensed Properties (and other MLB Marks, if previously applicable) on the Licensed Products herein (and MLB Marks, if previously applicable) where such registration is needed and shall assist Licensor in protecting the MLB Marks as reasonably requested and directed by Licensor at Licensor's expense.

C. Licensee also agrees that, in any case where it employs the services of photographers or artists in connection with the production, promotion, marketing or distribution of the Licensed Products, it will require each such photographer or artist to agree that the photographic or artistic works he or she produces for Licensee shall be "works made for hire" for the purposes of the copyright laws, and that to the extent such photographic or artistic works may not qualify as "works made for hire," the copyright in each such work is assigned to Licensee.

## 10.   APPROVALS:

A.      Licensor shall have absolute approval, per Paragraph 30 hereof, of the Licensed Products and of all packaging at all stages of the development thereof.  In addition, Licensor shall have the right to approve all advertising and promotional materials relating to the Licensed Products, including, but not limited to, all advertising and promotional materials that use any Licensed Properties.  Licensee agrees to furnish in a timely manner to Licensor, free of cost, for its written approval as to quality and style, designs of each Licensed Product and samples of each Licensed Product before its manufacture, sale, promotion, advertisement or distribution, whichever first occurs, and samples of all advertising, point-of-sale displays, catalogs, sales sheets and other items that display or picture any Licensed Properties, and no such Licensed Product or other such materials shall be manufactured, sold, promoted, advertised or distributed by Licensee without such prior written approval.  By way of example, but not limitation, (i) no use of any Licensed Properties shall be made on stationery of Licensee (specifically including, without limitation, letterhead, envelopes, business cards, shopping bags, invoices, statements, packing slips, etc.) without Licensor's prior approval and (ii) no press release or public statement referring or relating to the Licensed Product, Licensor and/or its affiliates shall be distributed or disseminated without Licensor's express written approval in advance of any such use.  In addition, no irregulars, seconds or other Licensed Products which do not conform in all material respects to the approved samples may be distributed or sold without the express written advance consent of Licensor.  All such sales, if made, shall bear Royalties as set forth in Paragraph 4(B).  Subject, in each instance, to the prior written approval of Licensor, Licensee or its agents may use textual and/or pictorial matter pertaining to the Licensed Properties on such promotional display and advertising material as may, in its judgment, promote the sale of the Licensed Products.  All promotional display and advertising material must contain and prominently display the Major League Baseball silhouetted batter logo.  A representative sample of each Licensed Product shall be supplied free of cost to Licensor and to the extent necessary, Licensor will send these samples, if and as applicable, to the Clubs.  Upon request (which shall only be made by Licensor upon "good cause" (as defined below)), a reasonable number of production samples shall periodically be sent to Licensor free of cost.  For purposes of this paragraph, "good cause" shall mean any instance whereby Licensor, in order to satisfy Licensor's (a) agency obligations to the Clubs, and/or (b) trademark registration obligations, is required to request such production samples.  If necessary in Licensor's judgment, such representative sample shall also be sent to Licensor for its written approval upon any change in design, style or quality, which shall necessitate subsequent approvals by Licensor.  Additional representative samples shall be supplied to Licensor upon request at no more than cost.

B.      In the event that any item or matter submitted to Licensor under this Agreement for approval or consent shall not have been approved or consented to, disapproved or denied, or commented upon within the number of Licensor business days specified in **Schedule J** after receipt thereof by Licensor and Licensor shall have received notice from Licensee that comment is overdue by facsimile, email or other written communication, and Licensor shall not have commented within the number of Licensor business days specified in **Schedule J** of receipt of such notice, any items or matters so submitted shall be deemed approved and consented to:  Licensee acknowledges and agrees that all submissions required to be given by it to Licensor hereunder shall be sent to Licensor's Quality Control Department with a copy to Licensee's contact within Licensor's Licensing Department.  Notwithstanding anything to the contrary contained above, no action (whether written or oral) or inaction by the Licensor's Quality Control Department shall be construed as granting any rights (including, without limitation, authorizing any new or different product) not expressly stated in this Agreement or a fully executed amendment hereto.  Licensee acknowledges and agrees that any Licensed Products not approved pursuant to the terms hereof, not complying with the requirements set forth in this Agreement, or not listed in **Schedule E**, shall be treated as unlicensed and unauthorized products for all purposes and shall not be manufactured, offered for sale, sold or distributed, or submitted to the Quality Control Department, or any

