In the event that upon the expiration of such period, Licensor has not approved, consented to, disapproved, denied or commented upon such items or matters, Licensee shall provide Licensor with written notice that such approval, consent, disapproval, denial or comment is overdue and Licensor shall then have an additional five (5) Licensor business days to respond.

In the event that upon the expiration of such additional period, Licensor has not approved, consented to, disapproved, denied or commented upon such items or matters, then such items or matters shall be deemed approved.

## SCHEDULE K

**CURRENCY**

All amounts payable pursuant to this Agreement shall be in United States dollars.

Redacted

C

Redacted

In each of the above cases, Royalties shall be applied against Guaranteed Compensation payable in the same Contract Year only, without carryover. Royalties attributable to Premium sales of the Licensed Products shall not be applied against Total Guaranteed Compensation.

## SCHEDULE M

## INSURANCE REQUIREMENTS

1. Commercial General Liability Insurance with minimum limits of:
   $1,000,000 (one million dollars) Each Occurrence;
   $1,000,000 (one million dollars) General Aggregate; and
   $1,000,000 (one million dollars) Products/Completed Operations Aggregate.

2. Errors & Omissions Liability Insurance, with a minimum limit of:
   $2,000,000 (two million dollars) Each Claim.

3. Umbrella Liability Insurance, in excess of **Schedule M.1.** above, with minimum limits of:
   $5,000,000 (five million dollars) Each Occurrence; and
   $5,000,000 (five million dollars) General Aggregate.

## SCHEDULE N

## PRODUCT CREDIT

Licensee shall provide to Licensor merchandise credit in the form of             ; for each product release of each Licensed Product during the License Period.

## SCHEDULE O

## ADVERTISING, MARKETING & PROMOTION

1. Licensee acknowledges that it is required to promote the Licensed Products under this Agreement. Accordingly, to satisfy part of that obligation, Licensee agrees to spend at least             during each Contract Year of the License Period towards the advertising, promotion and sponsorship of Major League Baseball and the Licensed Products. Licensee's expenditures specified in **Schedule O, Advertising, Marketing & Promotion** Nos. 4-9 shall apply against Licensee's obligations pursuant to this **Schedule O, Advertising, Marketing & Promotion** No. 1.

2. Upon commencement of the License Period and thereafter, on or before December 1 of each subsequent Contract Year during the License Period, Licensee shall submit to Licensor Licensee's planned advertising expenditures for the upcoming Contract Year for the Licensed Territory with regard to the Licensed Products (which shall include, without limitation, the media in which advertisements will appear and the monies expected to be spent in purchasing and producing such advertisements) or, if such Contract Year is the final Contract Year during the License Period, for the remainder of the License Period. Licensee acknowledges that any submissions under this Paragraph shall not relieve Licensee of the requirements of Paragraph 10 of this Agreement with regard to the approval of advertisements concerning the Licensed Products.

3. Upon execution, Licensee shall submit to Licensor, for Licensor's review, Licensee's marketing plans for the current Contract Year for the Licensed Territory with regard to the Licensed Products, and on or before September 15 of each Contract Year of the License Period, Licensee shall submit to Licensor, for Licensor's review, Licensee's marketing plans for the upcoming Contract Year with regard to the Licensed Products.

4. Licensee represents that it shall spend no less than              during each Contract Year of the License Period toward television advertising promoting the Licensed Products on national or cable television networks during programming that is specifically targeted at the youth/children's market (i.e., Cartoon Network, Nickelodeon, UPN, etc.), unless otherwise approved in writing by Licensor. All such television advertising shall be pre-approved by Licensor and produced by Licensee at its sole cost and expense. In addition, during the License Period, Licensee agrees to give good faith consideration to promoting the Licensed Products through the purchase of              television advertising spots during (i) Major League Baseball games designated by Licensor and broadcast by national over-the-air or cable television network rightsholders of the Office of the Commissioner of Baseball or (ii) national or cable television networks during programming that is specifically targeted at the youth/children's market (i.e., Cartoon Network, Nickelodeon, UPN, etc.) Each such television advertising spot shall be pre-approved by Licensor and produced by Licensee at its sole cost and expense. Licensee's cost and expense for the two (2) television advertising spots may apply against Licensee's              spending obligation hereunder.

