UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAJOR LEAGUE PROPERTIES, INC.,

                              Plaintiff,

         –against–

THE UPPER DECK COMPANY, LLC.,

                              Defendant.

10 Civ. 0732 (RWS)

ECF Case

**DEFENDANT UPPER DECK'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ..................................................................................2

ARGUMENT ....................................................................................................6

I.      MLBP IS NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER .................6

      A.      MLBP Has Not Shown That It Will Suffer Irreparable Harm. ...............6

      B.      MLBP Is Not Likely to Succeed on the Merits Of Its Trademark Claims. ...........10

            1.      MLBP Has Not Shown Consumer Confusion Is Likely. ...........................10

            2.      Upper Deck Cannot Compete In The Market For Baseball Cards Unless It Can Produce Cards that Contain Action Photographs of Baseball Players in Their Uniforms. ...........................................13

            3.      Upper Deck's Use of MLBP's Marks Is Nominative Fair Use ................14

            4.      MLBP Has Not Shown That Dilution Is Likely. .......................................17

      C.      MLBP Will Not Succeed On The Merits of Its Breach of Contract Claim. ..........18

            1.      The License's Language Prohibiting Non–Trademark Use Of The MLBP's Marks After Expiration Of The License Is Unenforceable .........18

      D.      The Balance of Equities Weighs Heavily Against A TRO. ...................25

      E.      An Injunction Is Not In The Public Interest. ...........................................26

II.     THE PROPOSED INJUNCTION IS OVERBROAD ......................................27

CONCLUSION ...............................................................................................28

## TABLE OF AUTHORITIES

**Page**

**Cases**

Bakers Aid v. Hussman Foodservice Co.,
  830 F.2d 13 (2d Cir. 1987)..................................................................................10

Beer Nuts, Inc. v. King Nut Co.,
  477 F.2d 326 (6th Cir. 1973) ..............................................................................21

C.B.C. Distrib. & Marketing, Inc. v. Major League Baseball Advanced Media, L.P.,
  443 F. Supp. 2d 1077 (E.D. Mo. 2006)......................................................20, 22, 24

Cardtoons v. Major League Baseball Players Ass'n,
  95 F.3d 959 (10th Cir. 1996) ..............................................................................26

Centaur Comm'cns, Ltd. v. A/S/M Comm'cns, Inc.,
  830 F.2d 1217 (2d Cir. 1987)..............................................................................21

Century 21 Real Estate v. Lending Tree, Inc.,
  425 F.3d 211 (3d Cir. 2005)........................................................................ passim

Citibank, N.A. v. Citytrust,
  756 F.2d 273 (2d Cir. 1985)..............................................................................6, 7

Clorox Co. v. Sterling Winthrop, Inc.,
  117 F.3d 50 (2d Cir. 1997)..................................................................................21

GMA Accessories, Inc. v. Eminent, Inc.,
  No. 07 Civ. 3219, 2008 WL 2355826 (S.D.N.Y. May 29, 2008)...........................27

George Basch Co., Inc. v. Blue Coral, Inc.,
  968 F.2d 1532 (2d Cir. 1992)..............................................................................10

Gionfreddo v. Major League Baseball,
  94 Cal. App. 4th 400 (Cal. Ct. App. 2001) ..........................................................26

Gruner + Jahr USA Publ'g. v. Meredith Corp.,
  991 F.2d 1072 (2d Cir. 1993)................................................................................8

Idaho Potato Comm'n v. M & M Produce Farm & Sales,
  335 F.3d 130 (2d Cir. 2003).........................................................19, 20, 21, 22

Landscape Forms, Inc. v. Columbia Cascade Co.,
  70 F.3d 251 (2d Cir. 1995)..................................................................................13

Lang v. Ret. Living Publ'g. Co.,
  949 F.2d 576 (2d Cir. 1991)..............................................................................10

Lear, Inc. v. Adkins,
  395 U.S. 653 (1969)................................................................................ passim

MWS Wire Indus., Inc. v. Cal. Fine Wire Co., Inc.,
  797 F.2d 799 (9th Cir. 1986) ................................................................21

Major League Baseball Prop., Inc. v. Pacific Trading Cards, Inc.,
  No. 98 Civ. 2739, 1998 WL 241904 (S.D.N.Y. May 14, 1998)....................1, 2, 3

Major League Baseball Properties, Inc. v. Pacific Trading Cards, Inc.,
  150 F.3d 149 (2d Cir. 1998)....................................................................9

Malletier v. Burlington Coat Factory Warehouse Corp.,
  No. 04 Civ. 2644, 2006 WL 1424381 (S.D.N.Y. May 23, 2006)...................10

New Kids on the Block v. News Am. Publ'g, Inc.,
  971 F.2d 302 (9th Cir. 1992) ...........................................................14, 15

Pirone v. McMillan, Inc.,
  894 F.2d 579 (2d Cir. 1990)..................................................................17

Playboy Enters., Inc. v. Welles,
  279 F.3d 796 (9th Cir. 2002) ...........................................................15, 16

Savin Corp. v. Savin Group,
  391 F.3d 439 (2d Cir. 2004)..................................................................17

Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.,
  190 F. Supp. 2d 577 (S.D.N.Y. 2002)........................................................6

T&T Mfg. Co. v. A.T. Cross Co.,
  587 F.2d 533 (1st Cir. 1978)..................................................................21

Tiffany (NJ) Inc. v. eBay, Inc.,
  576 F. Supp. 2d 463 (S.D.N.Y. 2008)......................................................15

Times Mirror Magazines, Inc. v. Field & Stream Licenses, Co.,
  294 F.3d 383 (2d Cir. 2002).............................................................21, 23

TrafFix Devices, Inc. v. Marketing Displays, Inc.,
  121 S. Ct. 1255 (2001).........................................................................13

Winter v. Nat. Resources Defense Council,
  129 S. Ct. 365 (2008)........................................................................5, 6

Yurman Design, Inc. v. PAJ, Inc.,
  262 F.3d 101 (2d Cir. 2001)..................................................................13

## Statutes

15 U.S.C. § 1125(c)(1).............................................................................17

15 U.S.C. § 1125(c)(2)(B) .........................................................................18

Fed. R. Civ. P. 65(d)(2)(C) ........................................................................27

## PRELIMINARY STATEMENT

This case presents the narrow, but nuanced, legal question of whether Upper Deck—who has a license from the Major League Baseball Players Association to use the images and likenesses of professional baseball players, but does not have a license from Major League Baseball Properties, Inc. ("MLBP") to use the league and teams' trademarks—may lawfully manufacture and sell baseball trading cards that contain in-game, action photographs of baseball players in uniform, but otherwise make no use of MLBP's trademarks.

This is not a garden variety trademark infringement dispute. This case requires a deliberate and careful assessment of the scope of MLBP's trademark rights in a context where those rights come into direct conflict with principles of free speech and competition, and the legal doctrines that aim to protect them.

