UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAJOR LEAGUE BASEBALL PROPERTIES, INC., <br><br> Plaintiff, <br><br> -against- <br><br> THE UPPER DECK COMPANY, LLC, <br><br> Defendant. | No. 10 Civ. 0732 (RWS) <br><br> ECF Case |

## DECLARATION OF JASON MASHERAH

I, JASON MASHERAH, pursuant to 28 U.S.C § 1746, declare as follows:

1. I am Director of Sports Brands at The Upper Deck Company, LLC ("Upper Deck LCC"). I submit this declaration in support of Upper Deck LCC's Opposition to Major League Baseball Properties, Inc.'s ("MLBP") Application for a Temporary Restraining Order and Expedited Discovery. I have personal knowledge of the facts set forth herein except where stated to be on information and belief, in which case, I believe those facts to be true.

2. I have been employed by Upper Deck LLC since 2006. Upper Deck LLC is one of several Upper Deck entities within the Upper Deck corporate family (collectively, "Upper Deck"). Currently, my primary responsibilities include overseeing the brand strategies for each of the sports business segments as well as overseeing the brand strategy for each individual product release. As part of my job, I communicate regularly with Upper Deck's sales force.

3. Founded twenty years ago, Upper Deck is in the sports and entertainment publishing business, but perhaps is best known for its sale of collectible products, including

sports trading cards. Upper Deck is well-respected for the caliber of its products and has achieved considerable success over the past two decades.

4. I am aware that MLBP is seeking a temporary restraining order ("TRO") from this Court enjoining Upper Deck LLC, and all those acting in concert or participation with it (including distributors and retailers) from manufacturing, distributing, shipping, advertising, marketing, promoting, selling, or otherwise using certain MLBP trademarks on any products not authorized by MLBP, including: (1) 2009 Signature Stars; (2) 2009 Ultimate Collection; and (3) 2010 Upper Deck Series I. I am aware that the requested TRO would also require Upper Deck LLC to immediately recall these products, and deliver them for destruction.

5. The issuance of the TRO sought by MLBP will result in immediate, severe, long-lasting, and irreparable harm to Upper Deck.

6. Through the course of the baseball season, Upper Deck manufactures and distributes various series of baseball cards. The Signature Stars and Ultimate Collection series are high-end baseball trading card series that are typically released at the end of a season. 2009 Signature Stars was released on January 26, 2010, and 2009 Ultimate Collection was released on January 26, 2010. Series I, which is the first series released for any given season, has historically been Upper Deck's best-selling product of the year. Series I typically accounts for about 10-20 percent of Upper Deck's baseball trading card revenue in a given year. Upper Deck's 2010 Series I was released on February 2, 2010.

7. Upper Deck sells its sports trading cards, including baseball cards, primarily to dealers and distributors. In this context, dealers are purchasers of Upper Deck products to whom Upper Deck sells directly. Distributors are intermediaries that purchase Upper Deck products in large quantities and sell them to dealers. Upper Deck has invested significant work, expense,

energy, time, and effort in creating and cultivating its relationships with dealers and distributors. Upper Deck's success in the marketplace depends on maintaining positive, trustworthy relationships with dealers and distributors, to encourage them to purchase greater quantities of Upper Deck's products in the future and to encourage them to support Upper Deck's products to their customers. A significant number of 2009 Ultimate Collection, 2009 Signature Stars, and 2010 Upper Deck Series I products have already been shipped to dealers and distributors, and either have been sold to consumers or remain in retailers' and distributors' inventory. Upper Deck's valuable business relationships will be seriously compromised if it cannot make good on its promise to dealers and distributors that Upper Deck will reliably deliver high-quality products that can be advertised, promoted, displayed, and sold without worry or concern.

8. If Upper Deck is immediately enjoined from selling its 2009 Signature Stars, 2009 Ultimate Collection, and especially its 2010 Upper Deck Series I series (even if only for a short period of time), the results would be catastrophic to Upper Deck's business enterprise. A TRO will saddle retailers and distributors in possession of cards with products that they are unable to sell; thus, our retailers and distributors will almost certainly seek a full refund for the product they have purchased from us which they can no longer sell. These series have a combined revenue of approximately $10 million, an enormous percentage of which will have to be immediately refunded. This will be an immediate, massive hardship on Upper Deck.