other individual at Licensor for review. Nothing herein shall be construed to prevent new product ideas submissions to licensing personnel for purposes of initial review and the potential grant of rights for such product.

      C.     Licensee must obtain all necessary licenses, clearances, consents and releases (collectively, "Consents") permitting it to use any material depicted, or referred to, in the materials submitted to Licensor including, but not limited to, any trademark, trade dress, copyright, design, name, likeness, slogan, logo, music, voice or other indicia or rights proprietary to any third party including, without limitation, any fans and/or former or current Major League Baseball players, or third party companies, municipalities or other entities, except such Consents as Licensor provides in writing to Licensee. Licensee is solely responsible for determining which licenses, clearances, consents and releases must be obtained. For purposes of this paragraph, a "third party" is any individual or entity who is not represented by Licensor in this Agreement. Evidence of having obtained such licenses, consents and releases shall be submitted to Licensor upon request.

## 11.   DISTRIBUTION:

      A.     Except as otherwise provided in **Schedule R** and **Schedule S**, Licensee shall sell the Licensed Products to jobbers, wholesalers, distributors or retailers for sale or resale and distribution to retail stores and merchants for their resale and distribution or directly to the public, subject to the terms herein. With respect to sales by Licensee Affiliates, Licensee acknowledges and agrees that at no time shall it sell or distribute the Licensed Products, directly or indirectly, to or through its Licensee Affiliates, unless such Licensee Affiliates are set forth in **Schedule R** and such sale or distribution is pre-approved in writing by Licensor and in compliance with the terms of Paragraph 4(B). Licensee will provide Licensor with the names, addresses, telephone numbers and names of principal contacts of each individual or entity, other than consumers or entities that sell directly to consumers, to whom Licensee sells or otherwise provides the Licensed Products for subsequent sale or distribution (hereinafter referred to as "Distributor"). Licensor agrees that such list shall be deemed complete if Licensee lists the twenty (20) Distributors distributing the largest quantity of Licensed Products during the License Period. Licensor agrees that, except as otherwise required by law, it will not divulge any information provided to it under this paragraph to any non-Major League Baseball-affiliated entity (except for the auditors, accountants, and other professionals of such entities who are consulted in the normal course of business), or to any other competitor licensing organization. This information shall be set out in **Schedule S** of this Agreement. Licensee shall specify the Licensed Products Distributor shall sell or distribute. Licensee acknowledges that unless otherwise specified in **Schedule P**, it may not allow any Distributor to act as a manufacturer of the Licensed Products. Licensee agrees that at no time during the License Period or Sell-Off Period shall it sell, directly or indirectly, to any Distributors not listed in **Schedule S**, or to any individual or entity affiliated in any manner with any of such Distributors, Licensed Products for subsequent sale or distribution without prior written approval of Licensor. In the event Licensee wishes to substitute a Distributor listed in **Schedule S** or wishes to add to the number of Distributors, Licensee shall first provide Licensor with the information set out in **Schedule S** regarding the proposed new Distributors for Licensor's written approval of such Distributors. Licensee's failure to do so may result in termination of this Agreement and/or confiscation and seizure of the Licensed Products.

      B.     Unless otherwise set forth in **Schedule P** of this Agreement, such distribution of the Licensed Products shall not be conducted through freight-on-board sales (wherein Licensee transfers title to and possession of the Licensed Products to a third party outside the Licensed Territory for subsequent distribution). In the event Licensee sells or distributes a Licensed Product at a special price directly or indirectly to itself, including, without limitation, any Licensee Affiliate, or to any other person, firm or corporation related in any manner to Licensee or its officers, directors or major stockholders,

Licensee shall pay Royalties with respect to such sales or distribution based upon the price generally charged to the trade by Licensee in the normal course of business (e.g. non-closeout situation).