5. During the License Period, Licensee shall reimburse Licensor for Licensor's actual costs and expenses (as invoiced) not to exceed the amount of:              unless otherwise approved by Licensee in each Contract Year during the License Period to participate in Licensor's cooperative advertising and retail marketing fund ("Fund") dedicated to Licensor-driven programs and/or initiatives designed to promote the trading card category. Such Fund shall be operated by Licensor during each year of the License Period. Licensor will organize and hold at least one meeting quarterly with Licensee alone or with Licensee and other trading card licensees to discuss and jointly and cooperatively develop marketing initiatives, Fund Commitment expenditures and, to the extent possible, ways in which to enhance the sales of trading cards (it being understood that Licensor shall have final approval rights over such initiatives, expenditures and enhancements). Such Fund Commitment expenditures shall include television, radio, print media, retail promotional activity, and Licensor initiatives. Commencing in April 2006, Licensor shall provide Licensee with quarterly written reports stating the types of expenditures made during the preceding quarter.

6. Licensee acknowledges that it shall participate in Major League Baseball-dedicated sampling promotions during each Contract Year of the License Period, as approved by Licensor. The promotion must be outlined in detail in the marketing plan submitted pursuant to <u>Schedule O, Advertising, Marketing & Promotion</u> No. 3 above.

**Redacted**

7. During each Calendar Year of the License Period, upon request by Licensor, Licensee shall give good faith consideration to participating in at least two (2) Licensor-sponsored events to be mutually agreed upon by Licensor and Licensee. Such Licensor-sponsored promotional events may include, among other things, cooperative advertising programs, authorized Licensor-focused shows or features displayed by electronic retailers (such as home shopping network shows and the Internet (subject to Paragraph 11(C) above)) or Licensor's other retail-related promotions or programs.

8. During each Contract Year of the License Period, Licensee has agreed to pay to Licensor to (i) place one (1) full-page four-color advertisement, produced by Licensee at no cost or expense to Licensor (it being understood that such production expenses shall not apply against the commitment), in each Licensor-published publication (including but not limited to <u>Little League Magazine</u> and the All-Star Game, World Series, and League Championship Series programs), (ii) participate in the Major League Baseball All-Star FanFest ("FanFest") events conducted during such Contract Year and to execute Licensor's standard FanFest Sponsorship agreements in connection therewith (the extent of Licensee's participation at FanFest shall be mutually agreed upon by Licensee and Licensor), and (

Redacted

9. Licensee shall spend a minimum of           per Club during each calendar year of the License Period on Club-specific marketing programs. The marketing programs must be outlined in detail in the marketing plan submitted pursuant to <u>Schedule O, Advertising, Marketing & Promotion</u> No. 3 above.

Licensee acknowledges and agrees that, except as otherwise set forth in <u>Schedule O, Advertising, Marketing & Promotion</u> No. 1 above, any financial commitments under any item identified in <u>Schedule O, Advertising, Marketing & Promotion</u> shall not offset or apply against each other or against any obligations under any other item hereunder.

## SCHEDULE P

Redacted

For purposes of this Agreement, a "Work Stoppage" means a lockout or strike involving the Major League Baseball Clubs and the Major League Baseball Players Association. A Work Stoppage shall also be considered to exist for purposes of this Paragraph any time during the regular or post-season within which one-third or more of the Major League Baseball Clubs' 25-man rosters consist of replacement players. A "Game Day" means a day during regular season or the post-season during which at least one Major League Baseball game is scheduled to be played.

Licensee's sole remedies in the event of a Work Stoppage are outlined in this Paragraph.