The only court to have adjudicated this precise issue concluded, after a full hearing on MLBP's motion for preliminary injunction, that MLBP was not likely to prevail on the merits of its trademark claims and that a balancing of the hardships weighed heavily against the issuance of an injunction. *See Major League Baseball Prop., Inc. v. Pacific Trading Cards, Inc.*, No. 98 Civ. 2739, 1998 WL 241904 (S.D.N.Y. May 14, 1998). As discussed below, the facts of the *Pacific* case are similar in many important respects to those here, as are claims and defenses asserted by the parties, and the Court's reasoning is persuasive.

The drastic temporary injunctive relief that MLBP now seeks pending a full hearing on their motion for a preliminary injunction is inappropriate given the merits of Upper Deck's defenses and the incompleteness of this hastily compiled record. Furthermore, the issuance of a temporary restraining order would be devastating to Upper Deck and its business partners; so much so, that the company may never fully recover from such an order. MLBP has not met the onerous burden of

1

demonstrating that it is likely to succeed on the merits of its claims, that it will suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in its favor and that an injunction is in the public interest.

**STATEMENT OF FACTS**

Founded twenty years ago, Upper Deck is in the sports and entertainment publishing business, but perhaps is best known for its sale of collectible products, including sports trading cards. (Masherah Decl. ¶ 3.) Upper Deck is well-respected for the caliber of its products and has achieved considerable success over the past two decades. (*Id.*)

**Upper Deck's Licenses With The Players Association and MLBP**

As they have been for many years, Upper Deck's 2010 baseball products are officially licensed by the Major League Baseball Players Association (the "Players Association"). (Bernstein Decl. ¶ 6.) Under the terms of this agreement, Upper Deck is entitled to use the images and likeness of professional baseball players on and in connection with its 2010 baseball card offerings. (*Id.*) The Players Association license also permits Upper Deck to use facsimile signatures of certain baseball players on and in connection with its products and packaging. (*Id.*)

In addition to its license with the Players Association, Upper Deck has obtained what are known as "highlight agreements" with individual players, which enables Upper Deck to obtain these players' original signatures and use them in connection with its trading cards. (*Id.* ¶ 7.)

Furthermore, Upper Deck has an exclusive spokesman agreement with Derek Jeter that gives Upper Deck the exclusive rights to use Derek Jeter's image on its packaging and his signature on its trading cards. (*Id.* ¶ 8.) Not surprisingly, Upper Deck has chosen to make the most of this highly desirable exclusive arrangement by featuring an image of Derek Jeter in

uniform on the packaging of its most important product of the year, Upper Deck Series 1, in each

and every year that the spokesman agreement has been in place.  (*Id.*)

In years past, Upper Deck also had a license from MLBP.  (*Id.* ¶ 9.)  This year, however,

MLBP elected not to grant Upper Deck a license, deciding instead to provide an exclusive

license to Topps, Upper Deck's only meaningful competitor in the market for baseball trading

cards.  (*Id.*)  Therefore, for the first time, Upper Deck has endeavored to make baseball trading

cards that utilize the various rights granted to it by the Players Association, without running afoul

of the legitimate trademark rights of MLBP.  (*Id.* ¶ 10.)

**Upper Deck's 2010 Baseball Card Series**

To date, Upper Deck has released three baseball trading card series that are not licensed

by MLBP—Signature Stars, Ultimate Collection and Upper Deck Series 1 (the "2010 Series").

Upper Deck's 2010 Series make no use of MLBP trademarks other than those that happen to be

visible in the high-quality, game-action photographs of the baseball players in  uniform.  The

cards in the 2010 Series contain accurate depictions of the players during the game, but

otherwise make no reference to the registered marks of MLBP or its Member Clubs.

Representative samples of the cards and packaging from each of the three series already in the

marketplace, namely, Signature Stars, Ultimate Collection, and Series 1, are attached to the

Declaration of Jason Masherah as Exhibits A-C.

Upper Deck's limited and incidental use of MLBP's marks in its 2010 Series lies in sharp

contrast to how the company leveraged the MLBP Marks when it was a licensee.  Specifically,

while under license from MLBP, Upper Deck's products made extensive use of MLBP's

trademarks and logos on and in connection with the sale and advertising of these products.  For

example, Upper Deck's cards, packaging and advertising made use of MLBP's trademarks in the

following ways:

1.    All product packaging prominently featured the "Authentic MLB Merchandise Hologram";

2.    All products, packaging, and marketing featured the MLB legal line and logo;

3.    All products bore Member Club trademarks on the face or back of the cards as part of the card design;

4.    Many products prominently featured MLBP and Member Club trademarks in promotions and advertising;

5.    Many products incorporated the team colors of the Member Club into the card designs; and

6.    Some products made mention of MLBP trademarked events, such as the All Star Game and/or the World Series.

(Masherah Decl. ¶ 19.)

By contrast, Upper Deck's 2010 Series do not use the MLBP Marks in any of the ways

listed above, and in fact do not utilize any of MLBP's trademarks, as trademarks.  (*Id.* ¶¶ 20-21,

Exs. A-C.)  Upper Deck's 2010 series contain no MLBP trademarks other than those that happen

to appear in the game–action photograph of the player featured, and, on occasion in a purely

editorial written copy describing the action depicted in the featured photograph.

Furthermore, Upper Deck has taken every reasonable step to avoid confusion as to the

source or sponsorship of its baseball trading cards—it has stripped away all MLBP and

Member Club marks, team names, logos, and/or color combinations from its card designs.

It has also placed a disclaimer at *every level* of its product packaging and on *every single*

*one* of its cards stating that the product is "NOT authorized by Major League Baseball or

its Member Teams."  (*Id.* ¶ 19-21, Exs. 19-21).

Given that it was refused a license by MLBP, but had already paid for a license with MLBPA, Upper Deck made the reasonable business decision to manufacture and sell baseball trading cards that capitalize on the extensive rights it had already obtained from MLBPA, while avoiding any use of MLBP's trademarks as source-identifiers.  (Bernstein Decl. ¶¶ 9-10.) Acting in good faith, Upper Deck has gone to great lengths to ensure that its 2010 Series products are respectful of MLBP and do not run afoul of its legitimate trademark rights.

**Upper Deck Will Suffer Tremendous Injury If Enjoined Temporarily**

If enjoined, even temporarily, Upper Deck will suffer tremendous and irreparable harm to its business relationships, its competitive position in the marketplace, and could sustain economic losses in the millions.  *See generally* Masherah Decl.  As discussed extensively in the Declaration of Jason Masherah and as detailed *infra* at I.D., even a ten-day temporary restraining order would have devastating financial, and reputational consequences not only for Upper Deck, but for its business partners—many of whom are mom-and-pop hobby shops that are counting on the revenue from the sales of Upper Deck products in the next few weeks to help them weather the difficult economy.