9. The heaviest period of consumer purchase of a newly released series is the time immediately following the series' launch. The day of and day after the launch historically show the heaviest sales, and sales slowly decline as the launch date recedes. A product usually "lives" or "dies" within the first 14 days of release because products (either from Upper Deck or from competitors such as Topps) come out so often – generally, every other week. About 80 percent

of all sports card products are purchased and opened within 60 days of release. By the time even a short-term TRO is lifted, another product will be out and sales of the enjoined products will be impeded. A significant number of purchasers will never return to purchase what they would have purchased had the cards been available when promised. Thus, **any** period of an injunction during the critical introductory weeks of a launch – and especially just days after a launch, as MLBP seeks with relation to 2010 Upper Deck Series I, the industry's second-largest sports product release of the year – would result in lost revenue that can never be regained.

10. Hobby shops depend on the revenue generated by Upper Deck products, particularly its Series I collections. Hobby shops know and expect that the initial days after a series' launch are when sales of that series will be the strongest. Enjoining sales of Upper Deck's products (including 2010 Upper Deck Series I, 2009 Signature Stars, and 2009 Ultimate Collection) in the early stages of a series' launch, even for a short time, will deprive hobby shops of that expected revenue. In the current economic climate, hobby shops are being hit particularly hard and are shutting down at alarming rates. Any loss of expected revenue from a top-selling series will be devastating. While I candidly cannot identify one by name as I have not had the opportunity or inclination to do so, my market experience tells me that it is conceivable that one or more small retailers could go out of business on the heels of a TRO as the restriction on 2010 Series I could be the tipping point in a difficult time for them.

11. Even assuming that Upper Deck is vindicated in this lawsuit, Upper Deck's reputation with these hobby shops will be irreparably damaged because the shops will lose confidence in Upper Deck products and choose not to carry future series in their stores.

12. Enjoining sales of Upper Deck's products (including 2010 Upper Deck Series I and 2009 Signature Stars) likewise will have a negative effect on mass retailers. Upper Deck, for

example, currently has relationships with Wal-Mart and Target stores (which make up the majority of Upper Deck's mass retail business). If Wal-Mart and Target suddenly had to remove 2009 Signature Stars and 2010 Upper Deck Series I from their shelves, Wal-Mart and Target will be faced with unexpected empty shelf space. Mass retailers such as Wal-Mart and Target will not tolerate empty shelf space, and will likely fill the space with competitors' products – most likely, to Topps, which I understand has an exclusive license with MLBP. Even more alarmingly, some mass retailers will choose to carry a reduced amount of sports trading cards or even none at all. The sports trading cards category has been in decline over the past two years, and enjoining the second-largest sports card release and subsequent similar Upper Deck series could lead to the removal of that category altogether at mass retail outlets when the category comes up for review. This would injure not only Upper Deck, but the entire sports trading card industry.

13. In addition, such mass retailers will be wary of doing further business with a company that had its products enjoined. Even if Upper Deck is vindicated, mass retailers would likely choose not to risk possible empty shelf space by entering into business relationships with Upper Deck if they believe that its products, rightly or wrongly, will result in possible legal action. Thus, Upper Deck's reputation with mass retailers will be irreparably damaged because they will lose confidence in Upper Deck products and choose not to carry future series in their stores.

14. Upper Deck would also face severe monetary fines and penalties from Wal-Mart and Target if Upper Deck's products are not available for sale on the promised dates, bringing more immediate financial hardship.

15. A TRO enjoining sales of 2010 Upper Deck Series I cards would result in additional injury because any reduction in sales of 2010 Upper Deck Series I baseball due to a TRO will have a cascading effect upon the rest of Upper Deck's baseball products, as 2010 Series I sets the tone for orders of Upper Deck's remaining 2010 baseball calendar.

16. Finally, a TRO enjoining sales of 2010 Upper Deck Series I, 2009 Signature Stars, and 2009 Ultimate Collection, and future series making use of players in their uniforms will have a "trickle-down" effect, injuring other aspects of Upper Deck's business. For example, Upper Deck's license with the Major League Baseball Players Association, for which it paid significant amounts, would essentially be worthless because Upper Deck would no longer have a viable method of producing baseball trading cards. In addition, if hobby stores and mass retailers have to scramble to fill their empty shelves due to a TRO, their loss of confidence in Upper Deck as a whole would infect Upper Deck's other trading card products, such as hockey, basketball, and football trading cards.

17. Based on the above, Upper Deck's reputation and relationships will suffer overwhelmingly if it is forced to either cancel orders previously made but not fulfilled or to recall sold products from its retailers and distributors. Such a scenario is sure to foster apprehension among Upper Deck's retailers and distributors with respect to ongoing future purchases from Upper Deck, thereby causing substantial, but unquantifiable, reputational harm to Upper Deck. Upper Deck will have no choice but to "make good" with these retailers and distributors in an effort to repair the injury to its goodwill. We estimate that this effort could cost Upper Deck in the neighborhood of 50 percent of its total losses, if not more. In addition, the impact of a TRO will undoubtedly translate into future losses and reputational harm to Upper Deck, the magnitude of which is unquantifiable.