C.     Subject to __Schedule S__ and Paragraph 10 regarding the approval of all materials and copy, Licensee shall be permitted to distribute the Licensed Products via "Interactive Media" (as defined below); provided, however, that Licensee shall not sell or otherwise distribute or allow for the sale or distribution of, directly or through others, the Licensed Products outside the Licensed Territory, and shall include prominent language on the Interactive Media through which the Licensed Products are offered that Licensee may not fulfill orders for delivery of the Licensed Products outside of the Licensed Territory. Licensee acknowledges and agrees that nothing herein shall be construed so as to imply that Licensee is herein granted the right to use the Licensed Properties on a free-standing basis (i.e., the Licensed Properties may be used only on the Licensed Products or in text describing such Licensed Products) or to run or advertise promotions via Interactive Media. Licensee's rights pursuant to this paragraph shall be limited to the sale and distribution of the Licensed Products via Interactive Media, and the Licensed Properties may only be used as depicted in the Licensed Products in connection therewith. For purposes of this Agreement, "Interactive Media" shall mean the Internet and any network or medium of electronic communication now known or hereafter devised.

D.     Provided that such distribution does not violate any terms and conditions of this Agreement or applicable law, Licensee may only distribute the Licensed Products through the distribution channels, if any, specified in __Schedule S__.

12.     **GOODWILL:** Licensee recognizes the great value of the publicity and goodwill associated with the MLB Marks and, in such connection, acknowledges that such goodwill belongs exclusively to Licensor and/or the Licensor Indemnitees, as the case may be, and that the MLB Marks have acquired a secondary meaning in the minds of the purchasing public.

13.     **SPECIFIC UNDERTAKINGS OF LICENSEE:** During the License Period, each additional License Period, if any, and thereafter in perpetuity, Licensee represents, warrants and agrees that:

A.     It will not acquire any rights in the Licensed Properties as a result of its use thereof (or the MLB Marks, if used previously by Licensee) and all uses of the Licensed Properties or MLB Marks shall inure to Licensor's benefit;

B.     It will not use MLB Marks not licensed hereunder, or directly or indirectly (i) attack the title of Licensor and/or the MLB Entities in and to the MLB Marks or any copyright, trademark, service mark or trade dress pertaining thereto, (ii) attack the validity of the license granted hereunder, or (iii) use the Licensed Properties in any manner other than as licensed hereunder;

C.     It will not at any time apply for any registration of any copyright, trademark, service mark or other designation which would affect the ownership of the MLB Marks, or file any document with any governmental authority or take any action which would affect the ownership of the MLB Marks or aid or abet anyone in doing so;

D.     It will not harm, misuse or bring into disrepute the MLB Marks;

E.     It will manufacture, sell, promote, advertise and distribute the Licensed Products in a legal and ethical manner and in accordance with the terms and intent of this Agreement;

**F.** It will not create any expenses chargeable to Licensor without the prior written approval of Licensor;

**G.** It will protect to the best of its ability the right to manufacture, sell and distribute the Licensed Products hereunder;

**H.** It will not use the Licensed Products for combination sales, as self-liquidating or free giveaways or for any similar method of merchandising without the prior written consent of Licensor and will exercise due care that its customers likewise will refrain from making such use of the Licensed Products;

**Redacted**

**I.** It will not, without the prior written consent of Licensor, enter into any sublicense or agency agreement for the manufacture, sale, promotion, advertisement or distribution of the Licensed Products;

**J.** It will not engage in tying practices, illegal restraints of trade, or selling practices that exclude any members of the retail trade for any reason other than poor credit history, known lack of integrity or disregard for the rights of Licensor and/or any of its affiliates. Nothing in the preceding sentence shall be deemed to require Licensee to violate any other term of this Agreement;