## EXCLUSIVITY

Provided that Licensee is not in default or breach under this Agreement at any time during the License Period provided herein, Licensor acknowledges that, subject to Paragraph 1 and the second sentence of Paragraph 19 of this Agreement regarding Premiums and in connection with the trademarks, service marks, trade dress, and copyrights associated with the Minor League Clubs, and subject to

**Schedule P, Miscellaneous** No. 12 of this Agreement regarding "Releases" of the Licensed Products (as such term is defined therein), Licensor shall designate certain fourteen (14) day periods (the "Release Windows") during which Licensee shall be the exclusive retail licensee of Licensor granted rights by Licensor on behalf of the Clubs to distribute new trading card releases to jobbers, wholesalers, distributors or retailers in the Licensed Territory during the License Period. Licensor shall communicate the Release Windows for each Contract Year to Licensee only after Licensee has submitted to Licensor the detailed marketing plan required pursuant to **Schedule O, Advertising, Marketing & Promotion** No. 3 above for such Contract Year. Licensor additionally represents that no licensee of Licensor who is authorized to produce and distribute at retail in the Licensed Territory trading cards featuring Major League Baseball players in uniform shall be afforded more or longer Release Windows than those identified herein.

**MISCELLANEOUS**

1. Notwithstanding anything to the contrary contained in Paragraph 11, Licensee acknowledges and agrees that Licensee may not sell or offer to sell or distribute the Licensed Products via mass direct print mail solicitations to consumers absent the prior written consent of Licensor.

2. Except as otherwise directed by Licensor, Licensee shall comply with the following guidelines regarding the Licensed Products:

   (a) the primary Licensed Property of the Club for whom the featured player will be playing in the upcoming year must be featured in a prominent manner on the front and/or back of the card (apart from as depicted in a uniform) and separate from any use of the Club's name in the statistics and/or editorial copy included on that card;

   (b) the name and/or Licensed Property of the Club must be separate and distinct from the player's name and any other corporate identification (including, without limitation, the Licensee's name and/or Licensed Property) featured on the card;

   (c) each pack of baseball trading cards must specify the number of cards contained therein, each box of baseball trading cards must specify the number of packs contained therein, and each case of baseball trading cards must specify the number of boxes contained therein;

   (d) any corporate identification featured in or adjacent to the copy lines on a baseball trading card or the packaging of baseball trading cards may be no larger than the Major League Baseball silhouetted batter Licensed Property or Club Licensed Property featured in or adjacent to the copy lines on the baseball trading card or package; and

   (e) the words "MAJOR LEAGUE BASEBALL TRADEMARKS AND COPYRIGHTS ARE USED WITH PERMISSION OF MAJOR LEAGUE BASEBALL PROPERTIES, INC." must be included on all packaging and display materials.

3. Upon execution of this Agreement and thereafter on a quarterly basis, Licensee shall provide to Licensor (i) an estimate of the percentage of returns of the Licensed Product (in relation to the quantity of units sold) for the License Period (categorizing information by calendar quarter, brand name, and stock keeping unit number); and (ii) a written summary of its current return policy. Licensee agrees to provide Licensor with any changes to such return policy as soon as a decision to change that policy has been made and before it is implemented. Licensor understands and agrees that these are only estimates and actual results may reasonably differ.

4. All Licensed Products and related marketing campaigns directed to children and young adults shall contain a positive message and must be submitted to Licensor for its prior review and written approval.

5. Upon execution of this Agreement and thereafter upon Licensor's request, Licensee shall provide to Licensor a list of the players to be featured on the Licensed Products, and shall update such list as necessary.

6. Licensee acknowledges and agrees that upon request by Licensor, but subject to applicable privacy policies, it will provide to Licensor aggregate data acquired through any direct marketing, promotion, sweepstakes, grass roots events, tournaments, leagues, etc. related to Licensee's advertising, marketing and distribution of the Licensed Products.

7. Licensee further acknowledges and agrees that in addition to the Royalties payable by Licensee hereunder on sales of Licensed Product Nos. 4-6 featuring the Licensed Properties **Redacted**, Licensee shall pay Royalties to Licensor on sales of Licensed Product Nos. 4-6 pursuant to License Agreement ML-4055C (the "Hall of Fame Agreement"). No Royalties payable hereunder with respect to the Licensed Products featuring the Licensed Properties shall offset or apply against Advance Compensation, Guaranteed Compensation or Royalties payable on Licensed Product Nos. 4-6 pursuant to the Hall of Fame Agreement.