In sharp contrast, MLB will suffer no irreparable harm whatsoever if Upper Deck is permitted to sell its cards until a hearing can be held on a more complete record.  Indeed, MLBP has failed to articulate any more than a vague, theoretical possibility of harm that *could possibly* result *if* MLBP can show that consumers are likely to purchase Upper Deck's products based on the false assumption that they are approved by MLBP.  This attenuated and largely theoretical harm is simply *not enough* to sustain MLBP's heavy burden under the preliminary injunction standard articulated by United States Supreme Court in *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008).

5

## ARGUMENT

## I.   MLBP IS NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER

The Supreme Court of the United States has recently clarified the standard applicable when a party seeks preliminary injunctive relief.  Specifically, in *Winter v. Natural Resources Defense Council*, the Supreme Court held that preliminary injunctive relief may not issue unless the movant has demonstrated all four of the following elements: (1) that he is likely to succeed on the merits of his claims; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in his favor; and (4) that an injunction is in the public interest.[1]  129 S. Ct. at 374.  With respect to irreparable harm, the *Winter* court expressly stated that the mere possibility of irreparable harm is not enough to sustain the movant's heavy burden:

> Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

*Id.* at 375–76.  As discussed below in detail, MLBP has not made the requisite showing on any of the four elements of the *Winter* test, and is therefore not entitled to the entry of a temporary restraining order.[2]

### A.   MLBP Has Not Shown That It Will Suffer Irreparable Harm

Irreparable harm to the movant is a critical factor in determining whether a preliminary injunction should be granted.  *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)

---

[1]  We note that MLBP has neglected to cite — much less apply — the standard articulated in *Winter*.

[2]  The parties agree that the test applicable for a preliminary injunction is the same test applicable to a party's bid for a temporary restraining order.  *See, e.g., Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.,* 190 F. Supp. 2d 577 (S.D.N.Y. 2002).

(stating that "the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered") (quotations omitted). Absent a *clear showing* of irreparable harm to the movant, preliminary injunctive relief must be denied. *Id.* at 275, 277 (vacating preliminary injunction based on plaintiff's failure to establish requisite irreparable harm).

MLBP's moving papers contain *not a shred of evidence* that it will suffer irreparable harm in fact if Upper Deck is not immediately enjoined pending the hearing on the merits of its preliminary injunction application. Instead, MLBP relies heavily on the presumption that irreparable harm will flow from a showing of likelihood of consumer confusion. (*See* MLBP Br. at 31.) This argument puts the cart before the horse. As discussed *infra* at I.B.1., MLBP has proffered absolutely no evidence whatsoever that consumers of trading cards are likely to falsely believe that MLBP has sponsored or approved Upper Deck's 2010 baseball card series. MLBP has not submitted any evidence of actual marketplace confusion, nor has it introduced survey evidence purporting to show that consumers are likely to be confused. In sum, the evidence supporting the position that consumers are likely to be confused is exactly nil. MLBP's claims of consumer confusion amount to nothing but bald speculation.

On the other hand, Upper Deck has submitted persuasive evidence, culled directly from the marketplace, demonstrating that trading card collectors understand—without a doubt—that MLBP has *not* sponsored or approved Upper Deck's 2010 baseball series. (*See* Anten Decl. ¶ 3, Ex. A.) These postings from popular trading card websites and blogs, clearly show that card collectors understand that Upper Deck's 2010 Series are not licensed or approved by MLBP. Given the total lack of any tangible evidence that consumers are confused—and in light of the

direct evidence to the contrary—MLBP may not claim irreparable harm flowing from a finding of consumer confusion.

Similarly, MLBP's argument that it will be irreparably harmed through the loss of control of its trademarks again *presupposes* that consumers will assume that MLBP has sponsored or approved Upper Deck's cards. If consumers are not under any such misimpression, then MLBP does not have the right to control how Upper Deck—or any third party for that matter—makes use of its mark. *See Gruner + Jahr USA Publ'g. v. Meredith Corp.,* 991 F.2d 1072, 1074 (2d Cir. 1993) (stating that "if no such likelihood of confusion is found, a defendant will generally not be held to have infringed plaintiff's mark"). This argument also presupposes that Upper Deck does not have the right to use photographs of players in uniform on its cards under either the nominative fair use and/or functionality doctrines, discussed *infra* at Parts II.B.2 and II.B.3.

The same holds true for MLBP's argument that Upper Deck's cards destroy the "cache" of having a single official MLBP licensee: to suffer any such harm, MLBP must show consumers to believe that Upper Deck continues to be an official licensee of MLBP. Again, not only is the record utterly devoid of any such proof, it contains evidence to the contrary. (*See* Anten Decl. ¶ 3, Ex. A.) In any event, MLBP and its exclusive licensee, The Topps Company, Inc. ("Topps"), are both sophisticated entities who knew or should have known that MLBP's right to prevent third parties from making fair use of its trademarks, as Upper Deck has done here, has been called into question by the only court ever to have considered those rights:

> In large measure, plaintiff's argument that it is entitled to a preliminary injunction rests on its oft repeated over–confident assertion that defendant's use of the various team uniforms and logos violates Properties' trademark rights. If plaintiff was correct in this assertion, an injunction would issue. However, a careful analysis of the facts persuade the Court that plaintiff is not likely to prevail on the merits of either its trademark or contract claim, and the balance of hardships does not tip in plaintiff's favor.

*Pacific Trading Cards*, 1998 WL 241904, at *1.[3]  MLBP and Topps were thus on notice that MLBP's ability to prevent third parties from using photos of baseball players in uniform was dubious, at best.[4]

In a fit of hyperbole, MLBP contends that if Upper Deck is not immediately enjoined, MLBP's ability to "meaningfully license the MLBP Marks in connection with trading cards on an exclusive basis" will be threatened or destroyed.  It is simply not credible that allowing Upper Deck to sell its products for another ten days or so while the Court holds a hearing on the significant legal and factual issues underlying MLBP's preliminary injunction application, would have any lasting impact on MLBP's ability to license its trademarks in the future.  Even if this court were to find against MLBP on the merits of this case, MLBP would *still* have the right to anoint one particular manufacture as the "MLB Official Exclusive Licensee" and that company alone would have the right to tout its relationship with MLBP, use the Major League Baseball Logo on its products, packaging and in its advertising, and place the Club Logos on the face of its cards and packaging.

---

[3]  MLBP claims that *Major League Baseball Properties, Inc. v. Pacific Trading Cards*, Inc., 150 F.3d 149 (2d Cir. 1998) "weighs heavily in MLBP's favor" because "the Second Circuit strongly indicated that it intended to grant MLBP's motion for an injunction."  (Br. at 18.)  MLBP's representation is utterly baseless.  The district court denied MLBP's motion to enjoin Pacific from issuing baseball cards depicting players in their team uniforms.  On a full record, Judge Martin denied MLBP's motion finding that Pacific did not use the marks as source-identifiers.  MLBP filed a motion for an injunction pending appeal of the order, and the Second Circuit stated that it intended to grant MLB's motion "unless Pacific posted a bond sufficient to secure MLB's claims."  This was purely a procedural determination regarding a bond; the Second Circuit made no mention of its position on the merits, and for MLBP to suggest otherwise is nothing more than wishful thinking .  Upper Deck, of course, does not refer the Court to the district court's opinion as binding authority, but as an example of  well-reasoned consideration of near-identical issues facing this Court.