18. The vast majority of consumers of Upper Deck's baseball trading cards consists of hobbyists and card collectors. These consumers are generally sophisticated, familiar with the products and discerning with their purchases. They closely follow the trading card industry. These collectors populating Upper Deck's customer base are generally baseball fans and baseball card "fanatics" who possess a passion for the art of collecting and trading baseball cards. This is true regardless of the purchaser's age. They inspect, collect, and trade cards, and keep their favorites for years. Thus, most consumers or potential consumers of 2009 Ultimate Collection, 2009 Signature Series, and 2010 Upper Deck Series I are savvy, knowledgeable, and sophisticated when it comes to their baseball trading card purchases, and they take their passion very seriously.

19. Upon termination of its license with MLBP, Upper Deck went to great lengths to modify its 2009 Signature Stars, 2009 Ultimate Collection, and 2010 Upper Deck Series I products to distinguish them from earlier licensed product lines. For example, for products sold under the MLBP license:

    a. All product packaging prominently featured the Authentic MLBP Merchandise Hologram;

    b. All products, packaging, and marketing materials featured MLBP's legal language and its logo;

    c. Products prominently featured intentionally-placed team logos, apart from their appearance on clothing worn by players;

    d. Products prominently featured MLBP trademarks in promotions and promotional advertising.

20. However, for products sold after the termination of the MLBP license:

a. Products no longer feature the authentic MLBP Hologram on their packaging, and there is a prominent disclaimer on (1) the outside of each box; (2) the outside of each wrapper; and (3) each individual trading card stating that it is a product "NOT authorized by Major League Baseball or its Member Teams";

b. Cards no longer feature independently-placed team logos; rather, a team logo appears only on the clothing the player wore when photographed;

c. Cards no longer incorporate team colors into the card design;

d. Team names are no longer used in the design of cards, only city names; and

e. Upper Deck no longer features MLBP events such as All-Star Games and the World Series on cards, advertisements, or packaging.

21. True and correct photocopies depicting the packaging and cards for Upper Deck's 2009 Ultimate Collection, 2009 Signature Stars and 2010 Upper Deck Series I are attached hereto as Exhibits A, B and C, respectively.

22. As anyone can see, we have made many changes to our products and the way we market them in order to steer a wide berth around MLBP's trademarks. We did this in good faith. Wherever we are, to whomever we sell, we let our customers know we no longer have a MLBP license, and that we are licensed only by the Players Association. We don't hide from it; we embrace it.

23. The only remnant of MLBP's "marks" on our products is the photo of a player in uniform, in action. We have not modified or altered the marks in any way – they appear exactly as they did on the day the photograph was taken. In order to compete effectively, Upper Deck

must produce cards that depict the players in uniform with high-quality, action photographs; indeed, about 80 percent of Upper Deck's cards feature action-photographs. Throughout history, and long before MLBP started leveraging trading card companies into licensing deals, baseball cards have borne players in uniform. In the modern market, there is no such thing as a baseball player series that does not feature photos of players in their uniforms. A series consisting solely of players not in uniforms would be, at best, a sporadic novelty low-revenue item. This is about Upper Deck's ability to continue to produce player-licensed baseball cards and to compete fairly in the market for such cards against MLBP-licensed cards. If we cannot use the uniforms, we cannot compete and most assuredly there will be only one baseball trading card company – Topps – when the dust settles.

24. MLBP has engaged in pattern of using legal actions to push non-licensees out of the baseball trading card market. I am aware of past instances where MLBP brought legal actions similar to this one against baseball trading card companies such as Pacific and Donruss, and those companies are no longer in business.

25. Upper Deck's distributors and retailers are aware that Upper Deck no longer has a license with MLBP. In addition, Upper Deck's baseball trading card consumers, who I above described as highly discerning and sophisticated consumers, are aware that Upper Deck no longer has a license with MLBP for its baseball trading cards. Everything we read from the trade tells us that the public is keenly aware that our 2010 offerings are NOT licensed by MLBP, such that I am confident that the messages we have conveyed to the public that we have no MLBP license are heard and understood by the consuming public.

26. It is my understanding that MLBP has been communicating with our distributors, directing them to send 2010 products back to Upper Deck before filing this lawsuit. These communications have resulted in some distributors refusing to sell our products.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York this ___ day of February, 2010.

                                                                Jason Masherah