**K.** It will not use, or knowingly permit the use of, the Licensed Products as a "Premium" (as defined below), except with the prior written consent of Licensor (in the form of an executed premium license from Licensor) and the specific negotiation of a : For purposes of this Agreement, the term "Premium" shall be defined as including, but not necessarily limited to, free or self-liquidating items offered to the public in conjunction with the sale or promotion of a product or service, including traffic building or continuity visits by the consumer/customer, or any similar scheme or device, the prime intent of which is to use the Licensed Products in such a way as to promote, publicize and/or sell the products, services or business image of the third party company or manufacturer. Premium use shall also specifically include distribution of the Licensed Products for retail sale through distribution channels (including, without limitation, catalogs) offering earned discounts or "bonus" points based upon the extent of usage of the offeror's product or service. Licensee represents and warrants that during the License Period and thereafter it shall not, without the prior written approval of Licensor, use any ticket(s) or pass(es) to any game, event or activity conducted by or on behalf of Licensor or any MLB Entity or Licensor Indemnitee (whether or not an MLB Mark is used in conjunction therewith) in connection with a consumer contest, sweepstakes or promotion including, without limitation, offering such ticket(s) or pass(es) as a Premium (including, without limitation, as a prize or inducement to participate); provided, however, that the foregoing shall not preclude Licensee from using tickets to a Club's regular season game, event or activity in a Club's home broadcasting territory pursuant to an agreement between Licensee and the Club; and provided further that the foregoing shall not preclude Licensee from exercising rights granted to it by MLBAM (as defined in <u>Schedule C</u>) in respect of on-line uses only. Notwithstanding the foregoing, Licensee acknowledges and agrees that any on-line use of Premiums (including tickets and passes) to promote off-line rights (such as the Licensed Products stated herein) shall require Licensor's approval, pursuant to Paragraph 10.

L.     It will comply with such guidelines and/or requirements as Licensor may announce from time to time, including, without limitation, the terms and conditions contained in any licensee manual provided to it by an MLB Entity. It will comply with all laws, regulations and standards relating or pertaining to the manufacture, sale, advertising or use of the Licensed Products and shall maintain the highest quality and standards, and shall comply with the requirements of any regulatory agencies (including, without limitation, the United States Consumer Product Safety Commission) which shall have jurisdiction over the Licensed Products, it being understood that to the extent that Licensee, in order to comply with newly announced guidelines, shall have to incur actual additional costs and expenses to modify finalized Licensed Product(s) already approved by Licensor pursuant to Paragraph 10 hereof, Licensor shall reimburse Licensee for its reasonable additional costs and expenses occasioned thereby, upon the submission of written proof of such costs and expenses;

M.     It guarantees that the Licensor Indemnitees, official Club and/or Licensor retail stores, Club in-stadium concessionaires and the Minor League Clubs shall be permitted to purchase the Licensed Products from Licensee for their retail sale at Licensee's lowest possible wholesale price and shall receive prompt shipments and/or deliveries of the Licensed Products, without regard to the relatively small volume their orders may represent. Licensor, the Licensor Indemnitees, and the Minor League Clubs shall be permitted to purchase the Licensed Products from Licensee for their use, but not resale, at Licensee's lowest possible price, which shall in no event be greater than its lowest wholesale price. Licensee shall be obligated to pay Royalties on all such sales (but not on product provided at no cost to Licensor, the Licensor Indemnitees and/or the Minor League Baseball Clubs, pursuant to **Schedule N, Product Credit** below, or for Licensor for Licensor's use (or use by the MLB Entities) as a Premium for its/their benefit) based on the actual price at which such units were sold to the Licensor Indemnitees by Licensee, unless otherwise specified herein;