8. Notwithstanding anything to the contrary contained in Paragraph 16(A)(iv) hereof, Licensor may exercise its right to terminate this Agreement under such sub-Paragraph only when, during the License Period, a new third party(ies) owns or controls more than thirty percent (30%) of Licensee and Licensor decides, in the reasonable exercise of its discretion, that it does not wish to have a relationship with such third party(ies). A reasonable basis for such a determination by Licensor shall be, but shall not be limited to, one or more of the following: (i) that the new party or parties are currently or have formerly been engaged in the unauthorized exploitation of one or more of Licensor's or another Major League Baseball-related entity's proprietary marks; (ii) that the new party or parties are currently licensees of Licensor and Licensor or another Major League Baseball-related entity feats that continuation of this particular Agreement might result in an undue concentration or domination in the marketplace and/or a conflict of interest; and (iii) a new party's past or present investment in or connection with casinos, any other form of legalized gambling enterprise, or any activity that Licensor or Major League Baseball has deemed unauthorized or which is contrary to official policy of Major League Baseball.

9. Notwithstanding anything to the contrary contained in this Agreement, Licensee acknowledges and agrees that in all cases where Licensor is not granting both the image and word mark of a particular mascot included in **Schedule D, Licensed Properties** No. 6, Licensee shall not include any aspect of such mascot (whether image or word mark) in the Licensed Products without Licensor's prior written consent, which shall be determined on a case-by-case basis.

10. Licensor agrees to keep confidential such documents and information provided by Licensee hereunder as would be deemed to be "confidential trade secrets" by a court of competent jurisdiction and which is stamped "Confidential" prior to distribution to Licensor. Notwithstanding the foregoing, such "confidential trade secrets" will not be kept confidential by Licensor if and to the extent such information is or becomes (i) generally available to the public; (ii) available to Licensor on a non-confidential basis from a source which is entitled to disclose it to Licensor; (iii) independently and lawfully discovered by Licensor; and/or (iv) necessary to be used by Licensor in a judicial or arbitration proceeding (or analogous alternative dispute resolution forum) involving a dispute between Licensor and Licensee relating to this Agreement. In the case of (iv) above, Licensor shall notify Licensee in writing of its intent

to disclose such information, and Licensee shall be afforded an opportunity to challenge such disclosure and/or seek a protective order, pursuant to the governing rules of the applicable jurisdiction. Licensee shall retain the confidentiality of Licensor information pursuant to Paragraph 13(R) above.

11. Licensee acknowledges and agrees that due to the fact that Licensee is sending periodic statements to Licensor by the last day of every calendar month as per Paragraph 5 of this Agreement instead of by the 15th day, Licensee may receive notices from Licensor's Finance Department ("Finance Notices") informing Licensee that its periodic statements are overdue. The parties hereby acknowledge and agree that such Finance Notices will not signal a default hereunder unless accompanied by a letter expressly stating actions or inactions constituting a Licensee default, or such default is expressly communicated by Licensor to Licensee separate and apart from such Finance Notices. Notwithstanding anything to the contrary contained in the preceding sentence, Licensor shall not be deemed to have waived, hindered, or in any manner impaired its rights or remedies hereunder and under applicable laws in the event of a Licensee default, including, without limitation, any failure to comply with the remaining reporting and payment obligations of this Agreement.

12. <u>Licensed Product Releases</u>.

a. Licensee may release no more than twenty (20) versions of the Licensed Products (each, a "Release") during the first Contract Year of the License Period (i.e., the period from January 1, 2006 through October 31, 2006); it being understood that each new Licensed Product shipped counts as a Release (for example, <u>each</u> of Series I, II, and III of one of the Licensed Products marketed under one of the Licensed Brands shall count as <u>one</u> Release). Thereafter, the number of permitted Releases for each Contract Year shall be discussed reasonably and in good faith by Licensee and Licensor (it being understood that nothing herein waives or hinders Licensor's rights of approval pursuant to Paragraph 10).

b. Each Release of a Licensed Product must be shipped during the calendar year to which it applies. For example, a Licensed Product for the 2007 Major League Baseball season may not be shipped during calendar year 2006. Licensee shall be permitted to advertise and promote a Licensed Product in the year prior to its intended release year.

c. Licensee may offer no more than two (2) Releases of Licensed Product No. 4 during each Contract Year of the License Period.