[4]  For more than a century, from approximately 1860 until 1969, when, upon information and belief, MLBP first began licensing, baseball cards containing images of baseball players in their team uniforms were manufactured and sold without a license from Major League Baseball.  *See* Wikipedia, http://en.wikipedia.org/wiki/Baseball_cards (last visited Feb. 2, 2010).

Finally, MLBP's contention that Upper Deck has conceded irreparable harm in its license agreement with MLBP finds no support in the law. (*See* MLBP Br. at 31.) To the contrary, the court must make an independent finding of irreparable harm in order to grant injunctive relief. *See Bakers Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987).

MLBP has utterly failed to meet its burden on the most important element of its preliminary injunction application—a showing that it is *likely* to suffer irreparable harm in the short period of time pending the Court's hearing on a preliminary injunction. In stark contrast, and as discussed *infra* at Part I.D and in the Declaration of Jason Masherah, Upper Deck will suffer severe and devastating economic and irreparable injury to its business if it is forced to discontinue sale of its Signature Stars, Ultimate Collection and Series 1 products for the next ten days. Temporary injunctive relief is properly denied for these reasons alone.

## B.    <u>MLBP Is Not Likely to Succeed on the Merits Of Its Trademark Claims</u>

MLBP goes beyond the outer reaches of the Lanham Act by seeking to enjoin Upper Deck on these facts. MLBP has not demonstrated a likelihood of success on the merits of its trademark infringement and unfair competition claims because (1) it has not demonstrated a likelihood of consumer confusion and (2) even if it could demonstrate consumer confusion, the functionality and nominative fair use doctrines each independently provide Upper Deck with a complete defense against MLBP's trademark claims.

### 1.    MLBP Has Not Shown That Consumer Confusion Is Likely

Consumer confusion is the *sine qua non* of trademark disputes. *See Lang v. Ret. Living Publ'g. Co.*, 949 F.2d 576, 579 (2d Cir. 1991). Absent consumer confusion, "'imitation of certain successful features in another's product is not unlawful.'" *Malletier v. Burlington Coat Factory Warehouse Corp.,* No. 04 CV 2644 (RMB), 2006 WL 1424381, at *2 (S.D.N.Y. May 23, 2006) (quoting *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir.

1992)).  The record contains not a scintilla of evidence suggesting that consumers will *mistakenly purchase* Upper Deck's 2010 trading cards under the misimpression that they were licensed by MLBP.  *See Lang*, 949 F.2d at 583 (to demonstrate consumer confusion, there must be evidence of a "potential or actual effect on consumers' *purchasing decisions*") (emphasis added).  To the contrary, the evidence of consumers' reaction to Upper Deck's 2010 demonstrates *precisely the opposite*—that these consumers have a ready and undeniable understanding that Upper Deck is the source of these cards and that Upper Deck is NOT licensed by MLBP to produce them.

MLBP has proffered absolutely no tangible evidence of consumer confusion –whether in the form of actual instances of confusion among consumers or consumer survey evidence.  In contrast, the record contains evidence strongly suggesting that consumers understand perfectly well that Upper Deck's 2010 Series are NOT licensed by MLBP.  (*See* Anten. Decl. ¶ 3, Ex. A.) Even assuming MLBP could establish that there is confusion among consumers as to whether MLBP sponsors or approves of Upper Deck's 2010 Series, MLBP has not shown that it is Upper Deck's use of player photographs that *is the cause of that confusion.*  In fact, to the extent consumers are confused at all, one likely source of confusion as to sponsorship or authorization could arise from the fact that many consumers do not understand the difference between the Players Association and MLBP.  It would be perfectly logical for consumers unfamiliar with the intricacies of baseball licensing practices, to assume that products bearing the images of professional baseball players and officially authorized by "Major League Baseball Players Association" are also authorized or approved by MLBP.

In its moving brief, MLBP mechanically plods through a discussion of each of the *Polaroid* factors, regardless of its relevance to the facts of this case, somehow concluding that

confusion among consumers is likely.  However, as several courts have recognized, the

"likelihood of confusion" test does not "lend itself well to a nominative fair use fact pattern"

such as this one—where there is no question that the defendant is using the plaintiffs mark, and

not its own.  *See Century 21 Real Estate v. Lending Tree, Inc.*, 425 F.3d 211, 224 (3d Cir. 2005)

("By definition, nominative use involves the use of *another's* trademark in order to describe the

trademark owner's *own* product.").  As a result, the Third Circuit has quite sensibly tailored the

confusion analysis to include only those four factors that are "meaningful and probative" in the

nominative fair use context.  *See id.*  These factors are "(1) the price of the goods and other

factors indicative of the care and attention expected of consumers when making a purchase; (2)

the length of time the defendant has used the mark without evidence of actual confusion; (3) the

intent of the defendant in adopting the mark; and (4) the evidence of actual confusion."  *Id.* at

225–26.  A close look at these factors shows that consumer confusion is simply not likely here.

    *First*, it almost goes without saying that baseball trading cards are the type of product to

which consumers pay particularly close attention.  Amateur and serious collectors alike

scrutinize and endlessly debate the relative merits of various cards, series, and brands. This is the

whole point of the hobby.  (Masherah Decl. ¶ 18).

    *Second*, Upper Deck's Signature Stars and Ultimate Collection products have been on the

market for one week.  While this may at first blush seem like a short time, in the life of a

baseball card series, it is significant, since the volume of consumer sales is typically at its peak in

the first few days after a product is released.  (*Id.* ¶ 9).  In fact, in the past week, consumers have

blogged enough about these products to produce substantial and compelling evidence that they

are crystal clear that MLBP has not authorized Upper Deck's products.

    *Third,* Upper Deck's use of the MLBP Marks is in good faith.  It simply cannot avoid

showing some portions of MLBP's marks and logos—which are affixed to practically every joint and surface of the players' uniforms—if it uses game action photos of the players on its cards. However, Upper Deck has attempted to be respectful of MLBP's rights by selecting predominantly images where the MLBP Marks are not overly prominent.

*Fourth*, MLBP has not proffered a shred of evidence of actual confusion, while Upper Deck has introduced evidence that marketplace participants are not at all confused about Upper Deck's unauthorized status.  (*See* Anten Decl. ¶ 3, Ex. A.)

In short, no matter how you slice it, this record simply does not support the conclusion that consumers are likely to believe that MLBP has authorized Upper Deck's 2010 Series.

### 2.    Upper Deck Cannot Compete In The Market For Baseball Cards Unless It Can Produce Cards that Contain Action Photographs of Baseball Players in their Uniforms.