N.     It will furnish to Licensor, upon request of Licensor (which shall be made only for reasonable cause and no more often than once per year), a list of all its distributors, sales representatives and jobbers for the Licensed Products, as well as a list of all its "trade names," said list to include the company name, address, telephone number, territorial representation and key contact name. Licensor agrees that such list shall be deemed complete if Licensee lists the twenty-five (25) purchasers buying the largest quantity of Licensed Product(s) during the License Period. Licensor agrees that, except as otherwise required by law, it will not divulge any information provided to it under this Paragraph 13(N) to any non-Major League Baseball-affiliated entity (except for the auditors, accountants, and other professionals of such entities who are consulted in the normal course of business), or to any other competitor licensing organization;

O.     Concurrently with its execution of this Agreement, it will provide Licensor with the names, addresses, telephone numbers and names of principal contacts of each party (hereinafter referred to as "Manufacturer"), that Licensee desires or intends to have produce one or more of the Licensed Products (including elements thereof) in the event Licensee desires not to be the manufacturer of such Licensed Products. This information shall be set out in **Schedule Q** of this Agreement and Licensee shall specify the Licensed Products number each such Manufacturer will produce. Unless otherwise specified in **Schedule P**, Licensee acknowledges that it may not allow any Manufacturer to act as a distributor of the Licensed Products. Licensee agrees that at no time during the License Period or Sell-Off Period shall it sell, directly or indirectly, to any of the Manufacturers listed in **Schedule Q**, or to any individual or entity affiliated in any manner with any of such Manufacturers, any Licensed Products for subsequent sale or distribution, without prior written approval of Licensor. In the event Licensee wishes to substitute a Manufacturer listed in **Schedule Q** or wishes to add to the number of Manufacturers, Licensee shall first provide Licensor with the information set out in **Schedule Q** regarding the proposed new Manufacturers for Licensor's written approval of such Manufacturers. Licensee's

failure to do so may result in termination of this Agreement and/or confiscation and seizure of the Licensed Products. Licensee shall ensure that:

(i)    Manufacturer produces no merchandise bearing the MLB Marks other than the Licensed Products specified in this Agreement unless authorized by Licensor;

(ii)    Manufacturer produces the Licensed Products only as and when directed by Licensee and in accordance with the terms herein and in compliance with all laws, regulations and governmental rules applicable to the Licensed Products and/or their manufacture;

(iii)    Manufacturer does not supply the Licensed Products to any person, firm, corporation or business entity other than Licensee or to such entities as may be authorized by Licensee and Licensor jointly; and

(iv)    Manufacturer does not delegate in any manner whatsoever its obligations with respect to the Licensed Products.

Prior to the delivery of the Licensed Products from Manufacturer to Licensee, Licensee shall submit to Licensor, free of cost, for its written approval as to quality and style, at least two samples of the Licensed Products produced by Manufacturer;

**P.**    It will not manufacture or allow the manufacture, or accumulate inventory, of the Licensed Products, at a rate greater than its average rate during the License Period as the end of the License Period approaches;

**Q.**    It will not sell the Licensed Products to parties whom it knows or reasonably should know will resell or distribute such Licensed Products outside the Licensed Territory;

**R.**    It will not disclose any confidential, private, restricted or otherwise nonpublic information concerning any Major League Baseball-affiliated entity (including, without limitation, all information contained in the Schedules attached hereto) which, it acknowledges, it may become privy to during the term of this Agreement. In addition, Licensee acknowledges and agrees that, to the extent it receives an identification/user code and password to be used to access Licensor's On-Line Style Guide, Licensee agrees to treat as confidential such codes, such that it shall only disclose the same to Licensee's employees, representatives and agents involved in the manufacture and design of the Licensed Products and then only on a need-to-know basis, and shall ensure that such individuals maintain the strict confidentiality thereof;

**S.**    Except as otherwise consented to by Licensor in writing, it has not granted and will not grant a security interest to or in the Licensed Products unless and until it notifies Licensor in writing of each such security interest and otherwise complies with the following conditions:

(i)    the grant of rights in the Licensed Products represents a non-assignable security interest and not a conveyance of ownership;

(ii)    such secured party is a credible financial institution which maintains at least an A- rating from a nationally recognized credit rating agency (such as Moody's or Standard & Poors) throughout the License Period;