In each case there shall be no limitation or restriction imposed on the quantity of cards per Release, which shall be decided in Licensee's sole discretion.

13. With respect to Licensed Products featuring the name and/or image of the ballparks specified in **Schedule D, Licensed Properties** Nos. 9 and 10 (the "Ballparks"), and in addition to all other terms contained in this Agreement, Licensee represents, warrants and agrees to the following:

a. That it shall limit its use of the Ballparks only to the products and quantities (if any limitation) defined in **Schedule E**.

b. That it shall not use the name or images of the Ballparks other than as authorized hereunder, unless otherwise approved by Licensor. In the event Licensor approves such additional use, this Agreement shall be amended in writing to include such additional use.

c. That, by signing this Agreement, it is contractually obligating itself to each of Miller Brewing Company, PNC Bank Corp., SBC Operations, Inc., and SAFECO Corporation (collectively, the "Ballpark Entities") to comply with the terms and conditions contained in this Agreement for use of their respective Ballpark names and/or images.

d. That it has been or will be supplied with standards for use of the SAFECO Field name and image and that it shall comply with such standards.

e. That it is financially and by experience able to meet the applicable quality standards set forth herein.

f. That it will comply with and be subject to all the terms and conditions of this Agreement.

g. That it will, within ten (10) days after written notification of non-compliance, which written notice may emanate from Licensor, the individual Clubs, or any of the Ballpark Entities, discontinue (i) manufacturing, selling and/or distributing of any and all materials, including, without limitation, any goods or services, that do not comply with this Agreement, and (ii) applying the Ballpark name and images to any products and services, and selling or distributing any such products or services, that in the reasonable and good faith judgment of Licensor, the individual Clubs, or any of the Ballpark Entities, do not meet the applicable quality standards.

h. That it will follow in all respects any graphics guidelines as to color and format of the Ballpark name and images that shall be provided to it by Licensor.

i. That any breach by it of these terms and conditions would result in irreparable injury to Licensor, the individual Clubs, and/or the Ballpark Entities, for which money damages would not be a sufficient remedy. Therefore, in addition to any other remedies that may be available, Licensor, the individual Clubs, and/or the Ballpark Entities shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, and it waives the requirement for the securing or posting of a bond in connection with such remedy.

**Redacted**

## SCHEDULE Q

### MANUFACTURERS

1) Licensed Product No.: _____

   Name of Manufacturer: _____

   Address: _____

   Telephone: _____ _____

   Principal Contact: _____

## SCHEDULE R

### LICENSEE AFFILIATES

1) Licensed Product No.: _____

   Name of Licensee Affiliate: The Upper Deck Company, LLC

   Address: 5909 Sea Otter Place, Carlsbad, CA 92008-6621

   Telephone: _____

   Principal Contact: _____

## SCHEDULE S

### DISTRIBUTORS

1) Licensed Product No.: _____

   Name of Distributor: _____

   Address: _____

   Telephone: _____

   Principal Contact: _____

### DISTRIBUTION CHANNELS

1) _____

-41-

## SCHEDULE T

**BRAND NAMES**

    1) Licensed Product No.: _____

       Brand Name(s): _____

In the event Licensee wishes to substitute a brand name for those listed above or wishes to add to the number of brand names, Licensee shall first obtain Licensor's written approval of such brand names.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement:

**MAJOR LEAGUE BASEBALL PROPERTIES, INC.**, on its own behalf and as agent for each of the MLB Entities

BY: _____

TITLE: _____

**THE UPPER DECK COMPANY**

BY: _____

TITLE: _____