The functionality doctrine is highly relevant to this case and bars MLBP from overextending its trademark rights to prevent legitimate competition by Upper Deck.  This doctrine "prevents trademark law, which seeks to promote competition by protecting a firm's reputation from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 70 F.3d 251, 253 (2d Cir. 1995).  "A product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it effects the cost or quality of the article." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 116 (2d Cir. 2001) (quoting *TrafFix Devices, Inc. v. Marketing Displays, Inc.* 121 S. Ct. 1255, 1261 (2001)).  This non-functionality requirement "protects competition *even at the cost of potential consumer confusion*." *Id.* (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F. 3d 373, 379–380 (2d Cir. 1997) (emphasis added).

13

Since baseball trading cards were first invented, they have consistently contained an image of the player in his uniform. It is beyond dispute that the essential feature of any collectible baseball trading card is a picture that accurately depicts the player *as a player* . . . and not in his street clothes or at home with his kids. To effectively compete in today's market, Upper Deck must produce baseball trading cards with high–quality, action photographs of players in uniform. (Masherah Decl. ¶ 23) These photographs are a critical element of Upper Deck's product design—essential to the very purpose of the card itself. If Upper Deck's baseball trading cards featured photographs of professional baseball players in their street clothes, they would cease to be baseball cards altogether. The use of player photographs, including the incidental depiction of their game uniforms, is therefore a functional element of baseball player trading cards. Simply put, there is no alternative way to make a marketable baseball card without depicting the players in their team uniforms. (*Id.*)

In MLBP's view of the world, it alone may dictate which companies can—and cannot—make baseball cards. This year, MLBP has unilaterally decided that its partner, Topps, is the only company that can lawfully make baseball cards containing images of players in uniform. In the past, MLBP's decision to terminate a license has ultimately proved fatal to the ex-licensees' baseball card business.[5]

### 3.    Upper Deck's Use of MLBP's Marks Is Nominative Fair Use

The doctrine of nominative fair use affords Upper Deck a complete defense to MLBP's claims of trademark infringement. The defense of nominative fair is applicable, here because

---

[5]   MLBP cites to its litigation against Donruss Playoff, L.P. and Donruss LLC (collectively "Donruss") as "instructive." (MLBP Br. at 17.) To the contrary, that litigation is substantively entirely irrelevant to the case before the Court. In *Donruss*, the parties entered a consent injunction. Such an injunction, by definition, requires the consent of both parties. What Donruss agreed to has absolutely no bearing on Upper Deck's position; indeed, the most likely impetus behind Donruss's agreement to a consent injunction is that it could not afford to litigate the issue.

Upper Deck uses players in uniform on trading cards not to identify the source of Upper Decks

cards, but to accurately describe the players as they would appear on the field.  *See New Kids on

the Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 308 (9th Cir. 1992).  As the *New Kids* court

aptly noted, the mere use of a trademark does not always imply sponsorship or endorsement:

> For example, one might refer to "the two–time world champions"
> or "the professional basketball team from Chicago," but it's far
> simpler (and more likely to be understood) to refer to the Chicago
> Bulls.  In such cases, use of the trademark does not imply
> sponsorship or endorsement of the product because the mark is used
> only to describe the thing, rather than to identify its source.

*Id.* at 306.

Nominative fair use has been recognized by and applied in this judicial circuit though no

particular test has formally been adopted by the Second Circuit Court of Appeals. [6]  In *Century

21 Real Estate Corp.*, the Third Circuit adopted a two step approach in cases where a defendant

contends that its use of the plaintiffs mark is fair.  First, the plaintiff must demonstrate there is a

likelihood of consumer confusion, by examining four relevant factors, namely "(1) the price of

the goods and other factors indicative of the care and attention expected of consumers when

making a purchase; (2) the length of time the defendant has used the mark without evidence of

actual confusion; (3) the intent of the defendant in adopting the mark; and (4) the evidence of

---

[6]  The status of the doctrine was recently described by the court in *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 495 n.27 (S.D.N.Y. 2008):

> There is some dispute about whether "nominative fair use" is properly
> characterized as an affirmative defense or as a substitute for the "likelihood of
> confusion" inquiry (which itself is included in the second prong of the Second
> Circuit's two–pronged test).  *Compare Century 21 Real Estate Corp. v.
> Lendingtree, Inc.*, 425 F.3d 211, 217–224 (3d Cir. 2005) (holding that nominative
> fair use is an affirmative defense to a prima facie case of likelihood of confusion,
> similar to the fair use defense), with *Playboy Enters., Inc. v. Welles*, 279 F.3d 796,
> 806 (9th Cir. 2002) (holding that an assertion of nominative use gives rise to a
> modified likelihood of confusion analysis).  The Court need not choose between
> these two approaches, as the outcome would be the same under either analytical
> framework.

15

actual confusion." *Century 21 Real Estate*, 425 F.3d at 225-26.  As discussed *supra* at Part I.B.1,

MLBP cannot show that consumers will believe mistakenly that Upper Deck's 2010 series

products are sponsored by MLBP.

Even if MLBP could demonstrate likely confusion, the second prong of the nominative

fair use test allows Upper Deck to establish that its use is fair and lawful, *notwithstanding the*

*existence of consumer confusion*.  *Century 21 Real Estate,* 425 F. 3d at 222.  To do so, Upper

Deck must show (1) that its use of MLBP's marks is necessary to describe both the plaintiffs'

product or service and the defendant's product or service; (2) that Upper Deck only uses so much

of MLBP's marks as to describe the plaintiffs product and (3) that the defendants conduct or

language reflect the true and accurate relationship between plaintiff and defendant's products or

services.  *Id.*  Under this test, or its analog in the 9th Circuit articulated in *Playboy Enters., Inc. v.*

*Welles*, 279 F.3d 796, 806 (9th Cir. 2002),[7] Upper Deck easily satisfies the elements of the

nominative fair use defense.

*First*, there is no question that Upper Deck's use of MLBP's mark is necessary to

describe MLBP's "product or service"—here, the baseball clubs and league to which the

depicted players belong and the official games in which they play.  In fact, there is virtually no

way around depicting these marks, at least in part, because they are so prevalent on the uniforms.

*Second*, Upper Deck has used only so much of MLBP's marks as necessary to accurately

depict the players as they actually appeared at the moment the photograph was taken.  Upper

---

[7]   The Ninth Circuit's three-pronged test, which is employed in lieu of the traditional likelihood of confusion
analysis, requires that "[1] the product or service in question must be one not readily identifiable without the use of
the trademark; [2] only so much of the mark or marks may be used as is reasonably necessary to identify the product
or service; and [3] the user must do nothing that would, in conjunction with the mark, suggest sponsorship or
endorsement by the trademark holder.  *Playboy Enters.*, 279 F.3d at 801.

Deck has not added any trademarks to the photographs, and in fact, has deliberately selected photographs where the MLBP's marks are not prominent. (Masherah Decl. ¶ 23.)

*Third*, Upper Deck's incidental use of the MLBP Marks in undoctored photographs of players reflects the true relationship between the parties. Upper Deck adds nothing to these photographs or to its cards in general that would falsely imply a sponsorship relationship. To the contrary, each and every card, and every level of packaging, contains a disclaimer clearly stating that Upper Deck is not licensed by MLBP. (*Id.* ¶ 20.)

Furthermore, in the context of baseball trademarks, the Second Circuit has itself recognized that the use of a mark in its primary, descriptive sense is not a trademark use and does not constitute an infringement. In *Pirone v. McMillan, Inc.,* 894 F.2d 579 (2d Cir. 1990), Babe Ruth's daughters sued the publishers of a calendar which included photographs of Babe Ruth, claiming that such photos implied that Ruth had sponsored or approved of the calendar. Rejecting this claim, the court noted the following:

> Photographs of baseball, its players and assorted memorabilia, are the subject matter of the calendar. The pictures of [Babe] Ruth no more indicate origin than does the back cover's picture of Jackie Robinson stealing home plate. Both covers are merely descriptive of the calendar's subject matter. *In neither case would any consumer reasonably believe that Ruth or Robinson sponsored the calendar.* Instead, the photographs identify great ball players and by so doing indicate the contents of the calendar, not its source. The source of the publication is clearly indicated by the numerous, prominent references to MacMillan.

*Id.* at 584 (emphasis added). In much the same way, it simply cannot be said that Upper Deck's use of MLBP's marks on its cards could reasonably give rise to consumer confusion.

### 4.    MLBP Has Not Shown That Dilution Is Likely

Without a single case citation, MLBP claims that the photographs featured in Upper Deck's baseball trading cards, which are of the same high quality that MLBP has explicitly

approved over the past twenty years, suddenly impair the distinctiveness of MLBP's

presumptively famous trademarks. Although the Lanham Act sets forth at least eight factors to

be considered in determining whether a mark is famous and distinctive and thus entitled to

federal anti-dilution-law protection, *see* 15 U.S.C. § 1125(c)(1), MLBP and does not endeavor to

meet the statutory test for even one of its trademarks. Fame is not a presumption, *see id.*; *Savin*

*Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004), and MLBP must be put to the test.

MLBP bases its dilution claim on the mere fact that Upper Deck "employ[s]" MLBP's

trademarks in the action photographs on its cards. (MLBP Br. at 30.) Taking this argument to

the extreme leads to the result that MLBP's marks have already been diluted over the decades by

the countless in–game newspaper and magazine photographs and television–broadcasts that

similarly depict MLBP's marks. If showing an action shot from a public sporting event impairs

the distinctiveness of MLBP's trademarks, then MLBP should have banned all sports writers and

reporters from its stadiums years ago. The position MLBP adopts is patently ludicrous, and its

dilution claim is inapplicable where Upper Deck has made no use of the allegedly famous and

distinctive marks apart from game-action photographs protected under the First Amendment.

Any association with MLBP derives not from the incidental appearance of the trademarks in the

card photos, but from consumers' recognition of the individual player depicted. *Cf.* 15 U.S.C. §

1125(c)(2)(B) (requiring an association deriving from the "mark").

### C.    MLBP Will Not Succeed On The Merits of Its Breach of Contract Claim

#### 1.    The License's Language Prohibiting Non–Trademark Use Of The MLBP's Marks After Expiration Of The License Is Unenforceable

MLBP first argues that Upper Deck has breached its "surviving obligation" with MLBP

under the License that, it would not make fair, incidental, or functional use of the MLB Marks

after the License had expired. MLBP's position however, flies in the face of case law—

18

including Supreme Court precedent—that has repeatedly found such contractual provisions in

trademark licenses to be unenforceable as against public policy.

In the License Upper Deck entered into with MLBP, Paragraph 15.A includes the

following language:

> Licensee … agrees that it will during or after the License Period
> make no use of any such MLB Marks, other than as provided in this
> Agreement, without the prior written consent of Licensor or the
> appropriate MLB Entity. . . . Licensee further acknowledges that for
> purposes of this Paragraph 15, "use" includes, but is not limited to,
> trademark, fair, incidental, descriptive or functional uses.

According to MLBP, the existence of this provision is dispositive because courts generally

enforce licensing agreements between sophisticated parties.  MLBP, however, fails to even

*mention*, let alone account for, long-standing case law—premised on the Supreme Court case

*Lear, Inc. v. Adkins*, 395 U.S. 653 (1969)—that routinely holds as unenforceable against public

policy explicit contractual provisions that purport to forever ban former licensees from making

non–trademark use of a mark when to do so would be against the public interest.

> (a)     *Lear* and Second Circuit precedent require the Court to weigh
> the public interest against the contractual language

In *Lear*, the Supreme Court held, in the patent context, that a licensee need not pay future

royalty payments for an invalid patent, regardless of explicit language contained in a contract

requiring otherwise.  *See id.* at 659.  There, the Supreme Court stated that such provisions will

not be upheld where the "strong federal policy favoring the full and free use of ideas in the

public domain" outweighs the public interest against the "competing demands of patent and

contract law."  *Id.* at 675.  The Supreme Court explained:

> Surely the equities of the licensor do not weigh very heavily when they are balanced
> against the important public interest in permitting full and free competition in the use
> of ideas which are in reality a part of the public domain. Licensees may often be the
> only individuals with enough economic incentive to challenge the patentability of an

inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would–be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued.

*Id.* at 670–71.

This doctrine is not limited to the patent context; the Second Circuit has specifically extended the *Lear* balancing test to Lanham Act disputes. *See Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 136-37 (2d Cir. 2003) (recognizing that "[t]he Lear balancing test has also been frequently applied to trademark licensing contracts" and concluding that that "*Lear* makes clear that courts should weigh the federal policy embodied in the law of intellectual property against even explicit contractual provisions and render unenforceable those provisions that would undermine the public interest").[8] In *M&M*, the Second Circuit concluded that the "public interests are more substantial and more likely to be harmed if M&M is not allowed to press its claims than the public interests and *de minimis* harm alleged in the trademark-related cases that upheld contractual no-challenge provisions." *Id.* at 139.

The *Lear* balancing test has recently been applied to sports licensing disputes nearly identical to the one before this Court. In *C.B.C. Distribution & Marketing, Inc. v. Major League Baseball Advanced Media, L.P.*, 443 F. Supp. 2d 1077 (E.D. Mo. 2006), *aff'd on other grounds*, 505 F.3d 818 (8th Cir. 2007), CBC entered into a licensing agreement with the Major League Baseball Players' Association ("MLBPA") to use certain MLBPA rights, including baseball players' names and statistics, in its fantasy sports products. The licensing agreement included a

---

[8] In *M&M*, in applying the *Lear* balancing test, the Second Circuit considered that (1) the provision was a "non-quality-control related restriction," *id.* at 139; (2) parties that have entered a licensee relationship with the plaintiff "may often be the only individuals with enough economic incentive to challenge the IPC's licensing scheme, and thus the only individuals with enough incentive to force the IPC to conform to the law," *id.;* and (3) considered the public interests implicated in maintaining a free market in the information at issue, *id.*

no–challenge provision that upon termination, CBC could not use players' names or statistics in any way. CBC challenged the provision as void against public policy.

The court began by applying the *Lear* balancing test, recognizing that "the court must balance the concern for the demands of contract law against the concern for full and free use of ideas in the public domain." *Id.* at 1106. The court considered the interest in maintaining free competition and the public's interest in the dissemination of information. Further, the court recognized that removing from the public domain information that would otherwise be readily accessible to the public would infringe CBC's First Amendment rights. The court concluded:

> [I]n the circumstances of this case "the strong federal policy favoring the full and free use of ideas in the public domain" as manifested in the laws of intellectual property prevails over the challenged contractual provisions in the 2002 Agreement. *See M & M Produce*, 335 F.3d at 137. As such, the court further finds that the no–challenge provision in the 2002 Agreement and the provision which prohibits CBC from using players' names and/or playing records without acquiring a license are unenforceable and void as a matter of public policy. *See Lear*, 395 U.S. at 674; *G & T Terminal Packaging*, 425 F.3d at 717–18; *M & M Produce*, 335 F.3d at 132–36; *T & T Mfg.*, 587 F.2d at 538.

*Id.* at 1106–07 (footnote omitted). *CBC* and *M&M* together provide critical guidance in how the *Lear* balancing test is to be applied in this case.

### (b)     There is minimal public interest in upholding contractual language prohibiting non–trademark uses of the MLBP Marks

There is little public interest in upholding Paragraph 15.A's provision that Upper Deck may not use "fair, incidental, descriptive or functional" uses – that is, ***non–trademark*** uses – of the MLB Marks. Upper Deck does not challenge the provision's applicability to use of the MLB Marks as source–identifiers. However, non–trademark uses of the MLB Marks do not implicate the underlying purpose of the Lanham Act: to prevent consumers from being confused as to source or sponsorship. By definition, non–trademark uses fall outside of the scope of the Lanham Act's reach. *See Centaur Comm'cns, Ltd. v. A/S/M Comm'cns, Inc.,* 830 F.2d 1217,

1220 (2d Cir. 1987) (the purpose of the Lanham Act is "to prevent consumer confusion regarding a product's source"). Because Upper Deck only challenges the enforceability of the provision to the extent that it covers *non–trademark* uses, MLBP's lengthy reliance on the need to enforce the provision to prevent a likelihood of confusion is wholly irrelevant.[9] The Court therefore faces nothing more than the standard interest in enforcing contractual language – an interest that is not particularly important to the public at large when the provision at issue is a "non–quality–control related restriction." *M&M*, 335 F.3d at 139.[10]

### (c) The federal interest in full and free use of ideas outweighs any interest in prohibiting non–trademark uses of the MLBP Marks

The second part of the *Lear* balancing test directs the Court to "weigh the federal policy embodied in the law of intellectual property" to determine whether an explicit contractual provision "would undermine the public interest." *Id.* at 136. Here, there is an extraordinarily strong public interest favoring Upper Deck's non–trademark use of the MLB Marks.

*First*, the Court should consider "the concern for full and free use of ideas in the public domain." *CBC*, 443 F. Supp. 2d at 1106. The sole part of Upper Deck's baseball cards that are implicated by Paragraph 15.A are the uniforms and the logos appearing on those uniforms, hats, or helmets that were incidentally captured in the photographs featured on Upper Deck's cards.

---

[9]  MLBP's case citations uniformly involve a defendant's use of a mark in a confusingly similar way (i.e., actionable under the Lanham Act) to the plaintiff's use of the mark. *See, e.g., Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 60 (2d Cir. 1997) (trademark agreements are favored when likelihood of confusion is implicated); *Times Mirror Magazines, Inc. v. Field & Stream Licenses, Co.*, 294 F.3d 383, 396 (2d Cir. 2002) (addressing confusion as to source); *MWS Wire Indus., Inc. v. Cal. Fine Wire Co., Inc.*, 797 F.2d 799, 803 (9th Cir. 1986) (addressing source identification); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328 (6th Cir. 1973) (addressing whether a mark had become descriptive in the context of source-identification); *T&T Mfg. Co. v. A.T. Cross Co.*, 587 F.2d 533, 538 (1st Cir. 1978). None of these cases involve defendants who argued that they were not using the mark as a source-identifier at all, as Upper Deck does here.

[10]  In addition, Upper Deck was not provided a meaningful opportunity to negotiate the provision requiring that Upper Deck not engage in non–trademark uses of the MLBP Marks. Such "standard" terms are rarely if ever negotiable. (Bernstein Decl. ¶ 5.) While MLBP and Upper Deck negotiated the financial and logistic aspects

(footnote continued)

22

Quite simply, there is no viable way for Upper Deck (or anyone else, for that matter) to produce baseball cards without showing the players in their uniforms.  Further, for the reasons discussed *supra*, Upper Deck is engaging in fair and functional use of the uniforms and logos.  Because these uses fall outside the purview of the Lanham Act, the public has a right (and an interest) in receiving that non–protectable information.

*Second*, Upper Deck is one of only two remaining producers of trading cards featuring professional baseball players, and any restriction on Upper Deck on its non-trademark uses will result in a severe restriction in competition for baseball cards, injuring the public interest.  In this factual context, any recognition of the License's enforceability as to non-trademark uses would reduce the entire baseball trading card industry to only one provider: Topps (MLBP's exclusive licensee).  While MLBP has every right to enter an exclusive license with Topps as to use of the MLBP Marks as source-identifiers, the enforcement of Paragraph 15.A will instantly eliminate Topps' primary competitor in the marketplace on the basis of uses of marks other than as source-identifiers.  There is an extraordinarily strong public interest for there to be viable competition in the marketplace for baseball trading cards – especially considering that Upper Deck has been in this business for over twenty years – and the excising of Upper Deck from that marketplace will restrict consumers' choice to one entity.  Indeed, MLBP concedes in its citation to *Times Mirror Magazines, Inc. v. Field & Stream Licenses, Co.*, 294 F.3d 383, 396 (2d Cir. 2002) that in a license agreement, a party should be held to its contract "unless adhering to the contract will damage the public and not just a contracting party."  (Br. at 16.)  Here, if the provision is held unenforceable, any damage would inure only to MLBP; however, enforcement of the provision

---

contained in the Schedules attached to the License, all of the intellectual property provisions, including Paragraphs 12, 13, 15, and 18, were not negotiable, presented by MLBP to Upper Deck on a take-it-or-leave-it basis.  (*Id.* ¶ 6.)

will severely damage the public interest in its interest in full and free use of ideas by restricting the public's access to marketplace competition that does not implicate a likelihood of confusion or any other contravening intellectual property interest.

*Third*, enforcement of the provision would implicate serious First Amendment concerns, which unquestionably impact the public interest.  As <u>CBC</u> recognized:

> Were the court to give effect to the no-challenge provision in the 2002 Agreement and to the provision prohibiting CBC from using the players' names and playing records without a license, information which is otherwise readily accessible would be removed from the public domain and CBC's First Amendment rights would be infringed. As such, balancing the interests in favor of CBC would facilitate enforcement of the First Amendment.

<u>CBC</u>, 443 F. Supp. 2d at 1106.  Similarly, giving effect to Paragraph 15.A's reach beyond the scope of the Lanham Act to permissible uses of uniforms and logos would result in the deprivation of any meaningful form of competition with Topps, depriving the public of competing information and depriving Upper Deck of its First Amendment rights.

Balancing the minimal public interest in enforcing a contractual provision that will have no effect on anyone other than MLBP with the drastic effects that enforcement would have on the public's interest in full and free competition and access to information – particularly in a factual context such as here, where there are only two competitors in the market – the *Lear* balancing test weighs heavily in Upper Deck's favor.  Even if the Court harbors doubts about how it would ultimately resolve *Lear*, the questions it raises mitigates against awarding MLBP any form of injunctive relief through a temporary restraining order, as MLBP must establish a *likelihood* of success on the merits on the issue.

24

D.     **The Balance of Equities Weighs Heavily Against A TRO**

Upper Deck will suffer considerable reputational damage, significant monetary losses, and an inability to operate its business in the regular course if it is enjoined pending the Court's ultimate determination on whether a preliminary injunction should issue.  As set forth below, a temporary restraining order operative over the next week or so would have devastating practical consequences to Upper Deck's business, and could ultimately result in Upper Deck being unable to continue to litigate this matter.

Upper Deck will suffer serious financial harm if it cannot sell its Signature Stars, Ultimate Collection and Series 1 products in the next ten days.  (Masherah Decl. ¶ 5.)  This is because trading card products sell most within the first week or two of their release into the marketplace.  (*Id.* ¶ 9.)  After this time, sales decline considerably, such that by only sixty days after a product is released, 80% has been sold to the consumer.  (*Id.*)  Thus, a temporary restraining order issued right now—when these three series have just been released into the marketplace—will have a disproportionately adverse effect on Upper Deck's overall sales.  (*Id.*)  Furthermore, because Series 1 is Upper Deck's most important product—and accounts for a significant percentage of its annual revenue from baseball products—even a temporary injunction at this time would have dire consequences, as Upper Deck will likely not be able to recapture these lost sales and its losses would be very substantial.  (*Id.*)  These same arguments hold true for Upper Deck's distributors and retailers—which include a large number of mom and pop hobby shops already stretched thin by the ailing economy.  These retailers are not likely to recover their lost sales, even if the TRO were vacated after a hearing.  (*Id.* ¶ 10.)

Upper Deck will also suffer tremendous and unquantifiable reputational harm amongst distributors, dealers and retailers if a TRO is entered preventing them from continuing to sell

Upper Deck's products, even for a brief period pending the outcome of a preliminary injunction hearing. (*Id.* ¶ 17.). Upper Deck relies on its reputation as one of the collectibles industry's leading providers of high-quality sports trading cards. This reputation stems from Upper Deck's ability to develop and deliver high-quality products quickly, efficiently and in a timely manner to distributors and retailers. (*Id.*) If a TRO were to issue, its goodwill and trust from distributors and retailers, whose long memories will carry their concern over the injunction into future business, would unquestionably be eroded. Such worry can translate into untold lost sales, unfavorable contracts with distributors and other less predictable harms. (*Id.*)

### E.    An Injunction Is Not In The Public Interest

As the Supreme Court directs in *Winter*, "in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." 129 S. Ct. 377 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). MLBP has ignored this factor entirely, even though MLBP must show that an injunction against Upper Deck would serve the public interest as a *prerequisite* to obtaining injunctive relief.

In any event, in light of the complete lack of record evidence that consumers are likely to be confused by Upper Deck's incidental, functional and otherwise fair use of MLBP's marks, an injunction against Upper Deck would only serve to hinder free speech. Indeed, numerous courts have held that both current and historical information concerning the game of baseball, including the information conveyed on a baseball card, is speech protected under the First Amendment. *See, e.g*, *Gionfreddo v. Major League Baseball*, 94 Cal. App. 4th 400, 411 (Cal. Ct. App. 2001) (recitations of facts about the game of baseball are protected by the First Amendment, whether or not they are presented in a commercial context); *Cardtoons v. Major League Baseball Players*

26

*Ass'n*, 95 F.3d 959, 969 (10th Cir. 1996) (holding that baseball cards are "an important means of expression that deserve First Amendment protection").

In sum, MLBP has failed to satisfy any—much less all—of the four factors required to obtain preliminary injunctive relief: (1) MLBP has not demonstrated likely success on the merits because it has not demonstrated that consumer confusion is likely; and, in the alternative, it cannot show that the nominative fair use and/or functionality defenses are inapplicable here; (2) it has not articulated that it will suffer any actual irreparable harm—all of its arguments on this point are based on the hypothetical and highly dubious assumption that consumers are likely to believe that MLBP has authorized Upper Deck's products, when the record contains absolutely no evidence to support that claim; (3) the balance of hardships tips sharply in Upper Deck's favor, as the entry of a temporary restraining would have devastating and lasting adverse consequences to Upper Deck's business; and (4) an injunction is not in the public interest because it would unfairly restrict speech protected by the First Amendment.

## II.    THE PROPOSED INJUNCTION IS OVERBROAD

Should the court be inclined to grant MLBP's application, Upper Deck objects to the form of the proposed order submitted by MLBP on the grounds that it is overbroad with respect to the obligations it imposes on Upper Deck's third-party retailers and distributors.  An injunction may only bind nonparties who are "in active concert or participation with" an enjoined party.  Fed. R. Civ. P. 65(d)(2)(C).  Courts in this Circuit have found a non-party to be "in active concert or participation with" an enjoined party where: (1) as a practical matter, the two entities are one and the same; (2) the non-party is controlled and used by the enjoined party as a device to circumvent the Court's orders; (3) the enjoined party is substantially intertwined with the non-party; or (4) it has been shown that a non-party has consciously and actively attempted to assist

the enjoined party in evading an injunction.  *See GMA Accessories, Inc. v. Eminent, Inc.*, No. 07

Civ. 3219, 2008 WL 2355826, at *12-13  (S.D.N.Y. May 29, 2008) (citing cases) (internal

citations and quotation marks omitted).  Thus, unless and until MLBP can show that Upper

Deck's retailers and distributors fall within one of the aforementioned categories, the

enforcement of an injunction against them would be improper.

<u>**CONCLUSION**</u>

For the reasons discussed above, MLBP's application for a temporary restraining order

should be denied in all respects.

DATED:     New York, New York
           February 2, 2010

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP


 /s/ Robert L. Raskopf          
Robert L. Raskopf
Jessica A. Rose
Todd Anten
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email:  robertraskopf@quinnemanuel.com
      jessicarose@quinnemanuel.com
      toddanten@quinnemanuel.com

*Attorneys for Defendant*
*The Upper Deck Company, Inc.*